# TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE GREAT AMERICAN FOOD CHAIN, INC. AND | § | |
| EDWARD SIGMOND | § | |
| | § | |
| vs. | § | CIVIL ACTION NO.: 3:14-cv-1727-L |
| | § | |
| ROBERT ANDREOTTOLLA, | § | |
| AMERICAN FRANCHISE CAPITAL, LLC, | § | |
| AND APPLE CENTRAL, LLC | § | |

**DECLARATION OF EDWARD SIGMOND IN SUPPORT OF PLAINTIFFS BRIEF IN RESPONSE
TO DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT
ON ALL CLAIMS AND COUNTERCLAIMS**

Pursuant to 28 U.S.C. § 1746, Edward Sigmond declares as follows:

"I, Edward Sigmond, declare under penalty of perjury that the forgoing is true and correct:

1.  My name is EDWARD SIGMOND.

2.  I am the Chairman of the Board and the Chief Executive Officer of The Great American Food Chain, Inc. ("GAMN").

3.  GAMN is a publicly held restaurant holding company based in Dallas, Texas. GAMN's goal is to develop profitable independent restaurant concepts into multi-unit location on a regional, national, and international level.  GAMN accomplishes this goal by identifying dynamic restaurant concepts around the country and providing the required resources in capital, operational systems and corporate infrastructure to develop their potential.  GAMN will further expand the restaurant into multi-unit locations through corporate owned stores, licensing opportunities, and franchising.

4.      In 2010, GAMN sought to acquire a group of restaurants in Georgia.  During the negotiations with the sellers for the acquisition of these restaurants, the parties addressed only the acquisition of the restaurants.  These negotiations did not include any discussions regarding employees or the roles of employees, including Robert Andreottola ("Andreottola"), who might later work for GAMN.  GAMN acquired these restaurants through an Asset Purchase Agreement executed on February 11, 2011.  A true and correct copy of the Asset Purchase Agreement is attached hereto as Exhibit 1. The Asset Purchase Agreement relates only to GAMN's purchase of the restaurants.

5.      Because the Asset Purchase Agreement did not include any provisions for  hiring employees to work for the newly acquired restaurants in Georgia, GAMN negotiated separate agreements with the corporate officers and employees it hired to work in the restaurants.  The discussions regarding Andreottola's employment with GAMN occurred outside of any negations related to the Asset Purchase Agreement.

6.      Beginning in October 2010, I held numerous conversations with Andreottola regarding GAMN employing Andreottola as GAMN's president and director.   During these conversations, we discussed Andreottola's role in GAMN, as well as his responsibilities and duties.  Some of the essential terms of the employment agreement were Andreottola's (1) roles as president of GAMN and director of GAMN, (2) duties and responsibilities, (3) exclusive employment with GAMN, (4) salary, (5) bonuses, (6) stock options, and (7) termination, among several others.

7.      From October 2011 onward, Andreottola repeatedly stated that he had the experience and desire to serve as GAMN's president and director.  I did not know at the time that

he grossly exaggerated and misrepresented his ability to serve as GAMN's president and director, and his willingness to manage and operate the restaurants for GAMN in Georgia.

8.      Based on these conversations with Andreottola and his acceptance of employment as GAMN's president and director, GAMN executed the Asset Purchase Agreement to acquire the restaurants in Georgia that Andreottola would oversee as GAMN's president and director. Based on these conversations with Andreottola and his acceptance of employment, GAMN sought to obtain funding necessary to purchase the restaurants in Georgia.  Also based on these conversations with Andreottola and subsequent to his acceptance of employment and the completion of the acquisition, I obtained a loan and secured it with my personal guarantee, as well as a parcel of land that had been previously unencumbered.

9.      After GAMN and Andreottola agreed to the terms of the employment agreement, GAMN executed the employment agreement with Andreottola on February 24, 2011.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit 2.   Although Andreottola did not sign this employment agreement, he assumed the roles of president of GAMN and director of GAMN when he began serving as the acting president and director of GAMN in February 2011.

10.     The Employment Agreement required Andreottola to:

a.      Work exclusively for GAMN (Exhibit 2 at GAMN-SIG-00042);

b.      Use his best efforts and abilities faithfully and diligently to promote the business interests of GAMN and its subsidiaries in accordance with all of GAMN's rules, regulations, guides, handbooks, procedures, and policies (Exhibit 2 at GAMN-SIG-00043);

c.      Adhere to the Code of Conduct attached as Exhibit A to the employment agreement  (Exhibit 2 at GAMN-SIG-00042); and

      d.      Not engage in any work that creates a conflict of interest with GAMN's interests (Exhibit 2 at GAMN-SIG-00049).

11.      GAMN's Code of Conduct required Andreottola to do the following:

      a.      Respect GAMN's philosophy of mutual trust, honesty, and integrity in all affairs, both internally and externally  (Exhibit 2 at GAMN-SIG-00052);

      b.      Avoid concealment of any information  (Exhibit 2 at GAMN-SIG-00052);

      c.      Avoid any conflict of interest of any nature that compromise the ability to act objectively and in the best interest of GAMN  (Exhibit 2 at GAMN-SIG-00052);

      d.      Have all business expenses approved by the Chairman of the Compensation Committee of the Board of Directors  (Exhibit 2 at GAMN-SIG-00053);

      e.      Carefully observe expense account regulations and guidelines (Exhibit 2 at GAMN-SIG-00053); and

      f.      Immediately disclose all situations that possess a potential for conflict of interest (Exhibit 2 at GAMN-SIG-00054).

12.      Also in February 2011, GAMN acquired Amici Enterprises, LLC ("Amici"). As a condition of this acquisition, Andreottola became the president of Amici.  In this capacity, Andreottola was responsible for day-to-day operations and oversight of policies for Amici.  As the chief executive officer of GAMN, Andreottola reported directly to me.

13.      Andreottola's role as GAMN's president required him to perform due diligence on any new concepts for acquisition, hold responsibility for creating budgets and act as the chief operating officer for the company.  As GAMN's president, Andreottola was solely responsible for supervising and directing all of the business affairs of the company.  Andreottola was the only person who could perform these functions.

14.     During Andreottola's tenure as director and president, GAMN had three (3) directors: Andreottola, Mike Torino ("Torino"), who was the vice president of Amici, and me. As a director of GAMN, Andreottola was responsible for attending regularly scheduled board meetings, at which decisions were made regarding business decisions integral to GAMN's success and providing oversight to all of GAMN's company activities.   Andreottola served as GAMN's president and director from February 2011 to July 2012.   During Andreottola's tenure with GAMN, I did not have direct control over any payment policies for employees.

15.     In exchange for Andreottola's service as GAMN's president and director, GAMN compensated Andreottola with a salary, bonuses, and an option for shares of stock.   In June 2011, Andreottola requested and received an increase in his salary from $60,000.00 to $75,000.00, in accordance with the terms of his employment agreement with GAMN.

16.     After Andreottola began serving as GAMN's president and director, Andreottola continued to state that he was committed to working with GAMN and the Amici restaurants, and growing the business.

17.     GAMN's bylaws required Andreottola, as a corporate officer, to submit his resignation to GAMN's board of directors or GAMN's secretary.   A true and correct copy of the GAMN's Amended Bylaws is attached hereto as Exhibit 3. GAMN's policies also required Andreottola to work exclusively for GAMN.

18.     I spoke with Torino and Andreottola and asked that they each provide me with an austerity plan that would guide the companies in a profitable direction.   In March 2012, Torino submitted a proposal to adjust salary wages of corporate personnel for GAMN and Amici.   This proposal would defer these wages for a minimum period of thirty (30) days.   The primary

corporate personnel affected by this deferment were Andreottola, Chris Torino, who was Amici's vice president of brand development, and Tom Greene, who was Amici's vice president of operations. As the President of GAMN and Amici, Andreottola would have had to approve this proposal before it could go into effect.

19.     In April 2012, I secured outside financing from La Jolla Cove in an effort to bring additional working capital to GAMN. I discussed obtaining the outside financing and with Andreottola. Ja Jolla Cove required that I secure the loan with personal assets. I secured the loan with two pieces of property owned by my family owned corporation. These two parcels had no other encumbrances on them. I advised Andreottola of my intent to obtain the loan from La Jolla Cove with the personal guarantee. Andreottola never mentioned to me his plan to leave GAMN. Had he done so, I would not have agreed to personally guarantee the loan or provide the property as collateral for the loan from La Jolla Cove.

20.     On or about May 2012, GAMN discovered that Andreottola was seeking employment with American Franchise Capital, LLC and Apple Central, LLC (collectively referred to as "AFC"). Much like GAMN, AFC provides the required resources in capital, operational systems and corporate infrastructure to develop the potential of restaurant franchises. In June 2012, GAMN realized that Andreottola already accepted employment with AFC while still engaged as GAMN's president and director. GAMN came to this realization after reading a press release issued by DineEquity, Inc., the seller of the restaurants to AFC. A true and correct copy of the Press Release is attached hereto as Exhibit 4.

21.     On May 25, 2012, I proposed an austerity plan that involved budget adjustment, additional cash flow allocation and a plan for a corporate restructure. Torino's position as vice

president of Amici would be terminated and he would assume the role of a consultant to handle specific tasks at an hourly or ½ day rate; at Andreottola's discretion, either Chris Torino or Tom Greene would be terminated and Andreottola would remain responsible for the day-to-day operations and profitability of the franchises.

22.     On June 1, 2012, I received an austerity plan proposed by Torino and Andreottola, collaboratively.  This plan involved the reduction in salary of employees at the corporate and franchise levels, with the exclusion of Torino, as well as the departure of Andreottola from GAMN and Amici.

23.     As a response, I recommended that Torino be terminated, that Tom Greene assume the roles and responsibility of Torino and that Andreottola remain in his position as president of Amici and president and director of GAMN.   Andreottola ignored this recommendation and continued collaborating with Torino on matters vital to the success and prosperity of the companies.

24.     Because I did not have control over employee compensation, I did not authorize Andreottola's salary to be withheld for any period of time.   Additionally, I never asked Andreottola to work for GAMN without pay.  As the president of GAMN, any decisions related to Andreottola's employment, salary or hours worked would have to be approved by Andreottola himself.

25.     I disagree with Andreottola's assertions regarding expense reports in paragraph 6 of his Affidavit.  I did not see, and was not apprised of, any expense reports or reimbursement requests that he submitted to GAMN until September 2013.  Corporate policy requires that expense reports be submitted on a monthly basis.  The reports I received were for several past

months.  Further, corporate policy is that reimbursement requests be submitted in accordance with Internal Revenue Service guidelines. These guidelines require supporting documentation in order for compensation to be received.  The requests I received were not timely made and did not have any supporting documentation. A true and correct copy of the reimbursement requests are attached hereto as Exhibit 5.

26.    Based upon my review of GAMN's accounting records and discussions with the accounting department, I disagree with Andreottola's assertion that GAMN owes him $8,653.86 ($7,086.42 after deduction of withholding, FICA and Medicare payments.)

27.    I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my personal knowledge."

Executed on the __16th__ day of _____December_____, 2015.


_____
**EDWARD SIGMOND**

EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("***Agreement***") is entered into on this 23rd day of February, 2011, by and between Amici Enterprises, LLC, a Texas limited liability company ("***Enterprises***"), Madison GA Acquisitions, LLC, a Georgia limited liability company ("***MAC***"), Covington Acquisitions, LLC, a Georgia limited liability company ("***CAC***"), Amici Franchising, LLC, a Texas limited liability company ("***AFLLC***"), and Amici Restaurants, Inc., a Georgia corporation ("***ARI***"), Amici Pizza Co., Inc., a Georgia corporation ("***APC***"), and Amici Franchising, LLC, a Georgia limited liability company ("***Franchising***").

For purposes of this Agreement: *(i)* Enterprises, MAC, CAC, and AFLLC may be referred to interchangeably or collectively as "***Buyer***"; *(ii)* ARI, APC, and Franchising may be referred to collectively as "***Sellers***"; *(iii)* Buyer and Sellers may be referred to individually as a "***Party***", and *(iv)* Buyer and Sellers may be referred to collectively as the "***Parties***."

## RECITALS

**WHEREAS,** ARI owns and operates a full service, family-style Italian restaurant offering a variety of pizzas, pastas, wings, salads, and sandwiches, located at 113 South Main Street, Madison, Georgia (the "***Madison Restaurant***");

**WHEREAS,** APC owns and operates a full service, family-style Italian restaurant offering a variety of pizzas, pastas, wings, salads, and sandwiches, located at 1116 College, Covington, Georgia (the "***Covington Restaurant***");

**WHEREAS,** Franchising owns certain assets related to the operation and franchising of AMICI ITALIAN CAFÉ restaurants (the "***Franchise Operations***");

**WHEREAS,** ARI desires to sell assets used in connection with the operation of the Madison Restaurant, APC desires to sell assets used in connection with the operation of the Covington Restaurant, and Franchising desires to sell assets used in connection with the Franchise Operations, and Buyer desires to purchase such assets, all in accordance with the terms and conditions of this Agreement;

**WHEREAS,** contemporaneous with closing the transactions contemplated by this Agreement, Sellers' affiliate, AFG Partners, LLC ("***AFG Partners***"), is contributing to Enterprises, in exchange for an equity interest in Enterprises, all tangible and intangible property used in connection with the Franchise Operations pursuant to a Contribution Agreement between AFG Partners and Enterprises (the "***Contribution Agreement***") and, contemporaneous with such contribution, AFG Partners is entering into the Amici Enterprises, LLC Operating Agreement (the "***Amici Enterprises Operating Agreement***");

**NOW THEREFORE,** in consideration of the mutual premises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## I.    SALE AND PURCHASE OF ASSETS

1.1    **Sale of Assets of Madison Restaurant.** With respect to the Madison Restaurant, the term "Assets" means and includes the following Assets, more specifically described in **Schedule 1.1**:

(a)    Sellers' interest in all leasehold improvements and fixtures of the Madison Restaurant;

(b)    All furniture, equipment, computer hardware and software, and signage used in connection with the Madison Restaurant business and/or located at the Madison Restaurant premises;

(c) All smallwares, and inventory and supplies on-hand at the Madison Restaurant premises at Closing (defined below);

(d) Sellers' interest in the Madison Restaurant real estate lease, including security deposit;

(e) Sellers' interest in any liquor license or other permit(s) required for the sale of alcoholic beverages at the Madison Restaurant;

(f) All books and records of Sellers relating to the Madison Restaurant (including vendor documentation);

(g) Permits and licenses applicable to the operation of the Madison Restaurant (to the extent that they are assignable);

(h) Prepaid expenses; and

(i) Sellers' interest in the telephone number(s) used in connection with the Madison Restaurant.

1.2 **Sale of Assets of Covington Restaurant**. With respect to the Covington Restaurant, the term "Assets" means and includes the following Assets, more specifically described in **Schedule 1.1**:

(a) Sellers' interest in all leasehold improvements and fixtures of the Covington Restaurant;

(b) All furniture, equipment, and computer hardware and software used in connection with the Covington Restaurant business and/or located at the Covington Restaurant premises;

(c) All smallwares, and inventory and supplies on-hand at the Covington Restaurant premises at Closing;

(d) Sellers' interest in any liquor license or other permit(s) required for the sale of alcoholic beverages at the Covington Restaurant;

(e) All books and records of Sellers relating to the Covington Restaurant (including vendor documentation);

(f) Permits and licenses applicable to the operation of the Covington Restaurant (to the extent that they are assignable);

(g) Prepaid expenses; and

(h) Sellers' interest in the telephone number(s) used in connection with the Covington Restaurant.

1.3 **Sale of Assets of Franchise Operations**. With respect to Franchise Operations, the term "Assets" means and includes the Franchising's interest, if any, in the following Assets:

(a) Franchising's interest in any and all rights and registrations relating to all trademarks relating to the AMICI ITALIAN CAFÉ system;

(b) Franchising's interest in any and all copyrights and copyrighted works relating to the AMICI ITALIAN CAFÉ system including, without limitation, web site design and content, menu and menu board design and content, and operations and training manuals design and content;

(c) Franchising's interest in any and all trade secrets relating to the AMICI

ITALIAN CAFÉ system, including recipes and preparation techniques; and

(d) Franchising's interest in any and all other intangible property rights relating to the AMICI ITALIAN CAFÉ system.

1.4 **Assets Not Included in Sale.** The sale contemplated under this Agreement does not include cash on hand, accounts receivable, utility deposits, prepayment of all taxes or fees, including but not limited to personal property taxes (but not including federal income taxes). The sale contemplated under this Agreement also does not include any assets used in connection with the operation of an AMICI ITALIAN CAFÉ Restaurant located at 116 N. Broad Street, Monroe, Georgia 30655 (the "***Monroe Restaurant***"), which will continue to operate after Closing pursuant to a license on terms to be negotiated between the owner of the Monroe Restaurant and Amici Enterprises.

1.5 **Prorations.** If Closing occurs in the middle of a billing period, all water charges, sewer, rents and other charges under the Madison real property lease, real property taxes, personal property taxes, utility charges and similar assessments and fees arising out of or related to the operation of the Madison Restaurant, Covington Restaurant, or Franchise Operation in the ordinary course shall be prorated between Sellers and Buyer as of the Closing date ("***Prorated Expenses***"). Sellers and Buyer shall, subsequent to Closing, cooperate with respect to the calculation of the Prorated Expenses and make any required payments to each other.

## II.   ENCUMBERED ASSETS

2.1 **Sale and Purchase of Assets**. Subject to the terms and conditions of this Agreement, Sellers agree to sell to Buyer at Closing, and Buyer agrees to purchase from Sellers at Closing, all of Sellers' right, title, and interest in and to the Assets pursuant to the terms and conditions of this Agreement.

2.2. **Encumbrances and Permitted Encumbrances of Assets.** Except as shown on **Schedule 2.1.**, and/or as described in Section 4.3., Sellers shall convey to Buyer title to the Assets at Closing free and clear of any liabilities, levies, claims, charges, taxes, assessments, mortgages, security interests, liens, *lis pendens,* pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions or other encumbrances or agreements.

## III.   PURCHASE PRICE FOR ASSETS

3.1 **Purchase Price.** In consideration of the sale and transfer as provided in Section 1 herein, Buyer agrees to pay the total purchase of $864,293.00 ("***Purchase Price***"), allocated to the Sellers as follows:

(a) $185,954.00 for the Assets relating to operation of the Madison Restaurant ("***Madison Purchase Price***");

(b) $338,376.00 for the Assets relating to operation of the Covington Restaurant ("***Covington Purchase Price***"); and

(c) $339,963.00 for the Assets relating to the Franchising Operations ("***Franchising Purchase Price***").

3.2 **Payment of Purchase Price.**

(a) The Madison Purchase Price shall be payable as follows: delivery of a promissory note in the principal amount of $185,954.00, in the form and containing the terms set forth in ***Exhibit D-1*** (the "***Madison Note***").

(b) The Covington Purchase Price shall be payable as follows: delivery of a

promissory note in the principal amount of $338,376.00, in the form and containing the terms set forth in ***Exhibit E-1*** (the "***Covington Note***").

(c)     The Franchising Purchase Price shall be payable as follows: $103,715.00 in good and immediate funds on or before March 7, 2011 (which Buyer may extend, at its option, for a period not to exceed 15 calendar days), and delivery of a promissory note in the principal amount of $236,248.00, in the form and containing the terms set forth in ***Exhibit F-1*** (the "***Franchising Note***"); provided that all amounts due Magnolia State Bank (in the approximate amount of $30,000) shall be paid from the settlement proceeds at Closing.

3.3.     **Allocation of Purchase Price**. The Purchase Price shall be allocated for all purposes in the manner set forth in Schedule 3.3.

3.4.     **Adjustment to Purchase Price for Inventory**. A complete physical inventory of the Madison Restaurant and Covington Restaurant ("***Inventory***") shall be conducted by Sellers and Buyer immediately following the Closing or such other time as mutually agreed by Sellers and Buyer. The Inventory shall be valued at Sellers' cost including applicable freight costs ("***Inventory Value***"). If Inventory Value at the Madison Restaurant and Covington Restaurant combined is less than $10,000, then the Purchase Price shall be decreased by an amount equal to the amount that the combined Inventory Value is less than $10,000. The reduction in the Purchase Price shall be applied against the cash due at Closing. If Inventory Value at the Madison Restaurant and Covington Restaurant exceeds $10,000 (the "***Excess Amount***"), and if Buyer elects to purchase the Excess Amount, then the Purchase Price shall be increased by an amount equal to the Excess Amount. The increase in the Purchase Price shall be paid in cash within 30 days after Closing.

## IV.     ASSUMPTION OF REAL ESTATE LEASES AND MATERIAL CONTRACTS AND OTHER LIABILITIES

### 4.1.     **Real Property Lease.**

4.1.1.     Sellers warrant to Buyer that ARI is the Lessee or Tenant, in good standing, under an oral or implied lease for the Madison Restaurant and that APC is the Lessee or Tenant, in good standing, under the written lease for the Covington Restaurant. A copy of the Covington lease agreement (the "***Covington Lease***") is attached hereto and made part hereof as **Schedule 4.1.** The Covington Lease grants APC the sole and exclusive use and possession of the location upon which the Covington Restaurant is located. Sellers hereby agree to sublease to CAC their rights under the Covington Lease according to the Sublease attached as **Exhibit B-2**. Sellers represent to Buyer that the Sublease has been approved by the Covington Lease landlord, without any personal guaranty required on the part of Buyer.

4.1.2.     To the extent that the Landlord conditions its consent to the assignment of the Madison lease or sublease of the Covington lease on delivery or reaffirmation of a personal guaranty by Michael Torino, Christian Torino, and/or APC, Michael Torino, Christian Torino, and/or APC shall deliver or reaffirm (as applicable) such personal guaranty. No extension of a personal guaranty shall be made, however, unless *(a)* required by the landlord, *(b)* guaranteed also by a principal of MAC or CAC, as applicable, and *(c)* such guaranty does not extend beyond expiration of Michael Torino's or Christian Torino's employment agreement, as applicable.

4.2.     **Franchise Agreements.** Sellers warrant to Buyer that Franchising is the Franchisor, in good standing, under the Franchise Agreements described in **Schedule 4.2.** A copy of the Franchise Agreement for each franchised restaurant is attached hereto and made part hereof as **Schedule 4.2.** Sellers hereby agree to transfer and assign their entire interests in the Franchise Agreements including all rights

and benefits as franchisor thereunder to Buyer according to the Assignment and Assumption of Franchise Agreements attached as **_Exhibit C-2_**.

4.3. **No Assumption of Liabilities** Except for the Franchise Agreements as set forth in Assignment and Assumption of Franchise Agreements and assignment of Seller's interest under the oral or implied lease for the Madison Restaurant, Buyer assumes no liabilities, debts, or other obligations of any Seller. Specifically, but without limiting the generality of the foregoing, Buyer assumes no liability for real estate taxes, ad valorem taxes, sales taxes, or other taxes, payroll obligations, debts, or liabilities of any Seller, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise. Sellers agree to satisfy and discharge as the same shall become due all obligations and liabilities of the Sellers not specifically assumed by the Buyer hereunder, and to indemnify Buyer from and against all such obligation and liabilities. Buyer also specifically assumes no liability for amounts due (estimated to be approximately $9,500) to Bank of Madison by ARI or amounts due (estimated to be approximately $118,000) to Bank of Madison by APC. Sellers shall timely pay and discharge all liabilities as and when due.

## V.    CLOSING

5.1. **Closing.** The consummation of the transactions contemplated by and described in this Agreement (the "**Closing**") shall take place on or before March 1, 2011 (the "**Closing Date**"). Any party may extend the Closing date for a period not to exceed thirty (30) days. If Closing does not occur by April 1, 2011, this Agreement will be null and void.

5.2. **Obligations of Sellers at Closing.** At the Closing, and unless otherwise waived in writing by the Buyer:

      (a)    Sellers shall deliver to Buyer a fully executed, general bill of sale for all of the Assets in the forms attached as **Exhibit A-1**, **Exhibit B-2**, and **Exhibit C-1**.

      (b)    Each Seller shall deliver to Buyer a resolution duly adopted by each of Seller's shareholders and directors authorizing the sale of all or substantially all of the Seller's assets and authorizing the transaction contemplated by this Agreement;

      (c)    Each Seller shall deliver to Buyer a certificate of existence and good standing from the Secretary of the State of Georgia, dated the most recent practical date prior to Closing;

      (d)    APC shall deliver to Buyer a fully signed Sublease for the Covington Restaurant location in the form attached as **Exhibit B-2**;

      (e)    ARI and APC shall deliver to Buyer all documents necessary to effect a transfer of the liquor license for the Madison Restaurant and Covington Restaurant locations;

      (f)    Franchising shall deliver to Buyer a fully executed Assignment and Assumption of Franchise Agreements in the form attached as **Exhibit C-2**; and

      (g)    Sellers shall deliver to Buyer such other instruments and documents as Buyer reasonably deems necessary to effect the transactions contemplated by this Agreement.

5.3. **Obligations of Buyer at Closing.** At Closing and unless otherwise waived in writing by Seller, Buyer shall deliver to Seller:

      (a)    Promissory Notes in the forms of **Exhibit D-1**, **Exhibit E-1**, and **Exhibit F-1**;

(b)     Security Agreements in the forms of **Exhibit D-2** and **Exhibit E-2**;

(c)     Sublease for the Covington Restaurant location in the form attached as **Exhibit B-2**;

(d)     All documents necessary to effect a transfer of the liquor license for the Madison Restaurant and Covington Restaurant locations;

(e)     A fully executed Assignment and Assumption of Franchise Agreements in the form attached as **Exhibit C-2**; and

(f)     Such other instruments and documents as Sellers reasonably deem necessary to effect the transactions contemplated by this Agreement.

5.4     **Pre-Closing Conditions.**   Notwithstanding anything to the contrary herein, it is a condition precedent to Closing that AFG Partners, LLC and anyone else with an interest in any intellectual property relating to the operation or franchising of AMICI ITALIAN CAFÉ Restaurants (including the mark AMICI ITALIAN CAFÉ and Registration No. 3408018, the content and design of the web site presently located at www.amici-cafe.com, the domain name www.amici-cafe.com, and all recipes, including all wing sauce recipes) has contributed such interests to Amici Enterprises, LLC according to the terms of the Contribution Agreement, so that Amici Enterprises, LLC owns all right, title and interest in and to such intellectual property.

## VI.     REPRESENTATIONS AND WARRANTIES OF SELLER

Sellers make the following representations and warranties to Buyer:

6.1     **Access By Buyer; Representation of 2010 EBITDA and Franchise Receipts.**   Sellers have provided Buyer access to, review of and/or copies of all documents, contracts, financial audits, records, data, and reports, requested by the Buyer, relating to and used in connection with the businesses to be acquired under this Agreement.  Sellers further represent to Buyer that, for tax year 2010, Earnings Before Interest, Taxes, and Depreciation (calculated on a cash basis) ("***EBITDA***") for ARI, exclusive of general administrative expenses, was $77,170.00; and EBITDA for APC, exclusive of general administrative expenses, was $140,424.00. Sellers further represent to Buyer that, for tax year 2010, Franchising collected from its franchisees $141,082.00 in royalty fees.  Buyer shall have the right, at its option and expense, to audit and inspect all financial records of Sellers for tax year 2010 to determine the accuracy of these representations. If the results of such audit or inspection reveal that EBITDA for ARI or APC, or franchise royalty revenue collected by Franchising, was less than the represented amounts, Buyer shall have the right to reduce the total Purchase Price by an amount equal to the total discrepancy multiplied by 3.5. Such amount shall be deducted from the principal balance initially due under the Madison Note, the Covington Note, and/or the Franchising Note, in such proportions as Buyer deems advisable, and all payments made under the adjusted Promissory Notes shall be re-applied to principal and interest consistent with such adjustment.

6.2     **Organizational Capacity.**   ARI and APC are corporations duly organized, validly existing and in good standing under the laws of the State of Georgia, and there is no other jurisdiction in which the ownership, use or leasing of ARI's or APC's assets or properties, or the conduct or nature of their businesses, makes licensing, qualification, or admission in another state necessary to Buyer as of the date of Closing.  Franchising is a limited liability company organized, validly existing and in good standing under the laws of the State of Georgia, and there is no other jurisdiction in which the ownership, use or leasing of Franchising's assets or properties, or the conduct or nature of its business, makes licensing, qualification or admission in another state necessary to Buyer as of the date of Closing.

6.3     **Corporate Powers, Consents, Absence of Conflicts with Other Agreements, Etc.** The

execution, delivery and performance of this Agreement by Sellers, and all other agreements referenced in or ancillary hereto and relating to the transactions contemplated by this Agreement to which any Seller is a party, and the consummation of the transactions contemplated herein by such Seller:

      (a)     will be duly and validly authorized, executed and delivered on behalf of the respective Seller;

      (b)     are within the respective Seller's corporate powers, are not in contravention of law or of the terms of its articles or certificate of incorporation and bylaws;

      (c)     do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement;

      (d)     do not conflict, result in any breach or contravention of, or permit the acceleration of the maturity of any of the respective Seller's liabilities, and do not create or permit the creation of any encumbrance on or affecting any of the Assets;

      (e)     do not violate any statute, law, rule or regulation of any governmental authority to which the respective Seller or the Assets may be subject, which in each case would not have a material adverse effect on the business of any Seller taken as a whole (a "***Material Adverse Effect***");

      (f)     do not violate any judgment, consent decrees or injunctions to which the respective Seller may be subject; and

      (g)     do not conflict with or result in a breach or violation of any agreement to which the respective Seller is a party or is bound.

This Agreement, and all agreements hereunder to which any Seller becomes a party, are valid and legally binding obligations of the respective Seller, enforceable against the respective Seller in accordance with the respective terms hereof or thereof, except as enforceability against the respective Seller may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditor's rights generally and except as enforceability may be subject to general principles of equity.

      6.4    **Limited Disclaimer of Warranties.**  The physical condition of the Assets will be sold by Sellers and purchased by Buyer in their present condition at Closing. Seller makes no warranties not expressly stated herein. **ALL OTHER WARRANTIES—EXPRESS OR IMPLIED—ARE HEREBY WAIVED.**

      6.5    **Employees and Employee Relations.**

      (a)    **Schedule 6.5,** attached hereto, sets forth a complete list as of the date hereof; of the names, positions, current annual salaries or wage rates, and bonus and other compensation arrangements of all full-time and part-time employees of the Sellers.

      (b)    There is no pending or, to Seller's knowledge, any threatened employee lawsuit against the Seller. ("***Knowledge***", "***to the knowledge of***", "***known***" or words or phrases of like import used in this Agreement mean the actual knowledge of the individual or entity making the representation after having made reasonable inquiry or the knowledge of awareness that a prudent person in such individual's position should have after making a reasonable inquiry.)

      (c)    To each Seller's knowledge, each Seller is in compliance in all material respects with all federal and state laws respecting employment and employment practices, terms and conditions of employment, and wages and hours. To each Seller's knowledge, no Seller is engaged in any unfair labor practices. To Sellers' knowledge, there are no pending or threatened EEOC, wage and hour, unemployment compensation, worker's compensation or similar claims against any Seller or against the

Madison Restaurant or the Covington Restaurant.

(d)     All persons employed by ARI, APC, or Franchising at the Closing Date were at-will employees with no stated term of employment remaining beyond the Closing Date.

6.6     **Taxes.** As used herein, the term "*__Tax__*" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, stamp, sales, use, transfer, registration, value added, alternative or add-on minimum, transactions privilege tax, estimated, tax, assessment, charge, levy or fee of any kind whatsoever, including any interest or penalties thereon and additions thereof; which are due or alleged to be due to any taxing authority, whether disputed or not; "*__Tax Return__*" means any federal, state or local return, declaration, report, claim for refund, information return or statement, including any schedule or attachment thereof and amendments relating to Taxes; and "*__Affiliated Group__*" means any affiliated group within the meaning of IRS Code Sec. 1504 or any similar group defined under a similar provision of state, local or foreign law.

(a)     Each Seller has filed all Tax Returns required to be filed and all such Tax Returns are correct and complete in all material respects; each Seller has duly paid all Taxes; no Seller is currently the beneficiary of any extension of time within which to file any Tax Return; no claim has ever been made by a taxing authority in a jurisdiction where any Seller does not file Tax Returns that it is or may be subject to Tax by that jurisdiction; and there are no encumbrances on any of the Assets of any Seller that arose in connection with any failure (or alleged failure) to pay any Tax;

(b)     Each Seller has withheld proper and accurate amounts from its employees' compensation in full and complete compliance with all withholding and similar provisions of the IRS Code and any and all other applicable laws, and has withheld and paid, or caused to be withheld and paid, all Taxes on monies paid by the Seller to independent contractors, creditors, stockholders, partners and other Person for which withholding or payment is required by law;

(c)     No taxing authority intends to assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax liability of any Seller either claimed or raised by any authority in writing, or as to which any Seller has notice or knowledge based upon personal contact with any agent of such authority; Sellers have provided to Buyer access to all requested Tax information.

(d)     There is not currently in effect any waiver of a statute of limitations in respect of Taxes by any Seller or any agreement to extend the time with respect to a Tax assessment or deficiency.

6.7     **Litigation or Proceedings.** There is no litigation, arbitration, or other proceedings with respect to the Madison Restaurant, the Covington Restaurant, the Franchise Operations, or any business or operations of any Seller. No Seller is in default in any material respect under any judgment of any court, arbitration tribunal or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located. There are no claims, actions, suits, proceedings or investigations pending, or to Seller's knowledge, threatened against or affecting any Seller or in connection with any Seller's business, at law or in equity, before or by any court, arbitration tribunal, federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality wherever located.

6.8 **Hazardous Materials.** There are no Assets in violation of any federal, state or local law, ordinance of regulation relating to Hazardous Materials (defined as any toxic, dangerous, or other regulated waste, substance or product, chemical or pollutants of any kind and other waste material, substance, chemical, pollutant, or contaminant the presence or emission of which is prohibited by or may give rise to liability under any laws ordinance, statutes, codes, rules, regulations, orders or decrees under federal, state or local law). To Seller's knowledge there is and has been no presence of Hazardous Materials at, on or under the Restaurant that currently requires remediation. No Seller has any notice of any formal or informal assertion by any governmental or regulatory agency or other person that any Seller or any predecessor business, operator, land owner, or occupant of the Madison Restaurant or the Covington Restaurant may be a potentially responsible party in connection with any Hazardous Material treatment, storage or disposal at either restaurant or in connection with the operation of either restaurant prior to Closing. No Seller has any knowledge of any pending or threatened claims or any reasonable basis for damages by any person or any governmental or regulatory authority against any Seller under any environmental law in connection with either restaurant or the operation of either restaurant prior to Closing. No Seller has any knowledge of any pending or threatened claims or any reasonable basis for damages by any person or any governmental or regulatory authority against any Seller under any environmental law in connection with either restaurant or the operation of either restaurant prior to Closing. No claim, lien or other encumbrance has been or is imposed on any of the Assets or either restaurant under any environmental laws. Each Seller has obtained all permits, licenses, registrations, identification numbers, and other approvals and authorization, and has made all reports and notifications required under any environmental laws in connection with the Assets and the restaurants.

6.9 **Licenses.** Except for the oral trademark licenses between Franchising and ARI and APC, the oral trademark license governing the operation of the Monroe Restaurant, and the written Franchise Agreements between Franchising and its franchisees, no third party presently has been granted any right or license to use the mark AMICI ITALIAN CAFÉ or any derivative thereof. The Parties acknowledge and agree that AFG Partners own a recipe for wing sauce (which recipe will be contributed to Enterprises under the Contribution Agreement) and may in the future desire to manufacture and distribute the wing sauce under the AMICI brand. In such event, Buyer agrees to grant to AFG Partners a perpetual, royalty-free license to use the AMICI trademark in connection with the wing sauce upon such terms mutually agreed to by the parties. Such license agreement may, at Buyer's election, include a restriction against distribution of the wing sauce to restaurants.

## VII. REPRESENTATIONS AND WARRANTIES OF THE BUYER

Buyer represents and warrants to Seller the following:

7.1 **Corporate Capacity.** Enterprises and AFLLC are and will be at Closing duly organized and validly existing in good standing under the laws of the State of Texas. Enterprises and AFLLC have the requisite power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its businesses as now being conducted.

7.2 **Corporate Powers, Consents, Absence of Conflicts With Other Agreements. Etc.** The execution, delivery and performance of this Agreement by Buyer and all other agreements referenced in or ancillary hereof to which Buyer is a party and the consummation of the transactions contemplated herein by Buyer:

(a)  will be duly and validly authorized, executed and delivered on behalf of Buyer;

(b)  are within Buyer's corporate powers, are not in contravention of law or of the terms of its articles or certificate of incorporation and bylaws;

(c)  do not require any approval or consent of, or filing with, any governmental

agency or authority bearing on the validity of this Agreement.

(d)    do not violate any statute, law, rule or regulation of any governmental authority to which Buyer may be subject and which may have an effect on the business contemplated under this Agreement subsequent to Closing;

(e)    do not violate any judgment, consent decrees or injunctions to which Buyer may be subject, which would have a Material Adverse Effect on Buyer.

7.3    **Binding Effect.** This Agreement and all other agreements to which Buyer becomes a party hereunder are valid and legally binding obligations of Buyer, enforceable against Buyer in accordance with the respective terms hereof and thereof; except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

## VIII. COVENANTS AND GUARANTY OF SELLERS

8.1    **Board of Director's Approvals.** As of the Closing Date, each Seller's Board of Directors shall have authorized this Agreement and the transaction contemplated herein and therein and each Seller's Secretary or Assistant Secretary shall have delivered to Buyer, within such time frame, a certified copy of the resolution of its Board of Directors to such effect.

8.2    **Adverse Actions After Closing.** No Seller shall take, or fail to take, any action after Closing that would render Seller unable to perform its post-Closing obligations, including Buyer's lease obligations, under this Agreement.

8.3    **Further Acts and Assurances.** At any time and from time to time at and after the Closing, upon request of Buyer, each Seller shall, without cost to Seller, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Buyer may reasonably request to carry out the provisions of this Agreement.

8.4    **Covenant Not to Compete.** For a period of two (2) years from the Closing date, Sellers and their principals, Michael Torino and Christian Torino, and their affiliate, AFG Partners, LLC, shall not directly or indirectly own any legal or beneficial interest in, manage, operate or provide consulting services for any restaurant offering pizza or wings as a menu item within the State of Georgia. For purposes of construing and enforcing this provision, the parties stipulate that the Madison Restaurant and Covington Restaurant draw a significant portion of their respective customer bases from areas exceeding a two (2) mile radius from the restaurant location. For a period of two (2) years from the Closing date, Sellers and their principals, Michael Torino and Christian Torino, and their affiliate, AFG Partners, LLC, shall not directly or indirectly own any legal or beneficial interest in, manage, operate or provide consulting services for any company that franchises the operation of any type of business with headquarters or company-owned or franchised locations in the State of Georgia. This two (2) year period will be tolled during any period of noncompliance.

8.5.    **Guaranty of Financial Performance.** Sellers represent to Buyer that franchise royalty fees payable and actually collected by Buyer under the four Franchise Agreements being assigned hereunder will equal or exceed $120,000 during calendar year 2011 (pro-rated as of the Closing date) and $120,000 during calendar year 2012. If franchise royalty fees payable and actually collected by Buyer during calendar year 2011 or 2012 are less than these amounts (regardless of the reason for the deficiency including if the deficiency resulted from a restaurant closure or relocation), Sellers shall be liable to Buyer in an amount equal to the actual deficiency multiplied by 3.5. The obligations of Sellers under this paragraph are joint and several. Buyer has the right to set-off the aggregate amount of such liability against payments due under the Madison Note, the Covington Note, and the Franchising Note (see

Section 3.3.), in such proportions as Buyer determines appropriate, in its sole discretion. Such set-off amount will be applied to reduce the initial Principal Balance due under the applicable note, and past and future payments of principal and interest will be adjusted accordingly.

## IX. COVENANTS OF BUYER

9.1. **Adverse Actions After Closing.** Buyer shall not take, or fail to take, any action after the Closing that would render Buyer unable to perform its post-Closing obligations under this Agreement.

9.2. **Further Acts and Assurances.** At any time and from time to time at and after the Closing, upon request of Seller, Buyer shall, without cost to Buyer, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Sellers may reasonably request to carry out the provisions of this Agreement.

## X. ADDITIONAL AGREEMENTS

10.1 **Post-Closing Maintenance of and Access to Information.** Seller and Buyer acknowledge that after Closing each party may need access to information or documents in the control or possession of the other Party for the purposes of concluding the transactions herein contemplated. Accordingly, each Party shall keep, preserve and maintain in the ordinary course of business, and as required by law and relevant insurance carriers, all books, records (including student records), documents and other information in the possession or control of such Party and relevant to the foregoing purposes at least until the expiration of any applicable statute of limitations or extensions thereof. Each Party shall cooperate fully with, and make available for inspection and copying by, the other Party, its employees, agents, counsel and accountants or governmental agencies, upon written request and at the expense of the requesting Party, such books, records documents and other information to the extent reasonably necessary to facilitate the foregoing purposes.

## XI. INDEMNIFICATION AND OTHER RELIEF

11.1 **Indemnification by Sellers.** Subject to and only to the extent provided in this Section 11.1, from and after the Closing, Sellers shall indemnify, defend and hold harmless Buyer after the Closing from and against any claims, demands, suits, judgments, and losses made against, incurred, or suffered by Buyer directly or indirectly, for the period prior to the Closing and/or as a result of or arising from:

      (a)    the breach of any representation or warranty of Sellers contained herein; or

      (b)    the nonfulfillment of any covenant, agreement or other obligation of Sellers set forth in this Agreement or any agreement, instrument, certificate or other document signed by the Parties and delivered or to be delivered pursuant to this Agreement; or

      (c)    any act or omission relating to the offer or sale of any franchise by Franchising, or claims arising out of or related to Franchising's performance or alleged failure to perform under any Franchise Agreement, including claims subject to indemnification under the Assignment and Assumption of Franchise Agreements,

The obligations of Sellers under this paragraph are joint and several.

11.2 **Indemnification by Buyer.** Subject to and only to the extent provided in this Section 11.2, from and after the Closing, Buyer shall indemnify, defend and hold harmless Seller, after the Closing, from and against any claims, demands, suits, judgments, and losses made against, incurred, or suffered by Seller directly or indirectly, for the period following the Closing and/or as a result of or

arising from:

    (a)    the breach of any representation or warranty of Buyer contained herein; or

    (b)    the nonfulfillment of any covenant, agreement or other obligation of Buyer set
           forth in this Agreement or any agreement, instrument, certificate or other
           document signed by the Parties and delivered or to be delivered pursuant to this
           Agreement.

       11.3    **Survival of Representations and Warranties; Indemnity Period.**  Notwithstanding
any right of Buyer (whether or not exercised) to investigate the affairs of Sellers, or any right of any Party
(whether or not exercised) to investigate the accuracy of the representations and warranties of the other
Party contained in this Agreement, Sellers have, on the one hand, and Buyer has, on the other hand, the
right to rely fully upon the representations, warranties, covenants and agreements of the other contained
in this Agreement. The representations and warranties respectively made by Sellers, on the one hand, and
Buyer, on the other hand, in this Agreement or in any certificate respectively delivered by Sellers or
Buyer will survive the Closing for twenty-four (24) months after the Closing.

       11.4    **Claims for Indemnification.**  Whenever any claim shall arise for indemnification
hereunder the party seeking indemnification (the "***Indemnified Party***"), shall promptly notify the party
from whom indemnification is sought (the "***Indemnifying Party***") of the claim and, when unknown, the
facts constituting the basis for such claim. In the event of any such claim for indemnification hereunder
resulting from or in connection with any claim or legal proceedings by a third-party, the notice to the
Indemnifying Party shall specify, if known, the amount or an estimate of the amount of the liability
arising therefrom. The Indemnified Party shall not settle or compromise any claim by a third party for
which it is entitled to indemnification hereunder without the prior written consent of the Indemnifying
Party, which shall not be unreasonably withheld, unless suit shall have been instituted against it. No party
may agree to equitable relief against the other party without such other party's written consent, given in
its sole discretion.

       11.5    **Defense by Indemnifying Party.**  In connection with any claim giving rise to indemnity
hereunder resulting from or arising out of any claim or legal proceeding by a person who is not a party to
this Agreement, the Indemnifying Party at its sole cost and expense may, upon written notice to the
Indemnified Party, assume the defense of any such claim or legal proceeding if it acknowledges to the
Indemnified Party in writing its obligations to indemnify the Indemnified Party with respect to all
elements of such claim. The Indemnified Party shall be entitled to participate in (but not control) the
defense of any such action, with its counsel and at its own expense. If the Indemnifying Party does not
assume the defense of any such claim or litigation resulting therefrom within 30 days after the date notice
of such claim is made, (a) the Indemnified Party may defend against such claim or litigation, in such
manner as it may deem appropriate, including, but not limited to, settling such claim or litigation, after
giving notice of the same to the Indemnifying Party, on such terms as the Indemnified Party may deem
appropriate, and (b) the Indemnifying Party shall be entitled to participate in (but not control) the defense
of such action, with its counsel at its own expense. If the Indemnifying Party thereafter seeks to question
the manner in which the Indemnified Party defended such third party claim or the amount or nature of any
such settlement, the Indemnifying Party shall have the burden to prove by a preponderance of the
evidence that the Indemnified Party did not defend or settle such third party claim in a reasonably prudent
manner.

       11.6    **Payment of Indemnification Obligation**.  All indemnification by the Buyer or the
Sellers hereunder shall be effected by payment of cash or delivery of a cashier's or certified check in the
amount of the indemnification liability. With respect to indemnification claims against Sellers (or any of
them), Buyer, at its option, shall have the right to offset the amount of such liability against payments due

under the Madison Note, the Covington Note, and/or the Franchising Note, as Buyer elects in its sole discretion.

## XII.   GENERAL PROVISIONS

12.1    **Schedules.** The Schedules and Exhibits attached to this Agreement are incorporated by reference herein.

12.2    **Time of Essence.** Time is of the essence in the performance of this Agreement. This Section may not be waived except in a writing signed by the Parties expressly referring hereof.

12.3    **Consents, Approvals and Discretion.** Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party or any party must or may exercise discretion, such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

12.4    **Expenses; Legal Fees and Costs.** Except as otherwise expressly set forth in this Agreement, all expenses of the preparation of this Agreement and of the purchase of the Assets, including counsel fees, accounting fees, brokerage or finder fees and commissions, investment advisor's fees and disbursements, shall be paid or accrued by the party incurring such expense, whether or not such transactions are consummated.

12.5    **Choice of Law, Jurisdiction, and Forum Selection.** This Agreement (including its Schedules and Exhibits, except as otherwise expressly provided therein) and the parties relationship created hereby is governed by Texas law, without regard to conflicts of laws principles. This Agreement shall be performed in Dallas County, Texas and shall be governed by and construed in accordance with the laws of the State of Texas and the County of Dallas, Texas. Any dispute arising out of this Agreement (including any Schedule or Exhibit to this Agreement, except as otherwise expressly provided therein), the Contribution Agreement, or Amici Enterprises Operating Agreement, shall be brought and prosecuted exclusively in a state or federal court situated in Dallas County, Texas. The Parties irrevocably consent to the personal jurisdiction of these courts, and waive all questions of personal and subject matter jurisdiction or venue for the purpose of carrying out this provision. Notwithstanding the foregoing, Buyer may bring an action for injunctive relief to enforce the noncompete provisions contained in Section 8.4. in any court of competent jurisdiction.

12.6    **Benefit/Assignment.** Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided that no party may assign this Agreement or any part hereof; or delegate any duty or obligation to be performed hereunder, to another Person without the prior written consent of the other party.

12.7    **No Third Party Beneficiary.** The terms and provisions of this Agreement are intended solely for the benefit of Buyer and its designees and Seller and its respective successors or assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

12.8    **No Waiver.** The waiver by either party of a breach or violation by another party of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach or violation of the same, or a breach or violation of any other provision hereof. All remedies, either under this Agreement, or by law or otherwise afforded, will be cumulative and not alternative.

12.9    **Notices.** Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by facsimile or other electronic means, when confirmed as delivered by courier, or the date of receipt as confirmed by the United States Postal Service, in any event addressed as follows:

**Sellers:**     Amici Restaurants, Inc.
520 East Ave.
Madison, Georgia 30650
Attention: Michael Torino

**with a copy to:** Eric Krasle, Esquire
425 N. Lumpkin St #210
Athens, Georgia 30601

**Buyer:**     Great American Food Chain, Inc.
2808 Cole Avenue
Dallas, Texas 75204
Attention: Ed Sigmond, President

**with copy to:**     Cheryl L. Mullin
Mullin Law, PC
2425 N. Central Expressway, Suite 200
Richardson, Texas 75080

or to such other address or number, or to the attention of such other Person, as any party may designate, at any time, in writing in conformity with these notice provisions.

12.10  **Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of Buyer or Sellers under this Agreement will not be materially and adversely affected thereby, such provision will be fully severable, this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as is possible.

12.11  **Gender and Number.** Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

12.12  **Entire Agreement/Amendment.** This Agreement and its Schedules and Exhibits supersedes all previous agreements, negotiations, representations or contracts and constitutes the entire agreement of whatsoever kind or nature existing between or among the Parties representing the within subject matter and no Party shall be entitled to benefits other than those specified herein. As between or among the Parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect. The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations and agreements contained in this Agreement and no others. All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded unless and until made in writing and signed by the Parties. The representations and warranties set forth in this Agreement shall survive the Closing and remain in full force and effect, and shall survive the execution and delivery of this Agreement. This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Agreement may not be amended or otherwise modified except in a writing duly executed by the Parties.

12.13  **Drafting.** No provision of this Agreement shall be interpreted for or against any party

hereof on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof; and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

12.14 **Transfer and Sales Tax.** Buyer agrees to pay and shall indemnify Seller in respect of, and hold Seller harmless against, all sales, use, value added, goods and services, transfer or similar taxes, if any, arising out of the transactions contemplated by this Agreement, as well as any interest or penalties owing in connection therewith.

12.15. **Joint and Several Obligations of Sellers**. The obligations of Sellers under this Agreement are joint and several.

## XIII. SIGNATURES OF PARTIES; EXECUTION DATE

IN WITNESS HEREOF, the Parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date and year first written above.

**SELLERS:**

AMICI RESTAURANTS, INC.
a Georgia corporation

By: _____
Name: _____MIKE TORINO_____
Title: _____CEO_____

AMICI PIZZA CO., INC.
a Georgia corporation

By: _____
Name: _____MIKE TORINO_____
Title: _____CEO_____

AMICI FRANCHISING, LLC
a Georgia limited liability company

By: _____
Name: _____MIKE TORINO_____
Title: _____CEO_____

**BUYER:**

AMICI ENTERPRISES, LLC
a Texas limited liability company

By: _____
Name: _____Edward Sigmond_____
Title: _____CEO_____

AMICI FRANCHISING, LLC
a Texas limited liability company

By: _____
Name: _____
Title: _____

MADISON GA ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Name: _____
Title: _____

COVINGTON ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Name: _____
Title: _____

The undersigned principals and affiliates of Sellers hereby agree to be personally bound by and to comply with the Covenant Not to Compete as set forth in paragraph 8.4. of this Agreement. The undersigned further bind themselves to the choice of law, jurisdiction, and forum selection provisions contained in Section 12.5., and irrevocably consent to the personal jurisdiction of the state and federal courts situated in Dallas County, Texas, and waive all questions of personal and subject matter jurisdiction or venue for the purpose of carrying out this provision. The undersigned further acknowledge and agree that, notwithstanding the foregoing, Buyer may bring an action for injunctive relief to enforce the noncompete provisions contained in Section 8.5. in any court of competent jurisdiction. The undersigned further consent to and agree to be bound by the choice of law, jurisdiction, and forum selection provisions as described in Section 12.5. of this Agreement.

_____
Michael Torino, Individually

_____
Christian Torino, Individually

AFG Partners, LLC

By: _____
Michael Torino, President

Schedule 1.1 – Assets

## ASSET SCHEDULE                                            MADISON

| # | Location | Description | QTY | U/M | Make | Model # | Serial # | Asset Tag No. | Date of Acqui. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | Water Heater | 2 | ea. | whirlpool | | | | |
| 2 | | Signs | 2 | ea. | | | | | |
| 3 | k | Hand Sinks 20'x20" | 4 | ea. | n/a | n/a | n/a | | |
| 4 | k | Ice Maker | 1 | ea. | manitow | ser.600 | | | |
| 5 | | Satelitte Receiver | 2 | ea. | n/a | n/a | n/a | | |
| 6 | rtc | 6 eye oven/stove | 1 | ea. | Imperial | | | | |
| 7 | k | Grill – Flattop | 1 | ea. | Anvil | FTA 9022 | 1153 | | |
| 8 | o | POS System: Includes, 1 Server, 3 terminals,3 printers, software | 1 | ea. | n/a | n/a | n/a | | |
| 9 | rtc | slide top beer cooler | 1 | ea. | TRUE | | | | |
| 10 | D | Radio Receiver | 1 | ea. | n/a | n/a | n/a | | |
| 11 | K | Custom  Bar | 1 | ea. | | | | | |
| 12 | K | Tea Urns | 3 | ea. | n/a | 8799 | 101802 | | |
| 13 | K | Wine Glasses | 36 | ea. | n/a | n/a | n/a | | |
| 14 | K | BeerCooler | 1 | ea. | TRUE | n/a | n/a | | |
| 15 | K | Coffee Maker | 1 | ea. | n/a | CWT – 15 | 1575 | | |
| 16 | K | Coffeer Mugs | 22 | ea. | n/a | n/a | n/a | | |
| 17 | K | Coke Glasses | 75 | ea. | n/a | n/a | n/a | | |
| 18 | rtc | stand-up freezer | 1 | ea. | | | | | |
| 19 | rtc | PA System | 1 | ea. | | | | | |
| 20 | D | Fire Extingusher | 2 | ea. | n/a | n/a | SM998437 | | |
| 21 | D | Bar Stools | 14 | ea. | n/a | n/a | n/a | | |
| 22 | k | 2 door food fridge | 1 | ea. | TRUE | | | | |
| 23 | D | CD Player | 1 | ea. | n/a | n/a | n/a | | |
| 24 | B | Coke Guns | 2 | ea. | n/a | n/a | n/a | | |
| 25 | B | CO2 Compressor | 1 | ea. | n/a | n/a | n/a | | |

| 26 | K | SS Prep Table – 2'X2' | 2 | ea. | | | | | |
| 27 | K | 4 door veggie fridge | 1 | ea. | mccall | | | | |
| 28 | rtc | Televisions | 1 | ea. | sony | | | | |
| 29 | D | Televisions HD | 1 | ea. | sony | n/a | n/a | | |
| 30 | D | TV Mounts | 1 | ea. | n/a | n/a | n/a | | |
| 31 | D | Tables – 2 tops | 10 | ea. | n/a | n/a | n/a | | |
| 32 | D | Tables – 4 tops | 12 | ea. | n/a | n/a | n/a | | |
| 33 | D | Tables- 6 top | 1 | ea. | n/a | n/a | n/a | | |
| 34 | D | Tables- round | 3 | ea. | | | | | |
| 35 | D | Dining Room Chairs | 45 | ea. | n/a | n/a | n/a | | |
| 36 | D | Ceiling Fans | 4 | ea. | n/a | n/a | n/a | | |
| 37 | D | Booths | 6 | ea. | n/a | n/a | n/a | | |
| 38 | D | Speakers | 4 | ea. | n/a | n/a | n/a | | |
| 39 | D | Hanging Lights | 7 | ea. | n/a | n/a | n/a | | |
| 40 | F | Awning | 1 | ea. | | | | | |
| 41 | rtc | metal back chairs | 36 | ea. | | | | | |
| 42 | F | Chairs – Patio | 12 | ea. | n/a | n/a | n/a | | |
| 43 | F | Tables – Patio | 3 | ea. | n/a | n/a | n/a | | |
| 44 | K | Appetizer Plates | 78 | ea. | Crestware | | | | |
| 45 | K | Pizza Pans – 16" | 15 | ea. | | | | | |
| 46 | K | Pizza Pans – 14" | 27 | ea. | | | | | |
| 47 | K | Pizza Pans – 10" | 40 | ea. | | | | | |
| 48 | K | Pizza Screens – 14" | 20 | ea. | | | | | |
| 49 | K | Pizza Screens – 10" | 25 | ea. | | | | | |
| 48 | K | Pizza Screens – 16" | 15 | ea. | | | | | |
| 49 | K | Mixing Bowl – Lg | 3 | ea. | | | | | |
| 50 | K | Mary Warmer – 3 Comp. | 1 | ea. | Nemco | 6055A 19A | M02 | | |
| 51 | K | Industrial Can Opener | 1 | ea. | Edlund | | | | |
| 52 | K | assorted kitchen utensils | | | | | | | |
| 53 | K | Pans – 1/3 Metal | 5 | ea. | Cambro | | | | |
| 54 | K | Mixing Bowl – Sm | 5 | ea. | | | | | |

| 55 | K | SS Prep Table – 6' | 1 | ea. | | | | | |
| 56 | K | SS Prep Table – 5' | 2 | ea. | | | | | |
| 57 | K | WOOD  Prep Table – 5' | 1 | ea. | Sani Safe | Std 2 | 20000542 | | |
| 58 | K | Boiling Pot – Lg | 3 | ea. | | | | | |
| 59 | K | Timer (Electronic) | 1 | ea. | Cooper | | | | |
| 60 | K | box freezers | 3 | ea. | whirlpool | | | | |
| 61 | K | Refrigerator – Upright | 1 | ea. | n/a | n/a | n/a | | |
| 62 | K | Pizza Screens – 18" | 10 | ea. | | | | | |
| 63 | K | 3 comp sink | 1 | | | | | | |
| 64 | rtc | Small Cooler | 1 | ea. | TRUE | | | | |
| 65 | K | Sheet Pans | 5 | ea. | | | | | |
| 66 | K | Salad Bowls | 25 | ea. | | | | | |
| 67 | K | Fryer | 1 | ea. | Imperial | | | | |
| 68 | K | Dough Trays | 22 | ea. | | | | | |
| 69 | K | Hobart  Mixer | 1 | ea. | Hobart | p-660 | 1684951 | | |
| 70 | K | Hotel Pan - ½ – Plastic | 2 | ea. | Cambro | | | | |
| 71 | K | Hotel Pan - ½ – Metal | 2 | ea. | | | | | |
| 72 | K | 2 eye stock burner | 1 | ea. | | | | | |
| 73 | K | Collander | 2 | ea. | | | | | |
| 74 | K | Burner – 4 Eye | 1 | ea. | Royal | RHP 36-6 | 239904 | | |
| 75 | K | Brick Oven | 2 | ea. | Blodget | 6000.00 | | | |
| 76 | K | Dishwashing Machine | 1 | ea. | n/a | n/a | n/a | | |
| 77 | K | Line freezer | 1 | ea. | Frigidaire | | | | |
| 78 | K | Dinner Plates | 80 | ea. | Homer | | | | |
| 79 | K | Hotel Pan -full– Metal | 2 | ea. | | | | | |
| 82 | K | Ice  Bin | 1 | ea. | Scottsmann | BH900E | 711849-09Z | | |
| 83 | O | Dunnage racks | 6 | ea. | | | | | |
| 84 | K | 1/6th pan lids | 40 | ea. | Cambro | | | | |
| 85 | K | DELI Slicer | 1 | ea. | berkel | 827-E | 29238 | | |
| 86 | K | Scale – 32 oz. | 1 | ea. | Pelouze | 832 RD | n/a | | |
| 87 | K | Cutting Board – Small | 2 | ea. | | | | | |

| 88 | K | Salad spinner | 1 | ea. | | | | | |
| 89 | K | Cutting Board – Large | 2 | ea. | | | | | |
| 90 | K | neon signs | 4 | ea. | | | | | |
| 91 | K | A.C. units | 2 | ea. | | | | | |
| 92 | K | phone systems | 4 | ea. | uniden | | | | |
| 93 | K | Sandwich Prep Table 72" | 1 | ea. | TRUE | | | | |
| 94 | K | SS. Equipmetn table | 1 | ea. | | | | | |
| 95 | K | high chairs | 4 | ea. | | | | | |
| 96 | K | Can Rack | 1 | ea. | n/a | n/a | n/a | | |
| 97 | K | 1 door table fridge | 1 | ea. | | | | | |
| 98 | K | Warmer – 7 qt. | 1 | ea. | Vollrath | HS – 7 | | | |
| 99 | rtc | 4 comp. sink | 1 | ea. | | | | | |
| 100 | K | Pasta Pot | 1 | ea. | | | | | |
| 101 | K | Pizza Peels | 3 | ea. | | | | | |
| 102 | K | Hotel Pan – Deep Plastic | 1 | ea. | Cambro | | | | |
| 103 | K | Hotel Pan – Shallow | 1 | ea. | Cambro | | | | |
| 104 | K | Pans – 1/6 Plastic | 60 | ea. | Cambro | | | | |
| 105 | K | Hand blender | 1 | ea. | GE | | | | |
| 106 | K | Pizza prep table 96" | 1 | ea. | TRUE | | | | |
| 107 | K | Pizza Spatula's | 25 | ea. | | | | | |
| 108 | K | Scale – 25 lb. | 1 | ea. | Pelouze | YG425R | | | |
| 109 | K | Metro Shelves | 12 | ea. | | | | | |
| 110 | K | Microwave – 1200 W | 1 | ea. | Sharp | | | | |
| 111 | K | Scale  - 2 lb. | 1 | ea. | Crestwx | | | | |
| 112 | K | Saute Pans | 12 | ea. | | | | | |
| 113 | K | Plastic Shelves – White | 6 | ea. | | | | | |
| 114 | rtc | Refrigerator | 1 | ea. | Frigidaire | FFU14C3W7 | W840969433 | | |
| 115 | rtc | salamander broiler | 1 | ea. | Imperial | | | | |
| 116 | K | Containers – 4 qt. | 10 | ea. | Cambro | | | | |
| 117 | K | Pans – 1/6 Metal | 25 | ea. | | | | | |

| 118 | K | Containers – 2 qt. | 12 | ea. | Cambro | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 119 | K | Pans – 1/3 Plastic | 6 | ea. | | | | | |
| 120 | O | Printer | 1 | ea. | n/a | n/a | n/a | | |
| 121 | O | Fax machine | 1 | ea. | n/a | n/a | n/a | | |
| 122 | O | File Cabinet | 1 | ea. | n/a | n/a | n/a | | |
| 123 | O | office desk | 1 | ea. | | | | | |
| 124 | O | Security camera system | 1 | ea. | | | | | |

**ASSET SCHEDULE**                                    **COV**

| # | Location | Description | QTY | U/M | Make | Model # | Serial # | Asset Tag No. |
|---|----------|-------------|-----|-----|------|---------|----------|---------------|
| 1 | B | Water Heater | 1 | ea. | n/a | EIEZ5US | 04081893.. | |
| 2 | B | Back Bar Stools | 6 | ea. | n/a | n/a | n/a | |
| 3 | B | Hand Sink | 1 | ea. | n/a | n/a | n/a | |
| 4 | B | Red Wine Glasses | 21 | ea. | n/a | n/a | n/a | |
| 5 | B | Satelitte Receiver | 2 | ea. | n/a | n/a | n/a | |
| 6 | B | Keg Cooler – 3 tap | 1 | ea. | n/a | n/a | n/a | |
| 7 | B | Keg Cooler – 5 tap | 1 | ea. | n/a | n/a | n/a | |
| 8 | B | POS System: Includes, 1 Server, 3 terminals,3 printers, software | 1 | ea. | n/a | n/a | n/a | |
| 9 | B | Wione Chiller | 1 | ea. | n/a | n/a | n/a | |
| 10 | B | XM Radio | 1 | ea. | n/a | n/a | n/a | |
| 11 | B | Custom Front Bar | 1 | ea. | | | | |
| 12 | B | Tea Urns | 3 | ea. | n/a | 8799 | 101802 | |
| 13 | B | White Wine Glasses | 36 | ea. | n/a | n/a | n/a | |
| 14 | B | BeerCooler | 1 | ea. | n/a | n/a | n/a | |
| 15 | B | Coffee Maker | 1 | ea. | n/a | CWT – 15 | 1575 | |
| 16 | B | Coffeer Mugs | 22 | ea. | n/a | n/a | n/a | |
| 17 | B | Coke Glasses | 115 | ea. | n/a | n/a | n/a | |
| 18 | B | BeerCooler | 1 | ea. | n/a | 44779V | n/a | |
| 19 | B | Carafes | 4 | ea. | n/a | n/a | n/a | |
| 20 | B | Fire Extingusher | 1 | ea. | n/a | n/a | SM998437 | |
| 21 | B | Front Bar Stools | 14 | ea. | n/a | n/a | n/a | |
| 22 | B | Glass boards | 2 | ea. | n/a | n/a | n/a | |
| 23 | B | CD Player | 1 | ea. | n/a | n/a | n/a | |
| 24 | B | Coke Guns | 2 | ea. | n/a | n/a | n/a | |
| 25 | B | Wine Chillers | 3 | ea. | n/a | n/a | n/a | |
| 26 | B | CokeCompressor | 1 | ea. | n/a | n/a | n/a | |

| 27 | BB | CO2 Compressor | 1 | ea. | n/a | n/a | n/a | |
|----|----|----|----|----|----|----|----|----|
| 28 | BB | Fire Extingusher | 1 | ea. | n/a | n/a | n/a | |
| 29 | D | Televisions | 3 | ea. | n/a | n/a | n/a | |
| 30 | D | Train | 1 | ea. | n/a | n/a | n/a | |
| 31 | D | TV Mounts | 3 | ea. | n/a | n/a | n/a | |
| 32 | D | Tables – 2 tops | 12 | ea. | n/a | n/a | n/a | |
| 33 | D | Tables – 4 tops | 8 | ea. | n/a | n/a | n/a | |
| 34 | D | Hand Sink | 1 | ea. | n/a | n/a | CS4265092 | |
| 35 | D | Dining Room Chairs | 55 | ea. | n/a | n/a | n/a | |
| 36 | D | Ceiling Fans | 6 | ea. | n/a | n/a | n/a | |
| 37 | D | Booths | 4 | ea. | n/a | n/a | n/a | |
| 38 | D | Speakers | 6 | ea. | n/a | n/a | n/a | |
| 39 | D | Hanging Lights | 14 | ea. | n/a | n/a | n/a | |
| 40 | F | Awning | 1 | ea. | | | | |
| 41 | F | Iron Railing | 1 | ea. | | | | |
| 42 | F | Chairs – Patio | 8 | ea. | n/a | n/a | n/a | |
| 43 | F | Tables – Patio | 4 | ea. | n/a | n/a | n/a | |
| 44 | K | Appetizer Plates | 78 | ea. | Crestware | | | |
| 45 | K | Pizza Pans – 16" | 15 | ea. | | | | |
| 46 | K | Pizza Pans – 14" | 27 | ea. | | | | |
| 47 | K | Pizza Pans – 10" | 40 | ea. | | | | |
| 48 | K | Pizza Screens – 14" | 20 | ea. | | | | |
| 49 | K | Pizza Screens – 10" | 25 | ea. | | | | |
| 48 | K | Pizza Pans – 18" | 3 | ea. | | | | |
| 49 | K | Mixing Bowl – Lg | 3 | ea. | | | | |
| 50 | K | Mary Warmer – 3 Comp. | 1 | ea. | Nemco | 6055A 19A | M02 | |
| 51 | K | Industrial Can Opener | 1 | ea. | Edlund | | | |
| 52 | K | Pasta Pot | 1 | ea. | | | | |
| 53 | K | Pans – 1/3 Metal | 5 | ea. | Cambro | | | |
| 54 | K | Mixing Bowl – Sm | 5 | ea. | | | | |
| 55 | K | SS Prep Table – 6' | 1 | ea. | | | | |

| 56 | K | SS Prep Table – 5' | 1 | ea. | | | | |
|----|---|--------------------|---|-----|-----------|----------|-------------|---|
| 57 | K | SS Prep Table – 5' | 2 | ea. | Sani Safe | Std 2 | 20000542 | |
| 58 | K | Boiling Pot – Lg | 2 | ea. | | | | |
| 59 | K | Timer (Electronic) | 1 | ea. | Cooper | | | |
| 60 | K | SS Prep Table – 8' | 2 | ea. | Load King | PT 3072-3 | 1357026 | |
| 61 | K | Refrigerator – Upright | 1 | ea. | n/a | n/a | n/a | |
| 62 | K | Pizza Screens – 18" | 10 | ea. | | | | |
| 63 | K | Pizza Screens – 16" | 15 | ea. | | | | |
| 64 | K | Small Cooler | 1 | ea. | Beverage-Aire | | | |
| 65 | K | Sheet Pans | 5 | ea. | | | | |
| 66 | K | Salad Bowls | 50 | ea. | | | | |
| 67 | K | Fryer – Large | 1 | ea. | Frymaster | MJCFSD | 0006HA0068 | |
| 68 | K | Dough Trays | 22 | ea. | | | | |
| 69 | K | Dough Mixer | 1 | ea. | Hobart | L-800 | 1684951 | |
| 70 | K | Hotel Pan - ½ – Plastic | 2 | ea. | Cambro | | | |
| 71 | K | Hotel Pan - ½ – Metal | 2 | ea. | | | | |
| 72 | K | Fryer – Small | 1 | ea. | Dean | SR42GNS | 0402MA0860 | |
| 73 | K | Collander | 2 | ea. | | | | |
| 74 | K | Burner – 6 Eye | 1 | ea. | Royal | RHP 36-6 | 239904 | |
| 75 | K | Brick Oven | 4 | ea. | Blodget | | | |
| 76 | K | Dishwashing Machine | 1 | ea. | n/a | n/a | n/a | |
| 77 | K | Cooler – dessert | 1 | ea. | Everage Aire | | | |
| 78 | K | Dinner Plates | 80 | ea. | Homer | | | |
| 79 | K | Hotel Pan – Metal | 2 | ea. | | | | |
| 82 | K | Ice Collector Box | 1 | ea. | Scottsman | BH900E | 711849-09Z | |
| 83 | K | Spoons – Wooden | 5 | ea. | | | | |
| 84 | K | Square Tops | 40 | ea. | Cambro | | | |
| 85 | K | Meat Slicer | 1 | ea. | Anvil | SLR 7312 | 3702 | |
| 86 | K | Scale – 32 oz. | 1 | ea. | Pelouze | 832 RD | n/a | |
| 87 | K | Cutting Board – Small | 1 | ea. | | | | |
| 88 | K | Sign | 1 | ea. | | | | |

| 89 | K | Cutting Board – Large | 2 | ea. | | | | |
| 90 | K | Spatula's – Plastic | 5 | ea. | Crestware | | | |
| 91 | K | Meat Mallet | 2 | ea. | | | | |
| 92 | K | Whisks – Small | 3 | ea. | | | | |
| 93 | K | Sandwich Prep Table 72" | 1 | ea. | | | | |
| 94 | K | Equipmetn Stand | 1 | ea. | | | | |
| 95 | K | Ice Maker | 1 | ea. | Scottsman | CME506A | 757029-11E | |
| 96 | K | Can Rack | 1 | ea. | n/a | n/a | n/a | |
| 97 | K | Walk-In Cooler Freezer | 1 | ea. | | | | |
| 98 | K | Warmer – 7 qt. | 1 | ea. | Vollrath | HS – 7 | | |
| 99 | K | Whisks – Large | 1 | ea. | | | | |
| 100 | K | Pasta Pot | 1 | ea. | | | | |
| 101 | K | Pizza Peels | 2 | ea. | | | | |
| 102 | K | Hotel Pan – Deep Plastic | 1 | ea. | Cambro | | | |
| 103 | K | Hotel Pan – Shallow | 1 | ea. | Cambro | | | |
| 104 | K | Pans – 1/6 Plastic | 60 | ea. | Cambro | | | |
| 105 | K | Hand blender | 1 | ea. | GE | | | |
| 106 | K | Grill – Flattop | 1 | ea. | Anvil | FTA 9022 | 1153 | |
| 107 | K | Pizza Spatula's | 25 | ea. | | | | |
| 108 | K | Scale – 25 lb. | 1 | ea. | Pelouze | YG425R | 120000000243 | |
| 109 | K | Metro Shelves | 12 | ea. | | | | |
| 110 | K | Microwave – 1200 W | 1 | ea. | Sharp | | | |
| 111 | K | Scale  - 2 lb. | 1 | ea. | Crestwx | | | |
| 112 | K | Saute Pans | 12 | ea. | | | | |
| 113 | K | Plastic Shelves – White | 6 | ea. | | | | |
| 114 | K | Refrigerator | 1 | ea. | Frigidaire | FFU14C3W7 | W840969433 | |
| 115 | K | Hot Water Heater | 2 | ea. | | | | |
| 116 | K | Containers – 4 qt. | 10 | ea. | Cambro | | | |
| 117 | K | Pans – 1/6 Metal | 25 | ea. | | | | |
| 118 | K | Containers – 2 qt. | 12 | ea. | Cambro | | | |

| 119 | K | Pans – 1/3 Plastic | 6 | ea. | | | | |
| 120 | O | Printer | 1 | ea. | n/a | n/a | n/a | |
| 121 | O | Fax machine | 1 | ea. | n/a | n/a | n/a | |
| 122 | O | File Cabinet | 1 | ea. | n/a | n/a | n/a | |
| 123 | O | Security Camera System | 1 | ea. | lease | n/a | n/a | |
| 124 | O | Host Stand | 1 | ea. | n/a | n/a | n/a | |
| 125 | O | Produce Sink | 1 | ea. | n/a | n/a | n/a | |
| 126 | O | 3 Compartment sink | 1 | ea. | n/a | n/a | n/a | |
| 127 | K | | | | | | | |
| 128 | K | | | | | | | |
| 129 | K | | | | | | | |
| 130 | K | | | | | | | |
| 131 | K | | | | | | | |
| 132 | K | | | | | | | |
| 133 | K | | | | | **TOTAL** | | |

**Schedule 2.1 – Encumbrances**

**Bank of Madison #551192920:    Balance: $9267.49 (interest rate: 8.75%), secured by assets of Madison Restaurant.**

**Bank of Madison #51192029: Balance: $95,481.60. 19 (interest rate: 8.75%), secured by assets of Covington Restaurant.  Monthly payments of $2,726 with balloon payment due on July 31, 2012.**

**Magnolia State Bank, approximately $30,000 principal due, secured by pledge or assignment of Amici Franchising franchise agreements.  To be paid off with settlement funds at Closing.**

**Schedule 3.3. – Allocation of Purchase Price**

Schedule 4.1. – Real Property Leases

Lease dated June 24, 2003, by and between RDF Properties, Inc., as Landlord, and Amici Pizza Co., Inc., as tenant.

**Schedule 4.2. – Franchise Agreements**

Franchise Agreement dated April 25, 2007, between Amici Franchising, LLC as franchisor and A.K. Gulati, as franchisee

Franchise Agreement dated February 11, 2008, between Amici Franchising, LLC as franchisor and Romano Lakes Country Foods, LLC, as franchisee

Franchise Agreement dated December 30, 2008, between Amici Franchising, LLC as franchisor and Joiner & Ewing, LLC as franchisee

Franchise Agreement dated June 15, 2010, between Amici Franchising, LLC as franchisor and Bearphat, LLC as franchisee

**Schedule 6.5.- Employees**

**EXHIBIT A**
**TRANSFER DOCUMENTS**
**MADISON RESTAURANT**

## Exhibit A-1

### BILL OF SALE – MADISON RESTAURANT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Amici Restaurants, Inc., a Georgia corporation ("**SELLER**") hereby sells, transfers, and conveys to Madison GA Acquisitions, LLC, a Georgia limited liability company ("**BUYER**"), all of SELLER's rights, title, and interest and to the following personal property:

All of the assets described in a certain Asset Purchase Agreement entered into between SELLER and BUYER related to the operation of an AMICI ITALIAN CAFÉ located at 113 S. Main Street, Madison, Georgia ("***Madison Restaurant***") and, more specifically, the following:

(a)     Sellers' interest in all leasehold improvements and fixtures;

(b)     All furniture, equipment, computer hardware and software, and signage used in connection with the Madison Restaurant business and/or located at the Madison Restaurant;

(c)     All smallwares, and inventory and supplies on-hand at the Madison Restaurant premises at Closing (defined below);

(d)     Sellers' interest in the Madison Restaurant real estate lease, including security deposit;

(e)     Sellers' interest in any liquor license or other permit(s) required for the sale of alcoholic beverages at the Madison Restaurant location;

(f)     All books and records of Sellers relating to the Madison Restaurant (including vendor documentation);

(g)     Permits and licenses applicable to the operation of the Madison Restaurant (to the extent that they are assignable);

(h)     Prepaid expenses; and

(i)     Sellers' interest in the telephone number(s) used in connection with the Madison Restaurant.

SELLER warrants that SELLER is the sole owner of the Assets being conveyed and that it has full rights and authority to sell them.

SELLER warrants that the Assets are being conveyed free and clear of all liens and encumbrances, and further warrants that SELLER shall fully defend, protect, and indemnify BUYER from any claims against the Assets.

IN WITNESS WHEREOF, this Bill of Sale is executed and delivered on this 23rd day of February, 2011.

**SELLER:**

AMICI RESTAURANTS, INC.
A Georgia corporation

By: _____
Name: _____
    MIKE  TORINO
Title: _____
    CEO

**EXHIBIT B**
**TRANSFER DOCUMENTS**

**COVINGTON RESTAURANT**

## Exhibit B-1

### BILL OF SALE – COVINGTON RESTAURANT

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Amici Pizza Co., Inc., a Georgia corporation ("**SELLER**") hereby sells, transfers, and conveys to Madison GA Acquisitions, LLC, a Georgia limited liability company ("**BUYER**"), all of SELLER's rights, title, and interest and to the following personal property:

All of the assets described in a certain Asset Purchase Agreement entered into between SELLER and BUYER related to the operation of an AMICI ITALIAN CAFÉ located at 1116 College, Covington, Georgia ("***Covington Restaurant***") and, more specifically, the following:

(a)     Sellers' interest in all leasehold improvements and fixtures;

(b)     All furniture, equipment, computer hardware and software, and signage used in connection with the Covington Restaurant business and/or located at the Covington Restaurant;

(c)     All smallwares, and inventory and supplies on-hand at the Covington Restaurant premises at Closing;

(d)     Sellers' interest in any liquor license or other permit(s) required for the sale of alcoholic beverages at the Covington Restaurant location;

(e)     All books and records of Sellers relating to the Covington Restaurant (including vendor documentation);

(f)     Permits and licenses applicable to the operation of the Covington Restaurant (to the extent that they are assignable);

(g)     Prepaid expenses; and

(h)     Sellers' interest in the telephone number used in connection with the Covington Restaurant.

SELLER warrants that SELLER is the sole owner of the Assets being conveyed and that it has full rights and authority to sell them.

SELLER warrants that the Assets are being conveyed free and clear of all liens and encumbrances, and further warrants that SELLER shall fully defend, protect, and indemnify BUYER from any claims against the Assets.

IN WITNESS WHEREOF, this Bill of Sale is executed and delivered on this 23rd day of February, 2011.

**SELLER:**

AMICI PIZZA CO., INC.
A Georgia corporation

By: _____
Name: _____MIKE TORINO_____
Title: _____CEO_____

**Exhibit B-2**

**SUBLEASE**

**EXHIBIT C**
**TRANSFER DOCUMENTS**

**FRANCHISE OPERATIONS**

## Exhibit C-1

## BILL OF SALE – FRANCHISE OPERATIONS

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Amici Franchising, LLC, a Georgia limited liability company ("**SELLER**") hereby sells, transfers, and conveys to Amici Franchising, LLC, a Texas limited liability company ("**BUYER**"), all of SELLER's rights, title, and interest and to the following personal property:

All of the assets described in a certain Asset Purchase Agreement entered into between SELLER and BUYER related to franchising the operation of the AMICI ITALIAN CAFÉ concept and, more specifically, the following:

(a)   SELLER's interest (if any) in any and all rights and registrations relating to all trademarks relating to the AMICI ITALIAN CAFÉ system;

(b)   SELLLER's interest (if any) in any and all copyrights and copyrighted works relating to the AMICI ITALIAN CAFÉ system including, without limitation, web site design and content, menu and menu board design and content, and operations and training manuals design and content;

(c)   SELLER's interest (if any) in any and all trade secrets relating to the AMICI ITALIAN CAFÉ system including recipes and preparation techniques;

(d)   SELLER's interest in any and all other intangible property rights relating to the AMICI ITALIAN CAFÉ system; and

SELLER warrants that SELLER or AFG Partners, LLC is the sole owner of the foregoing Assets and that that no other person has any ownership right in the Assets.

SELLER warrants that the Assets are being conveyed free and clear of all liens and encumbrances, and further warrants that SELLER shall fully defend, protect, and indemnify BUYER from any claims against the Assets.

IN WITNESS WHEREOF, this Bill of Sale is executed and delivered on this 23rd day of February, 2011.

**SELLER:**

AMICI FRANCHISING, LLC
a Georgia limited liability company

By: _____

Name: _____

Title: _____

## Exhibit C-2
## ASSIGNMENT AND ASSUMPTION OF FRANCHISE AGREEMENTS

THIS ASSIGNMENT AND ASSUMPTION OF FRANCHISE AGREEMENTS ("***Assignment***") is entered into by and between Amici Franchising, LLC, a Georgia limited liability company ("***Assignor***") and Amici Franchising, LLC, a Texas limited liability company ("***Assignee***").

WHEREAS, Assignor franchises the operation of full service, family style Italian restaurants offering a variety of pizzas, pastas, wings, salads, and sandwiches ("***AMICI ITALIAN CAFÉ Restaurants***);

WHEREAS, Assignor has granted four franchises, the terms and conditions of which are memorialized in four written franchise agreements described on Schedule A (the "***Franchise Agreements***");

WHEREAS, Assignor desires to assign to Assignee certain of its rights under the Franchise Agreements and to delegate certain of its obligations under the Franchise Agreement, and Assignee desires to accept such rights and assume such obligations, all as set forth in this Assignment.

NOW, THEREFORE, in consideration of the mutual premises set forth in this Assignment and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     **Assignment of Rights**. Assignor hereby assigns to Assignee, and Assignee hereby accepts, all of Assignor's rights under the Franchise Agreements that accrue on or after the date of this Assignment.

2.     **Assumption of Obligations.** Assignee hereby delegates to Assignee, and Assignee hereby assumes, all of Assignors obligations under the Franchise Agreements that accrue on or after the date of this Assignment.

3.     **Timely Discharge of Obligations; Indemnification.** The parties expressly acknowledge and agree that Assignee is not assuming any liability for obligations accruing prior to the date of this Assignment. Specifically, but without limiting the generality of the foregoing, and notwithstanding anything to the contrary contained in this Assignment, Assignee assumes no liability for any claims or obligations (whether sounding in contract or tort, whether disclosed or undisclosed), arising out of or related to the Franchise Agreements, that have accrued prior to the date of this Assignment, or any claims or obligations, arising out of or related to the Franchise Agreements, that are based on actions or omissions occurring prior to the date of this Assignment (each a "***Claim***"). Assignor shall timely discharge all obligations not being assumed, and shall indemnify Assignor for all liability and damages (including the amount of any settlement) arising out of or related to such Claim.

4.     **Right to Offset.** Assignor and Assignee are parties to a certain promissory note relating to the transfer and assignment of the Franchise Agreements. If Assignee sustains any liability or damage as a result of any Claim subject to indemnification, Assignee may, at its option and in its discretion and for purposes of exercising its right of indemnification under paragraph 3, above, offset against payments due under the promissory note the amount of the liability or damages. The rights under this paragraph are cumulative and not in lieu of any other rights or remedies available under applicable law.

5.     **Choice of Law, Jurisdiction, and Forum Selection.** This Agreement and the parties relationship created hereby is governed by Texas law, without regard to conflicts of laws principles. This Agreement shall be performed in Dallas County, Texas and shall be governed by and construed in accordance with the laws of the State of Texas and the County of Dallas, Texas. Any dispute arising out of this Agreement shall be brought and prosecuted exclusively in a state or federal court situated in Dallas County, Texas. The parties irrevocably consent to the personal jurisdiction of these courts, and waive all questions of personal and subject matter jurisdiction or venue for the purpose of carrying out this provision.

6.     **Miscellaneous.** This Agreement may be modified or amended only by a writing signed by both Assignor and Assignee. This Agreement may be executed in a number of identical counterparts, and if so executed, each of such counterparts shall be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement.

7.     **Default; Assignor's Right to Rescind**. The foregoing transaction is part of an integrated transaction involving the acquisition of assets used in connection with an AMICI'S ITALIAN CAFÉ restaurant located at 113 S. Main Street, Madison, Georgia 30650 and an AMICI'S ITALIAN CAFÉ restaurant located at 1116 College, Covington, Georgia 30014, and assets used in connection with franchising the operation of AMICI'S ITALIAN CAFÉ restaurants. In connection with such acquisitions, affiliates of Debtor are entering into financing documents referred to herein as the "***Madison Financing Documents***," the "***Covington Financing Documents***," and the "***Franchising Financing Documents***." In the event of a default under the Madison Financing Documents, the Covington Financing Documents, or the Franchising Financing Documents that results in a foreclosure of assets, the assignment represented by this Agreement shall be deemed rescinded, null and void; provided that, in the event of such rescission, all of the covenants and indemnification obligations contained in this Agreement will remain in full effect.

IN WITNESS WHEREOF, each of the parties hereto has executed this Assignment on and to be effective as of the 23rd day of February, 2011.

**ASSIGNOR:**

AMICI FRANCHISING, LLC
a Georgia limited liability company

By: _____

Michael Torino, President


**ASSIGNEE:**

AMICI FRANCHISING, LLC
a Texas limited liability company

By: _____

Ed Sigmond, President

## Schedule A
### Franchise Agreements

Franchise Agreement dated April 25, 2007, between Amici Franchising, LLC as franchisor and A.K. Gulati, as franchisee

Franchise Agreement dated February 11, 2008, between Amici Franchising, LLC as franchisor and Romano Lakes Country Foods, LLC, as franchisee

Franchise Agreement dated December 30, 2008, between Amici Franchising, LLC as franchisor and Joiner & Ewing, LLC as franchisee

Franchise Agreement dated June 15, 2010, between Amici Franchising, LLC as franchisor and Bearphat, LLC as franchisee

**EXHIBIT D**
**FINANCE DOCUMENTS**

**MADISON RESTAURANT**

## EXHIBIT D-1
## PROMISSORY NOTE

Principal: $185,954                                              February 23, 2011

**MAKER:**
Madison GA Acquisitions, LLC
2808 Cole Avenue
Dallas, Texas 75204

**HOLDER:**
Amici Restaurants, Inc.
520 East Avenue
Madison, Georgia 30650

**PAYMENT.** FOR VALUE RECEIVED, Madison GA Acquisitions, LLC ("*Maker*") promises to pay to the order of Amici Restaurants, Inc. ("*Holder*"), in lawful money of the United States of America, at its office indicated above, or wherever else Holder may specify, the sum of One Hundred Eighty-Five Thousand Nine Hundred Fifty-Four Dollars ($185,954), together with interest thereon at the rate of six percent (6.0%) per annum from and after the date hereof, payable in lawful money of the United States of America in installments (of principal and accrued interest) in the amount of $3,595.01, as outlined on the schedule attached hereto, commencing on April 1, 2011, and continuing on the first day of each succeeding calendar month for a period of sixty (60) months, ending March 1, 2016.

**BANK OF MADISON DEBT. Maker and Holder acknowledge that, as of the date hereof, Holder is indebted to Bank of Madison in the amount of approximately $9,500 ("*Bank of Madison Debt*"). Holder hereby authorizes and directs Maker to pay any and all amounts due under this Note to Bank of Madison until the Bank of Madison Debt is paid in full.**

**MAKER'S RIGHT TO SET-OFF PAYMENTS. Maker and Holder acknowledge that they are parties to a certain Asset Purchase Agreement granting Maker the right to set-off payments due under this Note (Sections 8.5. and 11.6.). In the event Maker exercises its set-off rights under Section 8.4. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the delivery date of this Note shall be reduced by the set-off amount, and all past and future payments of principal and interest shall be adjusted accordingly. In the event Maker exercises its set-off rights under Section 11.6. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the date such set-off rights are exercised shall be reduced by the set-off amount, and all future payments of principal and interest shall be adjusted accordingly.**

**SECURITY.** To secure payment of this Note, Maker has granted Holder a security interest in certain collateral as identified in the Security Agreement of even date ("*Security Agreement*").

**PREPAYMENT ALLOWED.** This Note may be prepaid in whole or in part at any time. No partial prepayment shall affect the obligation of Maker to make any payments of principal due under this Note on the dates specified in the Payment Terms paragraph of this Note until this Note has been paid in full. Prepayments shall apply first to accrued interest and then to principal.

**APPLICATION OF PAYMENTS.** Monies received by Holder from any source for application toward payment of the obligations under this Note ("*Obligations*") shall be applied to interest first, and then to principal. If a Default occurs, monies may be applied in the following order at

Holder's discretion to the Obligations: (1) expenses and costs of collection, including attorneys' fees; (2) interest, and (3) principal.

**DEFAULT.** If any of the following occurs, a default ("***Default***") under this Note shall exist: *(1)* Maker fails to timely pay any amount due under this Note; or *(2)* an event of default occurs under the Security Agreement and is not timely cured in accordance with any applicable cure period.

**REMEDIES UPON DEFAULT.** If a Default occurs under this Note, Holder may at any time thereafter, take the following actions: **Holder Lien.** Foreclose its security interest upon thirty days notice with a cure period of thirty days. **Acceleration Upon Default.** Accelerate the maturity of this Note and, at Holder's option, any or all other Obligations, whereupon this Note and the accelerated Obligations shall be immediately due and payable; provided, however, if the Default is based upon a bankruptcy or insolvency proceeding commenced by or against Maker or any guarantor or endorser of this Note, all Obligations shall automatically and immediately be due and payable. **Cumulative.** Exercise any rights and remedies as provided under the Note and Security Agreement, or as provided by law or equity.

**ATTORNEYS' FEES.** If any Holder of this Note retains an attorney in connection with any Default or at maturity to collect or enforce this Note in any lawsuit or in any probate, reorganization, bankruptcy, arbitration, or other proceeding, or if Maker sues any Holder hereof in connection with this Note, then Maker agrees to pay to each such Holder, in addition to principal and any other sums owing to such Holder hereunder, all reasonable costs and expenses incurred by such Holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, attorneys' fees and expenses, investigation costs, and all court costs, whether or not suit is filed hereon, whether before or after the payment date, or whether in connection with bankruptcy, insolvency, or appeal, or whether collection is made against Maker or guarantor or any other person primarily or secondarily liable hereunder.

**WAIVERS AND AMENDMENTS.** No waivers, amendments, or modifications of this Note or the Security Agreement shall be valid unless in writing and signed by an officer of Holder. No waiver by Holder of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Holder in exercising any right, power, or remedy under this Note and Security Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

Except to the extent otherwise provided by the Security Agreement or prohibited by law, each Maker and each other person liable under this Note waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale, and all other notices of any kind.

**MISCELLANEOUS PROVISIONS. Assignment.** This Note and the Security Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, and successors. Holder's interests in and rights under this Note and the Security Agreement are non-negotiable and non-assignable. **Organization; Powers.** Maker represents that Maker is (i) a limited liability company, duly organized, validly existing, and in good standing under the laws of its state of organization and is authorized to do business in each jurisdiction wherein its ownership of property or conduct of business legally requires such organization; (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver, and perform, and by all necessary action has authorized the execution, delivery, and performance of, all of its obligations under this Note and the Security Agreement. **Applicable Law; Conflict Between Documents.** This Note shall be governed by and construed under the laws of the state of Georgia without regard to that state's conflict of laws principles. If

the terms of this Note should conflict with the terms of any loan agreement or any commitment letter that survives Closing, the terms of this Note shall control. **Severability.** If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective, but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note or other such document. **Notices.** Any notices to Maker shall be sufficiently given, if in writing and mailed or delivered to the Maker's address shown above or such other address as provided hereunder, and to Holder, if in writing and mailed or delivered to Holder at the address set forth above or such other address as Holder may specify in writing from time to time. In the event that Maker changes Maker's address at any time prior to the date the Obligations are paid in full, Maker agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid. **Plural; Captions.**   All references to Maker, guarantor, person, document or other nouns of reference mean both the singular and plural form, as the case may be, and the term "person" shall mean any individual, person or entity.

**FINAL AGREEMENT.** This Note and the Security Agreement represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**IN WITNESS WHEREOF,** Maker, on the day and year first above written, has caused this Note to be executed.

**MAKER**

MADISON GA ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
     Ed Sigmond, Manager

## GUARANTY

Each of the undersigned, an affiliate of the Maker that will secure a personal benefit from the loan evidenced by the foregoing Note, jointly and severally guarantee Maker's timely performance under the Note.

Intending to be legally bound, the undersigned have executed this Guaranty to be effective as of February 23, 2011.

### GUARANTORS

AMICI ENTERPRISES, LLC
a Texas limited liability company

By: _____
Ed Sigmond, President

AMICI FRANCHISING, LLC
a Texas limited liability company

By: _____
Ed Sigmond, President

COVINGTON ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Ed Sigmond, President

Amici Restaurants

| Compound Period: | Monthly |
|---|---|
| Nominal Annual Rate: | 6.000% |

CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 2/23/2011 | 185,954.00 | 1 | | |
| 2 | Payment | 4/1/2011 | 3,595.01 | 60 | Monthly | 3/1/2016 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 2/23/2011 | | | | 185,954.00 |
| 1 | 4/1/2011 | 3,595.01 | 929.77 | 2,665.24 | 183,288.76 |
| 2 | 5/1/2011 | 3,595.01 | 916.44 | 2,678.57 | 180,610.19 |
| 3 | 6/1/2011 | 3,595.01 | 903.05 | 2,691.96 | 177,918.23 |
| 4 | 7/1/2011 | 3,595.01 | 889.59 | 2,705.42 | 175,212.81 |
| 5 | 8/1/2011 | 3,595.01 | 876.06 | 2,718.95 | 172,493.86 |
| 6 | 9/1/2011 | 3,595.01 | 862.47 | 2,732.54 | 169,761.32 |
| 7 | 10/1/2011 | 3,595.01 | 848.81 | 2,746.20 | 167,015.12 |
| 8 | 11/1/2011 | 3,595.01 | 835.08 | 2,759.93 | 164,255.19 |
| 9 | 12/1/2011 | 3,595.01 | 821.28 | 2,773.73 | 161,481.46 |
| 10 | 1/1/2012 | 3,595.01 | 807.41 | 2,787.60 | 158,693.86 |
| 11 | 2/1/2012 | 3,595.01 | 793.47 | 2,801.54 | 155,892.32 |
| 12 | 3/1/2012 | 3,595.01 | 779.46 | 2,815.55 | 153,076.77 |
| 13 | 4/1/2012 | 3,595.01 | 765.38 | 2,829.63 | 150,247.14 |
| 14 | 5/1/2012 | 3,595.01 | 751.24 | 2,843.77 | 147,403.37 |
| 15 | 6/1/2012 | 3,595.01 | 737.02 | 2,857.99 | 144,545.38 |
| 16 | 7/1/2012 | 3,595.01 | 722.73 | 2,872.28 | 141,673.10 |
| 17 | 8/1/2012 | 3,595.01 | 708.37 | 2,886.64 | 138,786.46 |
| 18 | 9/1/2012 | 3,595.01 | 693.93 | 2,901.08 | 135,885.38 |
| 19 | 10/1/2012 | 3,595.01 | 679.43 | 2,915.58 | 132,969.80 |
| 20 | 11/1/2012 | 3,595.01 | 664.85 | 2,930.16 | 130,039.64 |
| 21 | 12/1/2012 | 3,595.01 | 650.20 | 2,944.81 | 127,094.83 |
| 22 | 1/1/2013 | 3,595.01 | 635.47 | 2,959.54 | 124,135.29 |
| 23 | 2/1/2013 | 3,595.01 | 620.68 | 2,974.33 | 121,160.96 |
| 24 | 3/1/2013 | 3,595.01 | 605.80 | 2,989.21 | 118,171.75 |

| | | | | | |
|---|---|---|---|---|---|
| 25 | 4/1/2013 | 3,595.01 | 590.86 | 3,004.15 | 115,167.60 |
| 26 | 5/1/2013 | 3,595.01 | 575.84 | 3,019.17 | 112,148.43 |
| 27 | 6/1/2013 | 3,595.01 | 560.74 | 3,034.27 | 109,114.16 |
| 28 | 7/1/2013 | 3,595.01 | 545.57 | 3,049.44 | 106,064.72 |
| 29 | 8/1/2013 | 3,595.01 | 530.32 | 3,064.69 | 103,000.03 |
| 30 | 9/1/2013 | 3,595.01 | 515.00 | 3,080.01 | 99,920.02 |
| 31 | 10/1/2013 | 3,595.01 | 499.60 | 3,095.41 | 96,824.61 |
| 32 | 11/1/2013 | 3,595.01 | 484.12 | 3,110.89 | 93,713.72 |
| 33 | 12/1/2013 | 3,595.01 | 468.57 | 3,126.44 | 90,587.28 |
| 34 | 1/1/2014 | 3,595.01 | 452.94 | 3,142.07 | 87,445.21 |
| 35 | 2/1/2014 | 3,595.01 | 437.23 | 3,157.78 | 84,287.43 |
| 36 | 3/1/2014 | 3,595.01 | 421.44 | 3,173.57 | 81,113.86 |
| 37 | 4/1/2014 | 3,595.01 | 405.57 | 3,189.44 | 77,924.42 |
| 38 | 5/1/2014 | 3,595.01 | 389.62 | 3,205.39 | 74,719.03 |
| 39 | 6/1/2014 | 3,595.01 | 373.60 | 3,221.41 | 71,497.62 |
| 40 | 7/1/2014 | 3,595.01 | 357.49 | 3,237.52 | 68,260.10 |
| 41 | 8/1/2014 | 3,595.01 | 341.30 | 3,253.71 | 65,006.39 |
| 42 | 9/1/2014 | 3,595.01 | 325.03 | 3,269.98 | 61,736.41 |
| 43 | 10/1/2014 | 3,595.01 | 308.68 | 3,286.33 | 58,450.08 |
| 44 | 11/1/2014 | 3,595.01 | 292.25 | 3,302.76 | 55,147.32 |
| 45 | 12/1/2014 | 3,595.01 | 275.74 | 3,319.27 | 51,828.05 |
| 46 | 1/1/2015 | 3,595.01 | 259.14 | 3,335.87 | 48,492.18 |
| 47 | 2/1/2015 | 3,595.01 | 242.46 | 3,352.55 | 45,139.63 |
| 48 | 3/1/2015 | 3,595.01 | 225.70 | 3,369.31 | 41,770.32 |
| 49 | 4/1/2015 | 3,595.01 | 208.85 | 3,386.16 | 38,384.16 |
| 50 | 5/1/2015 | 3,595.01 | 191.92 | 3,403.09 | 34,981.07 |
| 51 | 6/1/2015 | 3,595.01 | 174.91 | 3,420.10 | 31,560.97 |
| 52 | 7/1/2015 | 3,595.01 | 157.80 | 3,437.21 | 28,123.76 |
| 53 | 8/1/2015 | 3,595.01 | 140.62 | 3,454.39 | 24,669.37 |
| 54 | 9/1/2015 | 3,595.01 | 123.35 | 3,471.66 | 21,197.71 |
| 55 | 10/1/2015 | 3,595.01 | 105.99 | 3,489.02 | 17,708.69 |
| 56 | 11/1/2015 | 3,595.01 | 88.54 | 3,506.47 | 14,202.22 |
| 57 | 12/1/2015 | 3,595.01 | 71.01 | 3,524.00 | 10,678.22 |
| 58 | 1/1/2016 | 3,595.01 | 53.39 | 3,541.62 | 7,136.60 |
| 59 | 2/1/2016 | 3,595.01 | 35.68 | 3,559.33 | 3,577.27 |
| 60 | 3/1/2016 | 3,595.01 | 17.74 | 3,577.27 | 0.00 |

Grand Totals    215,700.60    29,746.60    185,954.00

Last interest amount decreased by 0.15 due to rounding.

**EXHIBIT D-2**
**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT ("***Agreement***") is entered into as of the 23rd day of February, 2011 ("***Effective Date***"), by and between Madison GA Acquisitions, LLC, a Texas limited liability company, with an address at 2808 Cole Avenue, Dallas, Texas 75204 ("***Debtor***"), and Amici Restaurants, Inc., a Georgia corporation, with an address at 520 East Avenue, Madison, Georgia 30650 ("***Secured Party***").

**BACKGROUND**

A.      Contemporaneously with the execution of this Agreement, Debtor is acquiring from Secured Party certain assets used in connection with an AMICI'S ITALIAN CAFÉ restaurant located at 113 South Main Street, Madison, Georgia 30650 (the "***Restaurant***").

B.      As partial consideration for the purchase, Debtor is delivering to Secured Party a promissory note in the principal amount of $185,954 (the "***Note***").

C.      To secure payment of the Note, Debtor desires to grant to Secured Party, and Secured Party desires to acquire from Debtor, a security interest in certain collateral in accordance with the terms and conditions of this Agreement.

D.      The foregoing transaction is part of an integrated transaction involving the acquisition of assets used in connection with an AMICI'S ITALIAN CAFÉ restaurant located at 1116 College, Covington, Georgia 30014 (the "***Covington Restaurant***") and assets relating to the franchising of AMICI'S ITALIAN CAFÉ restaurants. In connection with such acquisitions, affiliates of Debtor are entering into financing documents referred to herein as the "***Covington Financing Documents***" and the "***Franchising Financing Documents***."

NOW THEREFORE, in consideration of the conveyance of the assets, delivery of the Note, and other good and value consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**AGREEMENT**

1.      Grant of Security Interest. Subject to the terms and provisions contained herein, on the Effective Date, Debtor hereby grants to Secured Party a purchase money security interest in all of Debtor's right, title, and interest in the collateral described herein (the "***Collateral***"), to secure payment of the Note. For purposes of this Agreement, the term "***Collateral***" means and includes all accounts, chattel paper (whether electronic or intangible), instruments, leasehold improvements, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, fixtures, furniture, equipment; supplies, and inventory used in connection with the Madison Restaurant, the Covington Restaurant, and the franchising of AMICI'S ITALIAN CAFÉ restaurants, and all goods covered thereby, including all accessions, additions, and improvements thereto and products thereof, wherever located, and all proceeds of any of the foregoing, whether arising from the sale, lease, or other use or disposition thereof, including without limitation, all rights to payment with respect to any insurance, including returned premiums, or any claim or cause of action relating to any of the foregoing.

Furthermore, "***general intangibles***," as referenced in the above paragraph, means all general intangibles, as defined in the Uniform Commercial Code, of any kind (including choses in action, commercial tort claims, software, payment intangibles, tax refunds, insurance proceeds, and contract rights), and all instruments, security agreements, leases, contracts, and other rights to receive payments of money or the ownership or possession of property,

including all general intangibles under which an account debtor's principal obligation is a monetary obligation.

2.   **Representations and Warranties of Debtor**.  Debtor represents and warrants to Secured Party that the Collateral is not subject to any assignment, default, claim, setoff, lien, demand, or encumbrance of any nature, except for certain liens held by Madison Bank relating to prior financing secured by Secured Party.

3.   **Covenants and Agreements of Debtor**.

   a.   Debtor covenants and agrees to promptly pay all taxes and assessments of every nature which may be levied or assessed against the Collateral.

   b.   Debtor covenants and agrees not to transfer or attempt to transfer any interest in the Collateral.

   c.   Debtor covenants and agrees to keep the Collateral within the State of Georgia and free and clear of any liens or encumbrances (other than that created by or disclosed in this document).

   d.   Debtor covenants and agrees to operate and use the Collateral in compliance with all applicable laws, rules, and regulations promulgated by any governmental entity.

   e.   Debtor covenants and agrees to use the Assets only in the ordinary course of business. Debtor shall maintain the Collateral in good working order and shall not dispose of any Assets except in the ordinary course of Debtor's business.

   f.   Secured Party or its representative shall have the right to inspect the Restaurant premises at any time during business hours to ensure Debtor's compliance with the foregoing.

4.   **Events of Default**.  The following shall constitute "Events of Default" hereunder, and each such Event of Default shall also constitute an Event of Default under the Note, entitling Secured Party to exercise all or any of the remedies available to Secured Party under the terms of the Note and this Agreement.

   a.   Any breach or default by Debtor under the Note, including the failure by Debtor to pay any sum when due and payable under the Note.

   b.   The failure of Debtor to perform or observe, or other breach of, any other covenant, obligation, agreement, condition, prohibition, representation, warranty, or any other term or provision hereunder.

   c.   An Event of Default under the Covington Financing Documents, or the Franchising Financing Documents.

5.   **Cure by Secured Party**.  Debtor agrees that Secured Party shall have the right, but not the obligation, to make any payment and take any action reasonably necessary to maintain, protect and preserve the Collateral, including, but not limited to, curing any late payment of taxes relating to the Collateral. The amount due under the Note shall be increased by any amounts so paid by Secured Party. Payment or action by Secured Party under this Section 5 shall not be deemed to cure any default by Debtor under the Note or this Agreement.

6.   **Secured Party's Right Upon an Event of Default**.  Upon the occurrence of an Event of Default hereunder, Secured Party may declare all indebtedness secured hereby immediately due and payable and shall have all of the remedies of a secured party under the Uniform Commercial Code as enacted by the State of Georgia. Without limiting the foregoing,

Secured Party shall be entitled to recover all of its costs and expenses incurred in enforcing its rights hereunder and under the Note, including reasonable attorneys' fees and costs.

7.    **Rights Cumulative**. The rights and remedies of Secured Party hereunder are cumulative and are not in lieu of, but are in addition to, any other rights or remedies which Secured Party may have under the Note, at law, or in equity.

8.    **Assignment of Secured Parties' Rights**. The rights of Secured Party under this Agreement may be assigned by it in connection with any assignment or negotiation of the Note, and any such holder or assignee shall be entitled to rely upon the representations, warranties and covenants herein made.

9.    **Further Assurances**. Debtor hereby agrees to execute such other documents and perform such other acts as may be deemed necessary or appropriate by Secured Party to perfect, protect or enforce the rights hereunder.

10.   **Binding Effect**. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.   **Amendment**. This Agreement may not be amended, modified, or changed, nor shall any waiver of any provision hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification, or discharge is sought.

12.   **Notices**. All notices permitted under this Agreement shall be in writing signed by the party giving same and shall be deemed effective upon personal delivery or three (3) days after mailing by certified or registered mail, postage prepaid, as follows:

If to Debtor:

> Madison GA Acquisitions, LLC
> 2808 Cole Avenue
> Dallas, Texas 75204
> Attention: Ed Sigmond, President

If to Secured Party:

> Amici Restaurants, Inc.
> 520 East Ave.
> Madison, Georgia 30650

13.   **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

14.   **Waiver of Jury Trial**.    DEBTOR AND SECURED PARTY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THE NOTE OR THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTE OR THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR DEBTOR AND SECURED PARTY ENTERING INTO THE SUBJECT TRANSACTION.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**DEBTOR**

MADISON GA ACQUISITIONS, LLC
A Georgia limited liability company

By: _____
      Ed Sigmond, Manager

**SECURED PARTY**

AMICI RESTAURANTS, INC.
A Georgia corporation

By:_____
      Michael Torino, President

**EXHIBIT E**
**FINANCE DOCUMENTS**

**COVINGTON RESTAURANT**

## EXHIBIT E-1
## PROMISSORY NOTE

Principal: $338,376                                    February 23, 2011

**MAKER:**
Covington Acquisitions, LLC
2808 Cole Avenue
Dallas, Texas 75204

**HOLDER:**
Amici Pizza Co., Inc.
520 East Avenue
Madison, Georgia 30650

**PAYMENT.** FOR VALUE RECEIVED, Covington Acquisitions, LLC ("*__Maker__*") promises to pay to the order of Amici Pizza Co., Inc. ("*__Holder__*"), in lawful money of the United States of America, at its office indicated above, or wherever else Holder may specify, the sum of Three Hundred Thirty-Eight Thousand Three Hundred Seventy-Six Dollars ($338,376), together with interest thereon at the rate of six percent (6.0%) per annum from and after the date hereof, payable in lawful money of the United States of America in installments (of principal and accrued interest) in the amount of $6,541.76, as outlined on the schedule attached hereto, commencing on April 1, 2011, and continuing on the first day of each succeeding calendar month for a period of sixty (60) months, ending March 1, 2016.

**BANK OF MADISON DEBT. Maker and Holder acknowledge that, as of the date hereof, Holder is indebted to Bank of Madison in the amount of approximately $118,000 ("*__Bank of Madison Debt__*"). Holder hereby authorizes and directs Maker to pay any and all amounts due under this Note to Bank of Madison until the Bank of Madison Debt is paid in full.**

**MAKER'S RIGHT TO SET-OFF PAYMENTS. Maker and Holder acknowledge that they are parties to a certain Asset Purchase Agreement granting Maker the right to set-off payments due under this Note (Sections 8.5. and 11.6.). In the event Maker exercises its set-off rights under Section 8.4. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the delivery date of this Note shall be reduced by the set-off amount, and all past and future payments of principal and interest shall be adjusted accordingly. In the event Maker exercises its set-off rights under Section 11.6. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the date such set-off rights are exercised shall be reduced by the set-off amount, and all future payments of principal and interest shall be adjusted accordingly.**

**SECURITY.** To secure payment of this Note, Maker has granted Holder a security interest in certain collateral as identified in the Security Agreement of even date ("*__Security Agreement__*").

**PREPAYMENT ALLOWED.** This Note may be prepaid in whole or in part at any time. No partial prepayment shall affect the obligation of Maker to make any payments of principal due under this Note on the dates specified in the Payment Terms paragraph of this Note until this Note has been paid in full. Prepayments shall apply first to accrued interest and then to principal.

**APPLICATION OF PAYMENTS.** Monies received by Holder from any source for application toward payment of the obligations under this Note ("*__Obligations__*") shall be applied to interest first, and then to principal. If a Default occurs, monies may be applied in the following order at

Holder's discretion to the Obligations: (1) expenses and costs of collection, including attorneys' fees; (2) interest, and (3) principal.

**DEFAULT.** If any of the following occurs, a default ("***Default***") under this Note shall exist: *(1)* Maker fails to timely pay any amount due under this Note; or *(2)* an event of default occurs under the Security Agreement and is not timely cured in accordance with any applicable cure period.

**REMEDIES UPON DEFAULT.** If a Default occurs under this Note, Holder may at any time thereafter, take the following actions: **Holder Lien.** Foreclose its security interest upon thirty days notice with a cure period of thirty days. **Acceleration Upon Default.** Accelerate the maturity of this Note and, at Holder's option, any or all other Obligations, whereupon this Note and the accelerated Obligations shall be immediately due and payable; provided, however, if the Default is based upon a bankruptcy or insolvency proceeding commenced by or against Maker or any guarantor or endorser of this Note, all Obligations shall automatically and immediately be due and payable. **Cumulative.** Exercise any rights and remedies as provided under the Note and Security Agreement, or as provided by law or equity.

**ATTORNEYS' FEES.** If any Holder of this Note retains an attorney in connection with any Default or at maturity to collect or enforce this Note in any lawsuit or in any probate, reorganization, bankruptcy, arbitration, or other proceeding, or if Maker sues any Holder hereof in connection with this Note, then Maker agrees to pay to each such Holder, in addition to principal and any other sums owing to such Holder hereunder, all reasonable costs and expenses incurred by such Holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, attorneys' fees and expenses, investigation costs, and all court costs, whether or not suit is filed hereon, whether before or after the payment date, or whether in connection with bankruptcy, insolvency, or appeal, or whether collection is made against Maker or guarantor or any other person primarily or secondarily liable hereunder.

**WAIVERS AND AMENDMENTS.** No waivers, amendments, or modifications of this Note or the Security Agreement shall be valid unless in writing and signed by an officer of Holder. No waiver by Holder of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Holder in exercising any right, power, or remedy under this Note and Security Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

Except to the extent otherwise provided by the Security Agreement or prohibited by law, each Maker and each other person liable under this Note waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale, and all other notices of any kind.

**MISCELLANEOUS PROVISIONS. Assignment.** This Note and the Security Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, and successors. Holder's interests in and rights under this Note and the Security Agreement are non-negotiable and non-assignable. **Organization; Powers.** Maker represents that Maker is (i) a limited liability company, duly organized, validly existing, and in good standing under the laws of its state of organization and is authorized to do business in each jurisdiction wherein its ownership of property or conduct of business legally requires such organization; (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver, and perform, and by all necessary action has authorized the execution, delivery, and performance of, all of its obligations under this Note and the Security Agreement. **Applicable Law; Conflict Between Documents.** This Note shall be governed by and construed under the laws of the state of Georgia without regard to that state's conflict of laws principles. If