the terms of this Note should conflict with the terms of any loan agreement or any commitment letter that survives Closing, the terms of this Note shall control. **Severability.** If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective, but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note or other such document. **Notices.** Any notices to Maker shall be sufficiently given, if in writing and mailed or delivered to the Maker's address shown above or such other address as provided hereunder, and to Holder, if in writing and mailed or delivered to Holder at the address set forth above or such other address as Holder may specify in writing from time to time. In the event that Maker changes Maker's address at any time prior to the date the Obligations are paid in full, Maker agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid. **Plural; Captions.** All references to Maker, guarantor, person, document or other nouns of reference mean both the singular and plural form, as the case may be, and the term "person" shall mean any individual, person or entity.

**FINAL AGREEMENT.** This Note and the Security Agreement represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**IN WITNESS WHEREOF**, Maker, on the day and year first above written, has caused this Note to be executed.

**MAKER**

COVINGTON ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Ed Sigmond, Manager

## GUARANTY

Each of the undersigned, an affiliate of the Maker that will secure a personal benefit from the loan evidenced by the foregoing Note, jointly and severally guarantee Maker's timely performance under the Note.

Intending to be legally bound, the undersigned have executed this Guaranty to be effective as of February 23, 2011

### GUARANTORS

AMICI ENTERPRISES, LLC
a Texas limited liability company

By: _____
    Ed Sigmond, President

AMICI FRANCHISING, LLC
a Texas limited liability company

By: _____
    Ed Sigmond, President

MADISON GA ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
    Ed Sigmond, President

Amici Pizza Company

Compound
Period:                          Monthly
Nominal Annual Rate:             6.000%

CASH FLOW DATA

|   | Event | Date | Amount | Number | Period | End Date |
|---|-------|------|--------|--------|--------|----------|
| 1 | Loan | 2/23/2011 | 338,376.00 | 1 | | |
| 2 | Payment | 4/1/2011 | 6,541.76 | 60 | Monthly | 3/1/2016 |

AMORTIZATION SCHEDULE - Normal Amortization

|      | Date | Payment | Interest | Principal | Balance |
|------|------|---------|----------|-----------|---------|
| Loan | 2/23/2011 | | | | 338,376.00 |
| 1 | 4/1/2011 | 6,541.76 | 1,691.88 | 4,849.88 | 333,526.12 |
| 2 | 5/1/2011 | 6,541.76 | 1,667.63 | 4,874.13 | 328,651.99 |
| 3 | 6/1/2011 | 6,541.76 | 1,643.26 | 4,898.50 | 323,753.49 |
| 4 | 7/1/2011 | 6,541.76 | 1,618.77 | 4,922.99 | 318,830.50 |
| 5 | 8/1/2011 | 6,541.76 | 1,594.15 | 4,947.61 | 313,882.89 |
| 6 | 9/1/2011 | 6,541.76 | 1,569.41 | 4,972.35 | 308,910.54 |
| 7 | 10/1/2011 | 6,541.76 | 1,544.55 | 4,997.21 | 303,913.33 |
| 8 | 11/1/2011 | 6,541.76 | 1,519.57 | 5,022.19 | 298,891.14 |
| 9 | 12/1/2011 | 6,541.76 | 1,494.46 | 5,047.30 | 293,843.84 |
| 10 | 1/1/2012 | 6,541.76 | 1,469.22 | 5,072.54 | 288,771.30 |
| 11 | 2/1/2012 | 6,541.76 | 1,443.86 | 5,097.90 | 283,673.40 |
| 12 | 3/1/2012 | 6,541.76 | 1,418.37 | 5,123.39 | 278,550.01 |
| 13 | 4/1/2012 | 6,541.76 | 1,392.75 | 5,149.01 | 273,401.00 |
| 14 | 5/1/2012 | 6,541.76 | 1,367.01 | 5,174.75 | 268,226.25 |
| 15 | 6/1/2012 | 6,541.76 | 1,341.13 | 5,200.63 | 263,025.62 |
| 16 | 7/1/2012 | 6,541.76 | 1,315.13 | 5,226.63 | 257,798.99 |
| 17 | 8/1/2012 | 6,541.76 | 1,288.99 | 5,252.77 | 252,546.22 |
| 18 | 9/1/2012 | 6,541.76 | 1,262.73 | 5,279.03 | 247,267.19 |
| 19 | 10/1/2012 | 6,541.76 | 1,236.34 | 5,305.42 | 241,961.77 |
| 20 | 11/1/2012 | 6,541.76 | 1,209.81 | 5,331.95 | 236,629.82 |
| 21 | 12/1/2012 | 6,541.76 | 1,183.15 | 5,358.61 | 231,271.21 |
| 22 | 1/1/2013 | 6,541.76 | 1,156.36 | 5,385.40 | 225,885.81 |
| 23 | 2/1/2013 | 6,541.76 | 1,129.43 | 5,412.33 | 220,473.48 |
| 24 | 3/1/2013 | 6,541.76 | 1,102.37 | 5,439.39 | 215,034.09 |

| 25 | 4/1/2013 | 6,541.76 | 1,075.17 | 5,466.59 | 209,567.50 |
| 26 | 5/1/2013 | 6,541.76 | 1,047.84 | 5,493.92 | 204,073.58 |
| 27 | 6/1/2013 | 6,541.76 | 1,020.37 | 5,521.39 | 198,552.19 |
| 28 | 7/1/2013 | 6,541.76 | 992.76 | 5,549.00 | 193,003.19 |
| 29 | 8/1/2013 | 6,541.76 | 965.02 | 5,576.74 | 187,426.45 |
| 30 | 9/1/2013 | 6,541.76 | 937.13 | 5,604.63 | 181,821.82 |
| 31 | 10/1/2013 | 6,541.76 | 909.11 | 5,632.65 | 176,189.17 |
| 32 | 11/1/2013 | 6,541.76 | 880.95 | 5,660.81 | 170,528.36 |
| 33 | 12/1/2013 | 6,541.76 | 852.64 | 5,689.12 | 164,839.24 |
| 34 | 1/1/2014 | 6,541.76 | 824.20 | 5,717.56 | 159,121.68 |
| 35 | 2/1/2014 | 6,541.76 | 795.61 | 5,746.15 | 153,375.53 |
| 36 | 3/1/2014 | 6,541.76 | 766.88 | 5,774.88 | 147,600.65 |
| 37 | 4/1/2014 | 6,541.76 | 738.00 | 5,803.76 | 141,796.89 |
| 38 | 5/1/2014 | 6,541.76 | 708.98 | 5,832.78 | 135,964.11 |
| 39 | 6/1/2014 | 6,541.76 | 679.82 | 5,861.94 | 130,102.17 |
| 40 | 7/1/2014 | 6,541.76 | 650.51 | 5,891.25 | 124,210.92 |
| 41 | 8/1/2014 | 6,541.76 | 621.05 | 5,920.71 | 118,290.21 |
| 42 | 9/1/2014 | 6,541.76 | 591.45 | 5,950.31 | 112,339.90 |
| 43 | 10/1/2014 | 6,541.76 | 561.70 | 5,980.06 | 106,359.84 |
| 44 | 11/1/2014 | 6,541.76 | 531.80 | 6,009.96 | 100,349.88 |
| 45 | 12/1/2014 | 6,541.76 | 501.75 | 6,040.01 | 94,309.87 |
| 46 | 1/1/2015 | 6,541.76 | 471.55 | 6,070.21 | 88,239.66 |
| 47 | 2/1/2015 | 6,541.76 | 441.20 | 6,100.56 | 82,139.10 |
| 48 | 3/1/2015 | 6,541.76 | 410.70 | 6,131.06 | 76,008.04 |
| 49 | 4/1/2015 | 6,541.76 | 380.04 | 6,161.72 | 69,846.32 |
| 50 | 5/1/2015 | 6,541.76 | 349.23 | 6,192.53 | 63,653.79 |
| 51 | 6/1/2015 | 6,541.76 | 318.27 | 6,223.49 | 57,430.30 |
| 52 | 7/1/2015 | 6,541.76 | 287.15 | 6,254.61 | 51,175.69 |
| 53 | 8/1/2015 | 6,541.76 | 255.88 | 6,285.88 | 44,889.81 |
| 54 | 9/1/2015 | 6,541.76 | 224.45 | 6,317.31 | 38,572.50 |
| 55 | 10/1/2015 | 6,541.76 | 192.86 | 6,348.90 | 32,223.60 |
| 56 | 11/1/2015 | 6,541.76 | 161.12 | 6,380.64 | 25,842.96 |
| 57 | 12/1/2015 | 6,541.76 | 129.21 | 6,412.55 | 19,430.41 |
| 58 | 1/1/2016 | 6,541.76 | 97.15 | 6,444.61 | 12,985.80 |
| 59 | 2/1/2016 | 6,541.76 | 64.93 | 6,476.83 | 6,508.97 |
| 60 | 3/1/2016 | 6,541.76 | 32.79 | 6,508.97 | 0.00 |

| Grand Totals | | 392,505.60 | 54,129.60 | 338,376.00 | |

Last interest amount increased by 0.25 due to rounding.

**EXHIBIT E-2**
**SECURITY AGREEMENT**

THIS SECURITY AGREEMENT ("***Agreement***") is entered into as of the 23rd day of February, 2011 ("***Effective Date***"), by and between Covington Acquisitions, LLC, a Georgia limited liability company, with an address at 2808 Cole Avenue, Dallas, Texas 75204 ("***Debtor***"), and Amici Pizza Co., Inc., a Georgia corporation, with an address at 520 East Avenue, Madison, Georgia 30650 ("***Secured Party***").

**BACKGROUND**

A.      Contemporaneously with the execution of this Agreement, Debtor is acquiring from Secured Party certain assets used in connection with an AMICI'S ITALIAN CAFÉ restaurant located at 1116 College, Covington, Georgia 30014 (the "***Restaurant***").

B.      As partial consideration for the purchase, Debtor is delivering to Secured Party a promissory note in the principal amount of $338,376 (the "***Note***").

C.      To secure payment of the Note, Debtor desires to grant to Secured Party, and Secured Party desires to acquire from Debtor, a security interest in certain collateral in accordance with the terms and conditions of this Agreement.

D.      The foregoing transaction is part of an integrated transaction involving the acquisition of assets used in connection with an AMICI'S ITALIAN CAFÉ restaurant located at 113 South Main Street, Madison, Georgia 30650 (the "***Madison Restaurant***") and assets relating to the franchising of AMICI'S ITALIAN CAFÉ restaurants. In connection with such acquisitions, affiliates of Debtor are entering into financing documents referred to herein as the "***Madison Financing Documents***" and the "***Franchising Financing Documents***."

NOW THEREFORE, in consideration of the conveyance of the assets, delivery of the Note, and other good and value consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

**AGREEMENT**

1.      **Grant of Security Interest**. Subject to the terms and provisions contained herein, on the Effective Date, Debtor hereby grants to Secured Party a purchase money security interest in all of Debtor's right, title, and interest in the collateral described herein (the "***Collateral***"), to secure payment of the Note. For purposes of this Agreement, the term "***Collateral***" means and includes all accounts, chattel paper (whether electronic or intangible), instruments, leasehold improvements, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, fixtures, furniture, equipment; supplies, and inventory used in connection with the Madison Restaurant, the Covington Restaurant, and the franchising of AMICI'S ITALIAN CAFÉ restaurants, and all goods covered thereby, including all accessions, additions, and improvements thereto and products thereof, wherever located, and all proceeds of any of the foregoing, whether arising from the sale, lease, or other use or disposition thereof, including without limitation, all rights to payment with respect to any insurance, including returned premiums, or any claim or cause of action relating to any of the foregoing.

Furthermore, "***general intangibles***," as referenced in the above paragraph, means all general intangibles, as defined in the Uniform Commercial Code, of any kind (including choses in action, commercial tort claims, software, payment intangibles, tax refunds, insurance proceeds, and contract rights), and all instruments, security agreements, leases, contracts, and other rights to receive payments of money or the ownership or possession of property,

including all general intangibles under which an account debtor's principal obligation is a monetary obligation.

2. **Representations and Warranties of Debtor**. Debtor represents and warrants to Secured Party that the Collateral is not subject to any assignment, default, claim, setoff, lien, demand, or encumbrance of any nature, except for certain liens held by Madison Bank relating to prior financing secured by Secured Party.

3. **Covenants and Agreements of Debtor**.

   a. Debtor covenants and agrees to promptly pay all taxes and assessments of every nature which may be levied or assessed against the Collateral.

   b. Debtor covenants and agrees not to transfer or attempt to transfer any interest in the Collateral.

   c. Debtor covenants and agrees to keep the Collateral within the State of Georgia and free and clear of any liens or encumbrances (other than that created by or disclosed in this document).

   d. Debtor covenants and agrees to operate and use the Collateral in compliance with all applicable laws, rules, and regulations promulgated by any governmental entity.

   e. Debtor covenants and agrees to use the Assets only in the ordinary course of. Debtor shall maintain the Collateral in good working order and shall not dispose of any Assets except in the ordinary course of Debtor's business.

   f. Secured Party or its representative shall have the right to inspect the Restaurant premises at any time during business hours to ensure Debtor's compliance with the foregoing.

4. **Events of Default**. The following shall constitute "Events of Default" hereunder, and each such Event of Default shall also constitute an Event of Default under the Note, entitling Secured Party to exercise all or any of the remedies available to Secured Party under the terms of the Note and this Agreement.

   a. Any breach or default by Debtor under the Note, including the failure by Debtor to pay any sum when due and payable under the Note.

   b. The failure of Debtor to perform or observe, or other breach of, any other covenant, obligation, agreement, condition, prohibition, representation, warranty, or any other term or provision hereunder.

   c. An Event of Default under the Madison Financing Documents, or the Franchising Financing Documents.

5. **Cure by Secured Party**. Debtor agrees that Secured Party shall have the right, but not the obligation, to make any payment and take any action reasonably necessary to maintain, protect and preserve the Collateral, including, but not limited to, curing any late payment of taxes relating to the Collateral. The amount due under the Note shall be increased by any amounts so paid by Secured Party. Payment or action by Secured Party under this Section 5 shall not be deemed to cure any default by Debtor under the Note or this Agreement.

6. **Secured Party's Right Upon an Event of Default**. Upon the occurrence of an Event of Default hereunder, Secured Party may declare all indebtedness secured hereby immediately due and payable and shall have all of the remedies of a secured party under the Uniform Commercial Code as enacted by the State of Georgia. Without limiting the foregoing,

Secured Party shall be entitled to recover all of its costs and expenses incurred in enforcing its rights hereunder and under the Note, including reasonable attorneys' fees and costs.

7.   **Rights Cumulative**. The rights and remedies of Secured Party hereunder are cumulative and are not in lieu of, but are in addition to, any other rights or remedies which Secured Party may have under the Note, at law, or in equity.

8.   **Assignment of Secured Parties' Rights**. The rights of Secured Party under this Agreement may be assigned by it in connection with any assignment or negotiation of the Note, and any such holder or assignee shall be entitled to rely upon the representations, warranties and covenants herein made.

9.   **Further Assurances**. Debtor hereby agrees to execute such other documents and perform such other acts as may be deemed necessary or appropriate by Secured Party to perfect, protect or enforce the rights hereunder.

10.   **Binding Effect**. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

11.   **Amendment**. This Agreement may not be amended, modified, or changed, nor shall any waiver of any provision hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification, or discharge is sought.

12.   **Notices**. All notices permitted under this Agreement shall be in writing signed by the party giving same and shall be deemed effective upon personal delivery or three (3) days after mailing by certified or registered mail, postage prepaid, as follows:

If to Debtor:

> Covington Acquisitions, LLC
> 2808 Cole Avenue
> Dallas, Texas 75204
> Attention: Ed Sigmond, President

If to Secured Party:

> Amici Pizza Co., Inc.
> 520 East Ave.
> Madison, Georgia 30650

13.   **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia.

14.   **Waiver of Jury Trial**.   DEBTOR AND SECURED PARTY KNOWINGLY, IRREVOCABLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THE NOTE OR THIS AGREEMENT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTE OR THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT FOR DEBTOR AND SECURED PARTY ENTERING INTO THE SUBJECT TRANSACTION.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**DEBTOR**

COVINGTON ACQUISITIONS, LLC
A Georgia limited liability company

By: _____
        Ed Sigmond, Manager

**SECURED PARTY**

AMICI RESTAURANTS, INC.
A Georgia corporation

By: _____
        Michael Torino, President

**EXHIBIT F**
**FINANCE DOCUMENTS**

**FRANCHISE OPERATIONS**

## EXHIBIT F-1
## PROMISSORY NOTE

Principal: $236,248                                                                February 23, 2011

**MAKER:**
Amici Franchising, LLC
2808 Cole Avenue
Dallas, Texas 75204

**HOLDER:**
Amici Franchising, LLC
520 East Avenue
Madison, Georgia 30650

**PAYMENT.** FOR VALUE RECEIVED, Amici Franchising, LLC, a Texas limited liability company ("*Maker*") promises to pay to the order of Amici Franchising, LLC, a Georgia limited liability company ("*Holder*"), in lawful money of the United States of America, at its office indicated above, or wherever else Holder may specify, the sum of Two Hundred Thirty-Six Thousand Two Hundred Forty-Eight Dollars ($236,248),together with interest thereon at the rate of six percent (6.0%) per annum from and after the date hereof, payable in lawful money of the United States of America in installments (of principal and accrued interest) in the amount of $4,567.34, as outlined on the schedule attached hereto, commencing on April 1, 2011, and continuing on the first day of each succeeding calendar month for a period of sixty (60) months, ending March 1, 2016.

**MAKER'S RIGHT TO SET-OFF PAYMENTS. Maker and Holder acknowledge that they are parties to a certain Asset Purchase Agreement granting Maker the right to set-off payments due under this Note (Sections 8.5. and 11.6.). In the event Maker exercises its set-off rights under Section 8.4. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the delivery date of this Note shall be reduced by the set-off amount, and all past and future payments of principal and interest shall be adjusted accordingly. In the event Maker exercises its set-off rights under Section 11.6. of the Asset Purchase Agreement (the terms of which are incorporated by reference), the Principal Balance due as of the date such set-off rights are exercised shall be reduced by the set-off amount, and all future payments of principal and interest shall be adjusted accordingly.**

**PREPAYMENT ALLOWED.** This Note may be prepaid in whole or in part at any time. No partial prepayment shall affect the obligation of Maker to make any payments of principal due under this Note on the dates specified in the Payment Terms paragraph of this Note until this Note has been paid in full. Prepayments shall apply first to accrued interest and then to principal.

**APPLICATION OF PAYMENTS.** Monies received by Holder from any source for application toward payment of the obligations under this Note ("*Obligations*") shall be applied to interest first, and then to principal. If a Default occurs, monies may be applied in the following order at Holder's discretion to the Obligations: (1) expenses and costs of collection, including attorneys' fees; (2) interest, and (3) principal.

**DEFAULT.** If any of the following occurs, a default ("*Default*") under this Note shall exist: *(1)* Maker fails to timely pay any amount due under this Note.

**REMEDIES UPON DEFAULT.** If a Default occurs under this Note, Holder may at any time thereafter, take the following actions: **Acceleration Upon Default.** Accelerate the maturity of this Note and, at Holder's option, any or all other Obligations, whereupon this Note and the accelerated Obligations shall

be immediately due and payable; provided, however, if the Default is based upon a bankruptcy or insolvency proceeding commenced by or against Maker or any guarantor or endorser of this Note, all Obligations shall automatically and immediately be due and payable. **Cumulative.** Exercise any rights and remedies as provided under the Note and Security Agreement, or as provided by law or equity.

**ATTORNEYS' FEES.** If any Holder of this Note retains an attorney in connection with any Default or at maturity to collect or enforce this Note in any lawsuit or in any probate, reorganization, bankruptcy, arbitration, or other proceeding, or if Maker sues any Holder hereof in connection with this Note, then Maker agrees to pay to each such Holder, in addition to principal and any other sums owing to such Holder hereunder, all reasonable costs and expenses incurred by such Holder in trying to collect this Note or in any such suit or proceeding, including, without limitation, attorneys' fees and expenses, investigation costs, and all court costs, whether or not suit is filed hereon, whether before or after the payment date, or whether in connection with bankruptcy, insolvency, or appeal, or whether collection is made against Maker or guarantor or any other person primarily or secondarily liable hereunder.

**WAIVERS AND AMENDMENTS.** No waivers, amendments, or modifications of this shall be valid unless in writing and signed by an officer of Holder. No waiver by Holder of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Holder in exercising any right, power, or remedy under this Note and Security Agreement shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

Each Maker and each other person liable under this Note waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale, and all other notices of any kind.

**MISCELLANEOUS PROVISIONS. Assignment.** This Note shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, and successors. Holder's interests in and rights under this Note are non-negotiable and non-assignable. **Organization; Powers.** Maker represents that Maker is (i) a limited liability company, duly organized, validly existing, and in good standing under the laws of its state of organization and is authorized to do business in each jurisdiction wherein its ownership of property or conduct of business legally requires such organization; (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver, and perform, and by all necessary action has authorized the execution, delivery, and performance of, all of its obligations under this Note and the Security Agreement. **Applicable Law; Conflict Between Documents.** This Note shall be governed by and construed under the laws of the state of Texas without regard to that state's conflict of laws principles. If the terms of this Note should conflict with the terms of any loan agreement or any commitment letter that survives Closing, the terms of this Note shall control. **Severability.** If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective, but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note or other such document. **Notices.** Any notices to Maker shall be sufficiently given, if in writing and mailed or delivered to the Maker's address shown above or such other address as provided hereunder, and to Holder, if in writing and mailed or delivered to Holder at the address set forth above or such other address as Holder may specify in writing from time to time. In the event that Maker changes Maker's address at any time prior to the date the Obligations are paid in full, Maker agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid. **Plural; Captions.** All references to Maker, guarantor, person, document or other nouns of reference mean both the singular and plural form, as the case may be, and the term "person" shall mean any individual, person or entity.

**FINAL AGREEMENT.** This Note and the Security Agreement represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**IN WITNESS WHEREOF**, Maker, on the day and year first above written, has caused this Note to be executed.

**MAKER**

AMICI FRANCHISING, LLC
a Texas limited liability company

By: _____
Ed Sigmond, Manager

# GUARANTY

Each of the undersigned, an affiliate of the Maker that will secure a personal benefit from the loan evidenced by the foregoing Note, jointly and severally guarantee Maker's timely performance under the Note.

Intending to be legally bound, the undersigned have executed this Guaranty to be effective as of February 23, 2011

## GUARANTORS

AMICI ENTERPRISES, LLC
a Texas limited liability company

By: _____
Ed Sigmond, President

MADISON GA ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Ed Sigmond, President

COVINGTON ACQUISITIONS, LLC
a Georgia limited liability company

By: _____
Ed Sigmond, President

| 25 | 4/1/2013 | 4,567.34 | 750.66 | 3,816.68 | 146,316.17 |
| 26 | 5/1/2013 | 4,567.34 | 731.58 | 3,835.76 | 142,480.41 |
| 27 | 6/1/2013 | 4,567.34 | 712.40 | 3,854.94 | 138,625.47 |
| 28 | 7/1/2013 | 4,567.34 | 693.13 | 3,874.21 | 134,751.26 |
| 29 | 8/1/2013 | 4,567.34 | 673.76 | 3,893.58 | 130,857.68 |
| 30 | 9/1/2013 | 4,567.34 | 654.29 | 3,913.05 | 126,944.63 |
| 31 | 10/1/2013 | 4,567.34 | 634.72 | 3,932.62 | 123,012.01 |
| 32 | 11/1/2013 | 4,567.34 | 615.06 | 3,952.28 | 119,059.73 |
| 33 | 12/1/2013 | 4,567.34 | 595.30 | 3,972.04 | 115,087.69 |
| 34 | 1/1/2014 | 4,567.34 | 575.44 | 3,991.90 | 111,095.79 |
| 35 | 2/1/2014 | 4,567.34 | 555.48 | 4,011.86 | 107,083.93 |
| 36 | 3/1/2014 | 4,567.34 | 535.42 | 4,031.92 | 103,052.01 |
| 37 | 4/1/2014 | 4,567.34 | 515.26 | 4,052.08 | 98,999.93 |
| 38 | 5/1/2014 | 4,567.34 | 495.00 | 4,072.34 | 94,927.59 |
| 39 | 6/1/2014 | 4,567.34 | 474.64 | 4,092.70 | 90,834.89 |
| 40 | 7/1/2014 | 4,567.34 | 454.17 | 4,113.17 | 86,721.72 |
| 41 | 8/1/2014 | 4,567.34 | 433.61 | 4,133.73 | 82,587.99 |
| 42 | 9/1/2014 | 4,567.34 | 412.94 | 4,154.40 | 78,433.59 |
| 43 | 10/1/2014 | 4,567.34 | 392.17 | 4,175.17 | 74,258.42 |
| 44 | 11/1/2014 | 4,567.34 | 371.29 | 4,196.05 | 70,062.37 |
| 45 | 12/1/2014 | 4,567.34 | 350.31 | 4,217.03 | 65,845.34 |
| 46 | 1/1/2015 | 4,567.34 | 329.23 | 4,238.11 | 61,607.23 |
| 47 | 2/1/2015 | 4,567.34 | 308.04 | 4,259.30 | 57,347.93 |
| 48 | 3/1/2015 | 4,567.34 | 286.74 | 4,280.60 | 53,067.33 |
| 49 | 4/1/2015 | 4,567.34 | 265.34 | 4,302.00 | 48,765.33 |
| 50 | 5/1/2015 | 4,567.34 | 243.83 | 4,323.51 | 44,441.82 |
| 51 | 6/1/2015 | 4,567.34 | 222.21 | 4,345.13 | 40,096.69 |
| 52 | 7/1/2015 | 4,567.34 | 200.48 | 4,366.86 | 35,729.83 |
| 53 | 8/1/2015 | 4,567.34 | 178.65 | 4,388.69 | 31,341.14 |
| 54 | 9/1/2015 | 4,567.34 | 156.71 | 4,410.63 | 26,930.51 |
| 55 | 10/1/2015 | 4,567.34 | 134.65 | 4,432.69 | 22,497.82 |
| 56 | 11/1/2015 | 4,567.34 | 112.49 | 4,454.85 | 18,042.97 |
| 57 | 12/1/2015 | 4,567.34 | 90.21 | 4,477.13 | 13,565.84 |
| 58 | 1/1/2016 | 4,567.34 | 67.83 | 4,499.51 | 9,066.33 |
| 59 | 2/1/2016 | 4,567.34 | 45.33 | 4,522.01 | 4,544.32 |
| 60 | 3/1/2016 | 4,567.34 | 23.02 | 4,544.32 | 0.00 |

Grand Totals    274,040.40    37,792.40    236,248.00
Last interest amount increased by 0.30 due to rounding.

# EXHIBIT 2

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of the 24th day of February, 2011 (the "Effective Date"), by and between The Great American Food Chain, Inc., a Nevada corporation (the "Company"), and Robert Andreottola (hereinafter, "Andreottola," and collectively with the Company, the "Parties"). The Company and Andreottola may be referred to herein individually as a "Party" or collectively as the "Parties".

### RECITALS

The Company desires assurance of the association and services of Andreottola in order to retain his experience, skills, abilities, background and knowledge, and is willing to engage Andreottola services on the terms and conditions set forth in this Agreement. Andreottola desires to be in the employ of the Company, and is willing to accept such employment on the terms a conditions set forth in this Agreement.

In consideration of the foregoing recitals and the mutual promises and covenants herein contained, and for other good and valuable consideration, the Parties, intending to be legally bound, agree as follows:

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

### ARTICLE I

### EMPLOYMENT; TERM; DUTIES

1.1     Employment.     Pursuant to the terms and conditions hereinafter set forth, the Company hereby employs Andreottola, and Andreottola hereby accepts employment, as President of The Great American Food Chain, Inc. and a member of the Board of Directors of The Great American Food Chain, Inc.

1.2     Term.  Unless otherwise terminated earlier in accordance with the provisions of this Agreement, Andreottola's employment with the Company shall commence on the Effective Date, and shall continue for a period of Three (3) year from the Effective Date (the "Initial Employment Term"). Upon expiration of the Initial Employment Term, the Term shall automatically renew for successive one-year periods every year thereafter ("Successive Terms") on the same terms and conditions set forth herein unless either Party provides the other with written notice of its intention not to renew the Term at least ninety (90) days prior to the end of the then-current term.

1.3     Duties and Responsibilities.     Andreottola shall perform such administrative, managerial and Andreottola duties for the Company (and its subsidiaries if and when directed by the Board of Directors of the Company (the "Board")) as are prescribed by applicable job specifications for the President and the Bylaws of the Company, such tasks and responsibilities as are customarily vested in and incidental to such positions, and such other duties, consistent with the Company's Bylaws, as may be assigned to him from time to time by the Board.

1.4     Exclusive Employment. This is a full time position and Andreottola agrees to devote the necessary amount of Andreottola's business time, energy and efforts to the business of the

1

Company (and its subsidiaries if and when directed by the Board), and to use Andreottola's best efforts and abilities faithfully and diligently to promote the business interests of the Company (and its subsidiaries if and when directed by the Board).

1.5    Other Obligations.  Andreottola represents that he has no other obligations that will impinge on his duties and obligations to Company under this Employment Agreement.

1.6    Board of Directors.  As of the Effective Date of this Agreement, Andreottola is hereby appointed as a member of the Board, and shall serve until the next election of directors by the Company's shareholders.  Thereafter, provided that Andreottola is still employed hereunder, the Board shall nominate Andreottola to be elected to serve on the Board at each meeting of the Company's shareholders held during the Term to elect directors, consistent with the provisions of Bylaws and Articles of Incorporation of the Company, as amended and in effect from time to time.

1.7    Indemnification and Insurance.  Andreottola shall receive indemnification as a corporate officer and as a director to the maximum extent extended to other officers and directors of the Company generally as provided by Nevada General Corporate Law and the Certificate of Incorporation and ByLaws of the Company, and shall be included as an insured under the Company's Director's and Officer's liability insurance policies.  Andreottola shall be permitted to review the applicable indemnification agreement prior to execution of this Agreement.  The Parties agree that in no event shall any indemnification be lower than that provided by Nevada General Corporate Law.

1.8    Covenants of Andreottola.

1.8.1    Best Efforts.  Andreottola shall report directly to the Board and shall devote his best efforts to the business and affairs of the Company (and its subsidiaries if and when directed by the Board).  Andreottola shall perform his duties, responsibilities and functions to the Company hereunder to the best of his abilities in a diligent, trustworthy, professional and efficient manner and shall comply, in all material respects, with all rules, regulations of the Company (and special instructions of the Board, if any) and all other rules, regulations, guides, handbooks, procedures and policies applicable to the Company and its business in connection with his duties hereunder.

1.8.2    Records.  Andreottola shall use his best efforts and skills to truthfully, accurately, and promptly prepare, maintain, and preserve all records and reports that the Company may, from time to time, request or require, fully account for all money, records, equipment, materials, or other property belonging to the Company of which he may have custody, and promptly pay and deliver the same whenever he may be directed to do so by the Board.

1.8.3    Code of Conduct.  For such period as when Andreottola is employed hereunder, Andreottola shall at all times conduct himself with the highest ethical standards, and shall at all times adhere to Code of Conduct attached hereto as Exhibit A or such other code of ethics that the Company may, from time to time, adopt.

1.8.4    Opportunities.  Andreottola shall make available to the Company and present to the Board all business opportunities of which he becomes aware, which are relevant to the business of the Company (and its subsidiaries), and without any limitation, to no other person or entity or to himself individually.

2

## ARTICLE II

### COMPENSATION AND OTHER BENEFITS

2.1 Base Salary. For the duration of the Term, for all services rendered by Andreottola hereunder and all covenants and conditions undertaken by the Parties pursuant to this Agreement, the Company shall pay, and Andreottola shall accept, as compensation, an annual base salary ("Base Salary") of Sixty Thousand dollars ($60,000.00) for the first three (3) months of employment. The Base Salary shall increase to Seventy Five Thousand dollars ($75,000.00) beginning June 1, 2011. The Base Salary shall be increase according to the formula contained herein; with the acquisition of each brand, 5% of their annual EBITDA will be calculated and that amount would be added as annual Base Salary. Annual EBITDA is defined as the contract price of the brand. This formula and compensation plan will be continue up to a Base Salary of $275,000.00 annually. Once this amount is established all future salaries and bonuses are determined by the compensation committee of GAFC. The Base Salary shall be payable in regular installments in accordance with the normal payroll practices of the Company, in effect from time to time, but in any event no less frequently than on a monthly basis.

2.2 Bonus Compensation. For each year during the Term, Andreottola will be eligible to earn an annual bonus (the "Bonus"), which Bonus shall be based on Andreottola's achievement of certain performance criteria established by the Compensation Committee of the Board ("Compensation Committee") and provided to Andreottola as soon as practicable following the commencement of each such year. In connection with the award of any Bonus pursuant to this Section 2.2, Andreottola's performance will be reviewed by the Compensation Committee on no less than an annual basis. Notwithstanding anything herein to the contrary, the Parties hereby acknowledge and agree that the Compensation Committee shall, in accordance with NASDAQ rules and regulations for publicly traded companies, comprise independent directors of the Board only. In the event that the Company has not established a Compensation Committee, the independent directors of the Board shall establish the annual target amount of any Bonus to be awarded hereunder and shall determine whether the target milestones have been satisfied. The Bonus shall be paid within three (3) months after the Company's fiscal year end.

2.3 Employment Incentive . Concurrently with the execution of this Agreement, the Company shall grant Andreottola an Incentive (the "Employment Incentive") of Two Hundred and Fifty Thousand shares (250,000) of the Company's common stock. The Employment Incentive shall vest according to the schedule set forth below:

      2.3.1    Twenty-five percent (25%) shall vest on December 31, 20111;

      2.3.2    Fifty percent (50%) shall vest six on December 31, 2012;

      2.3.3    Twenty-five percent (25%) shall vest on December 31, 2013,

2.4 Business Expenses. During the Initial Term and all Successive Terms thereafter, the Company shall reimburse Andreottola for all reasonable, out-of-pocket business expenses incurred in the performance of his duties hereunder consistent with the Company's policies and procedures, in effect from time to time, with respect to travel, entertainment and other business expenses customarily reimbursed to senior Andreottolas of the Company in connection with the performance of their duties on

3

behalf of the Company.  Such reimbursement shall be made by Company to Andreottola no later than thirty (30) days after submission of written expense reports by Andreottola to Company.

2.5     Other Benefits.  During the term of Andreottola's employment with the Company, Andreottola shall be entitled to the following benefits:

2.5.1     Andreottola shall be entitled to participate in the Company's employee stock option plan, life, health, accident, disability insurance plans, pension plans and retirement plans, in effect from time to time, to the extent and on such terms and conditions as the Company customarily makes such plans available to its senior Andreottola; and

2.5.2     Andreottola shall be entitled to receive coverage for services rendered to the Company (and its subsidiaries if and when directed by the Board) while Andreottola is a director or officer of the Company under any director and officer liability insurance policy(s) maintained by the Company from time to time.

2.6     Vacation.  Andreottola shall be entitled to vacation time each calendar year with full pay in accordance with the Company's then current vacation policy governing employees of the Company.

2.7     Withholding.  The Company may deduct from any compensation payable to Andreottola (including payments made pursuant to this Article II or in connection with the termination of employment pursuant to Article III of this Agreement) amounts sufficient to cover Andreottola's share of applicable federal, state and/or local income tax withholding, social security payments, state disability and other insurance premiums and payments.

## ARTICLE III

### TERMINATION OF EMPLOYMENT

3.1     Termination of Employment.     The Company hereby employs Anderottola, and Andreottola hereby accepts employment by the Company, upon the terms and conditions set forth in this Agreement. Andreottola shall be employed at will, meaning that either the Company or Anderottola may terminate this agreement and Andreottola's employment at any time, for any reason or no reason, with or without cause, without liability to the other save for wages earned through the effective date of termination.

Andreottola's employment pursuant to this Agreement shall terminate on the earliest to occur of the following:

3.1.1     upon the delivery to Andreottola of written notice of termination by the Company by the Board for any reason; or

3.1.2     upon the expiration of the Initial Term (or, if the Initial Term has been extended, upon the expiration of the then current Successive Term); or

3.1.3     upon the death of Andreottola.

3.2     Certain Definitions.  For purposes of this Agreement, "Termination Date" shall mean the date on which Andreottola's employment with the Company hereunder is terminated.

4

3.3     Effect of Termination.

3.3.1     If Andreottola's employment is terminated by Company, Andreottola shall be entitled to the following Severance Payments (the "Severance Payments"):

(a)     If terminated after December 31,2011the Company shall pay Andreottola an amount equal to six (6) months Andreottola's current monthly Base Salary in effect on the Termination Date; and

(b)     Any Employment Incentive Stock granted to Andreottola pursuant to Section 2.3 hereof having already vested; any unvested Employment Incentive Stock shall be forfeited.

3.3.2     At such time when Andreottola's employment with the Company is terminated, and as a condition to Andreottola's right to receive Severance Payments pursuant to this Section 3.3.1, Andreottola shall execute and deliver to the Company a written release in a form mutually acceptable to the Company and Andreottola.

3.3.3     Notwithstanding the reason for termination of Andreottola's employment or by which Party, Andreottola shall be entitled to:

(a)     all benefits payable under applicable benefit plans in which Andreottola is entitled to participate pursuant to Section 2.5 hereof through the Termination Date, subject to and in accordance with the terms of such plans; and

(b)     any accrued but unused vacation earned by Andreottola through the Termination Date pursuant to Section 2.6 hereof, paid out in accordance with legal requirements; and

(c)     reimbursement for any business expenses incurred by Andreottola prior to Termination Date in accordance with Section 2.4 of this Agreement.

3.3.4     If Andreottola's employment is terminated for death, disability, by Andreottola other than for Good Reason or by the Company for Cause, Andreottola shall be entitled to no severance or other post-employment benefits (including, without limitation, the Severance Payments) except as provided in Section 3.3.2 of this Agreement.

3.3.5     Andreottola hereby acknowledges that in the event of termination of his employment for any reason, Andreottola shall not be entitled to any severance, payment or other compensation from the Company except as specifically provided in this Section 3.3.

3.4     Section 409A.

3.4.1     Notwithstanding anything to the contrary in this Agreement, no severance payable to Andreottola, if any, pursuant to this Agreement that, when considered together with any other severance payments or separation benefits, are considered deferred compensation under Internal Revenue Service Code Section 409A and the final regulations and official guidance promulgated there under (together, "Section 409A") (together, the "Deferred Compensation Separation Benefits") will be payable until Andreottola has a "separation from service" within the meaning of Section 409A. Similarly, no severance payable to Andreottola, if any, pursuant to this Agreement that otherwise would be exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9) will be payable until Andreottola has a "separation from service" within the meaning of Section 409A.

5

GAMN-SIG-00046

3.4.2     Notwithstanding anything to the contrary in this Agreement, if Andreottola is a "specified employee" within the meaning of Section 409A at the time of Anderottola's separation from service, then, if required, the Deferred Compensation Separation Benefits, which are otherwise due to Anderottola on or within the six (6) month period following Anderottola's separation from service will accrue, to the extent required, during such six (6) month period and will become payable in a lump-sum payment on the date six (6) months and one (1) day following the date of Anderottola's separation from service or the date of Anderottola's death, if earlier. All subsequent Deferred Compensation Separation Benefits, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

3.4.3     Any amount paid under the Agreement that satisfies the requirements of the "short-term deferral" rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations will not constitute Deferred Compensation Separation Benefits for purposes of clause (a) above.

3.4.4     Any amount paid under this Agreement that qualifies as a payment made as a result of an involuntary separation from service pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations that does not exceed the Section 409A Limit will not constitute Deferred Compensation Separation Benefits for purposes of clause (a) above. "Section 409A Limit" will mean the lesser of two (2) times: (i) Andreottola's annualized compensation based upon the annual rate of pay paid to Andreottola during the Company's taxable year preceding the Company's taxable year of Andreottola's termination of employment as determined under Treasury Regulation 1.409A-1(b)(9)(iii)(A)(1) and any Internal Revenue Service guidance issued with respect thereto; or (ii) the maximum amount that may be taken into account under a qualified plan pursuant to Section 401(a)(17) of the Internal Revenue Code for the year in which Andreottola's employment is terminated.

3.4.5     The foregoing provisions are intended to comply with the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities herein will be interpreted to so comply. Anderottola and the Company agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to Anderottola under Section 409A."

## ARTICLE IV

### INVENTIONS; CONFIDENTIAL/TRADE SECRET INFORMATION AND RESTRICTIVE COVENANTS

4.1     Inventions. All processes, technologies and inventions relating to the business of the Company (and its subsidiaries) (collectively, "Inventions"), including new contributions, improvements, ideas, discoveries, trademarks and trade names, conceived, developed, invented, made or found by the Andreottola, alone or with others, during his employment by the Company, whether or not patentable and whether or not conceived, developed, invented, made or found on the Company's time or with the use of the Company's facilities or materials, shall be the property of the Company and shall be promptly and fully disclosed by Andreottola to the Company. The Andreottola shall perform all necessary acts (including, without limitation, executing and delivering any confirmatory assignments, documents or instruments requested by the Company) to assign or otherwise to vest title to any such Inventions in the Company and to enable the Company, at its sole expense, to secure and maintain domestic and/or foreign patents or any other rights for such Inventions.

6

4.2     Confidential/Trade Secret Information/Non-Disclosure.

4.2.1     Confidential/Trade Secret Information Defined.     During the course of Andreottola's employment, Andreottola will have access to various Confidential/Trade Secret Information of the Company and information developed for the Company   For purposes of this Agreement, the term "Confidential/Trade Secret Information" is information that is not generally known to the public and, as a result, is of economic benefit to the Company in the conduct of its business, and the business of the Company's subsidiaries. Andreottola and the Company agree that the term "Confidential/Trade Secret Information" includes but is not limited to all information developed or obtained by the Company, including its affiliates, and predecessors, and comprising the following items, whether or not such items have been reduced to tangible form (e.g., physical writing, computer hard drive, disk, tape, etc.): all methods, techniques, processes, ideas, research and development, product designs, engineering designs, plans, models, production plans, business plans, add-on features, trade names, service marks, slogans, forms, pricing structures, menus, business forms, marketing programs and plans, layouts and designs, financial structures, operational methods and tactics, cost information, the identity of and/or contractual arrangements with suppliers and/or vendors, accounting procedures, and any document, record or other information of the Company relating to the above. Confidential/Trade Secret Information includes not only information directly belonging to the Company which existed before the date of this Agreement, but also information developed by Andreottola for the Company, including its subsidiaries, affiliates and predecessors, during the term of Andreottola's employment with the Company. Confidential/Trade Secret Information does not include any information which (a) was in the lawful and unrestricted possession of Andreottola prior to its disclosure to Andreottola by the Company, its subsidiaries, affiliates or predecessors, (b) is or becomes generally available to the public by lawful acts other than those of Andreottola after receiving it, or (c) has been received lawfully and in good faith by Andreottola from a third party who is not and has never been an Andreottola of the Company, its subsidiaries, affiliates or predecessors, and who did not derive it from the Company, its subsidiaries, affiliates or predecessors.

4.2.2     Restriction on Use of Confidential/Trade Secret Information. Andreottola agrees that his/her use of Confidential/Trade Secret Information is subject to the following restrictions for an indefinite period of time so long as the Confidential/Trade Secret Information has not become generally known to the public:

(a)     Non-Disclosure. Andreottola agrees that he will not publish or disclose, or allow to be published or disclosed, Confidential/Trade Secret Information to any person without the prior written authorization of the Company unless pursuant to or in connection with Andreottola's job duties to the Company under this Agreement.

(b)     Non-Removal/Surrender. Andreottola agrees that he will not remove any Confidential/Trade Secret Information from the offices of the Company or the premises of any facility in which the Company is performing services, except pursuant to his duties under this Agreement. Andreottola further agrees that he shall surrender to the Company all documents and materials in his possession or control which contain Confidential/Trade Secret Information and which are the property of the Company upon the termination of this Agreement, and that he shall not thereafter retain any copies of any such materials.

4.2.3     Prohibition Against Unfair Competition/ Non-Solicitation of Customers. Andreottola agrees that at no time after his employment with the Company will he engage in competition with the Company while making any use of the Confidential/Trade Secret Information, or otherwise exploit or make use of the Confidential/Trade Secret Information. Andreottola agrees that during the twelve month period following the Termination Date, he will not directly or indirectly accept or solicit, in any capacity, the business of any customer of the Company with whom Andreottola worked or otherwise had access to

7

GAMN-SIG-00048

the Confidential/Trade Secret Information pertaining to the Company's business with such customer during the last year of Andreottola's employment with the Company, or solicit, directly or indirectly, or encourage any of the Company's customers or suppliers to terminate their business relationship with the Company, or otherwise interfere with such business relationships.

4.3     Non-Solicitation of Employees.  Employee agrees that during the twelve month period following the Termination Date, he shall not, directly or indirectly, solicit, directly or indirectly, or otherwise encourage any employees of the Company to leave the employ of the Company, or solicit, directly or indirectly, any of the Company's employees for employment.

4.4     Non-Solicitation During Employment.  During his employment with the Company, Anderottola shall not: (a) interfere with the Company's business relationship with its customers or suppliers, (b) solicit, directly or indirectly, or otherwise encourage any of the Company's customers or suppliers to terminate their business relationship with the Company, or (c) solicit, directly or indirectly, or otherwise encourage any employees of the Company to leave the employ of the Company, or solicit any of the Company's employees for employment.

4.5     Conflict of Interest.  During Andreottola's employment with the Company, Andreottola must not engage in any work, paid or unpaid, that creates an actual conflict of interest with the Company.

4.6     Breach of Provisions.  If Andreottola breaches any of the provisions of this Article IV, or in the event that any such breach is threatened by Andreottola, in addition to and without limiting or waiving any other remedies available to the Company at law or in equity, the Company shall be entitled to immediate injunctive relief in any court, domestic or foreign, having the capacity to grant such relief, to restrain any such breach or threatened breach and to enforce the provisions of this Article IV.

4.7     Reasonable Restrictions.  The Parties acknowledge that the foregoing restrictions, as well as the duration and the territorial scope thereof as set forth in this Article IV, are under all of the circumstances reasonable and necessary for the protection of the Company and its business.

4.8     Special Definition.  For purposes of this Article IV, the term "Company" shall also be deemed to include any subsidiary of the Company.

## ARTICLE V

## MISCELLANEOUS

5.1     Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, heirs, distributees, successors and assigns. Andreottola may not assign any of his rights and obligations under this Agreement.  The Company may assign its rights and obligations under this Agreement to any successor entity.

5.2     Notices.  Any notice provided for herein shall be in writing and shall be deemed to have been given or made (a) when personally delivered or (b) when sent by telecopier and confirmed within 48 hours by letter mailed or delivered to the party to be notified at its or his/hers address set forth herein; or three (3) days after being sent by registered or certified mail, return receipt requested, (or by equivalent currier with delivery documentation such as FEDEX or UPS) to the address of the other party set forth or to such other address as may be specified by notice given in accordance with this section 5.2:

If to the Company:          The Great American Food Chain, Inc.

8

2808 Cole Avenue
Dallas, Texas 75204
Telephone: (214) 880-0446
Attention:   Chairman of the Compensation Committee
of the Board of Directors

With a copy (which shall not constitute notice) to:

Mullin Law, PC
Cheryl L. Mullin
2425 N. Central Expy., Suite 200
Richardson, TX 75080
972.852.1703
cheryl.mullin@mullinlawpc.com

If to Andreottola:

Robert Andreottola

5.3     Severability.  If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and shall not in any manner affect or render invalid or unenforceable any other provision of this Agreement or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein.  In addition, any such invalid or unenforceable provision or portion thereof shall be deemed, without further action on the part of the parties hereto, modified, amended or limited to the extent necessary to render the same valid and enforceable.

5.4     Waiver.  No waiver by a party hereto of a breach or default hereunder by the other party shall be considered valid, unless expressed in a writing signed by such first party, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or any other nature.

5.5     Entire Agreement.  This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any and all prior agreements between the Company and Andreottola, whether written or oral, relating to any or all matters covered by and contained or otherwise dealt with in this Agreement.  This Agreement does not constitute a commitment of the Company with regard to Andreottola's employment, express or implied, other than to the extent expressly provided for herein.

5.6     Amendment.  No modification, change or amendment of this Agreement or any of its provisions shall be valid, unless in writing and signed by the Parties.

5.7     Authority.  The Parties each represent and warrant that it/he has the power, authority and right to enter into this Agreement and to carry out and perform the terms, covenants and conditions hereof.

5.8     Attorneys' Fees.  If either party hereto commences an arbitration or other action against the other party to enforce any of the terms hereof or because of the breach by such other party of any of the terms hereof, the prevailing party shall be entitled, in addition to any other relief granted, to all actual out-of-pocket costs and expenses incurred by such prevailing party in connection with such action, including,

9

GAMN-SIG-00050

without limitation, all reasonable attorneys' fees, and a right to such costs and expenses shall be deemed to have accrued upon the commencement of such action and shall be enforceable whether or not such action is prosecuted to judgment.

5.9     Captions. The captions, headings and titles of the sections of this Agreement are inserted merely for convenience and ease of reference and shall not affect or modify the meaning of any of the terms, covenants or conditions of this Agreement.

5.10     Governing Law. This Agreement, and all of the rights and obligations of the Parties in connection with the employment relationship established hereby, shall be governed by and construed in accordance with the substantive laws of the State of Texas without giving effect to principles relating to conflicts of law.

5.11     Survival. The termination of Andreottola's employment with the Company pursuant to the provisions of this Agreement shall not affect Andreottola's obligations to the Company hereunder which by the nature thereof are intended to survive any such termination, including, without limitation, Andreottola's obligations under Article IV of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

THE GREAT AMERICAN FOOD CHAIN, INC.,
a Nevada corporation

By: _____
Name:  Edward Sigmond
Title:  CEO & Chairman of the
Board of Directors

10

GAMN-SIG-00051

## EXHIBIT A

### CODE OF CONDUCT

**Honesty and Integrity**

Our business is based on mutual trust, honesty and integrity in all of our affairs, both internally and externally. This philosophy must be respected at all times. Each of us must be truthful in our business dealings with each other, and with our auditors, legal counsel, regulators and loan review and compliance staffs. Illegal, dishonest and fraudulent acts are grounds for termination. Making false statements or otherwise misleading internal or external auditors, attorneys, regulators or loan review and compliance personnel is prohibited. You must never withhold or fail to communicate fully information that is requested in connection with an appropriately authorized investigation or review. Any concealment of information is a violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

**Protecting Corporate Assets**

You are responsible for safeguarding the assets of the Company. Company assets must not be used for personal benefit. The Company's assets include, but is not limited to, all of its properties, including intellectual properties, business information, cash, and securities. Misappropriation of Company assets is a violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

**Accuracy of Company Records and Reports**

The Company is committed to maintaining records, data and information that are accurate and complete so as to permit the Company to make timely and accurate disclosures to its regulators and to its shareholders. You are personally responsible for the integrity of the information, reports and records under your control. Records must be maintained in sufficient detail so as to reflect accurately the Company's transactions and activities. Our financial statements must be prepared in accordance with generally accepted accounting principles ("GAAP") and fairly present, in all material respects, the financial condition and results of the Company. To accomplish full, fair, and accurate reporting, you must ensure that financial reports issued by the Company are timely, accurate, understandable, and complete.

**Compliance With Laws**

The Company's activities shall always be in full compliance with all applicable laws and regulations. When such laws or regulations are ambiguous or difficult to interpret, you should seek advice from the Company's outside legal counsel.

**Conflicts Of Interest**

You must conduct your private, business, and personal activities in a manner that avoids conflict with, or even the appearance of conflict with, your ability to act solely in the interests of the Company. A conflict of interest arises if you have interests of any nature that compromise your ability to act objectively and in the best interests of the Company. Conflicts can arise directly or through your family members or through business or other entities in which you or your family members have an interest. At no time may you, on behalf of the Company, transact personal business, the business of an immediate family member, or the business of a for profit entity in which you or a member of your immediate family has an interest (other than an interest not exceeding 1% in a publicly traded company (a "Permitted Public Company Interest")), with the Company. In all such situations, you must disqualify yourself from involvement with

GAMN-SIG-00052

any transaction or relationship between that person and the Company except as set forth in Section 1.6 herein.

### Business Ventures with Customers
You may not enter into or participate with the Company's customers in business ventures without the approval of a majority of the Governance & Compliance Committee of the Board.

### Acting as a Fiduciary
Officers may not assume the responsibility of executor, administrator, trustee, guardian, custodian, attorney-in-fact under a power of attorney, or any other fiduciary capacity (except with respect to matters involving direct family relationships) without the approval of a majority of the Governance & Compliance Committee of the Board.

### Company Opportunities
You must not take for yourself any opportunity that belongs to the Company. Whenever the Company has been seeking a particular business opportunity, or the opportunity has been offered to the Company, or the Company's funds, facilities or personnel have been used in developing the opportunity, that opportunity rightfully belongs to the Company and not to its employees.

### Investments in Customers or Suppliers
Because investments are an area in which conflicts of interest can very easily develop, you should obtain prior approval from a majority of the Governance & Compliance Committee of the Board before investing directly or indirectly in the business of a customer or supplier of the Company, other than a Permitted Public Company Interest, as defined above. Under no circumstances should you acquire an equity interest in a company that is a customer or supplier at a price which is more favorable than the price offered to the general public. If you own a direct or indirect interest in a business or other entity that becomes a customer or supplier, you should notify a majority of the Governance & Compliance Committee of the Board of the Board as soon as the underlying facts are known to you.

### Business Expenses
You must have all business-related expenses approved by the Chairman of the Chairman of the Compensation Committee of the Board of Directors of the Company. You must carefully observe expense account regulations and guidelines. Falsification of an expense account is considered to be a misappropriation of corporate funds and constitutes grounds for dismissal.

### Bequests from Customers
You may not accept a bequest or legacy from a customer, unless the customer is your immediate family member. However, there may be an occasional instance when a bequest from a non-relative customer is based upon a relationship other than the normal business relationship, which arises between you and a customer. In such a situation, full consideration by a majority of disinterested members of the Governance & Compliance Committee of the Board, will be given to approving receipt of the bequest.

### Gifts from Customers
You shall not solicit or accept for yourself, or for a third party, anything of value in return for, or in connection with, any business, service, or activity of the Company. You shall not accept a gift in circumstances in which it could appear that his or her business judgment was influenced by such gift. You shall not allow an immediate family member or business associate to accept a gift, services, loans or preferential treatment in exchange for a past, current, or future business relationship with the Company.

GAMN-SIG-00053

## Disclosure of Potential Conflicts of Interest

You shall immediately disclose to a majority of disinterested members of the Governance & Compliance Committee of the Board all situations that possess a potential for conflict of interest.

## Political Donations

You are prohibited from making any contribution to political candidates on behalf of the Company. You also may not make any contributions of anything of value in connection with any federal, state or local candidate's election. The Company makes, and discloses fully, contributions in state and local elections for the purpose of supporting ballot propositions that are in the interests of the Company and its several constituencies. Any proposal for political contributions on behalf of the Company or a group of Company employees should be referred for approval to a majority of disinterested members of the Governance & Compliance Committee of the Board.

## Confidential Information

You shall not use confidential and nonpublic information in any manner for personal advantage or to provide advantage to others.

## Insider Trading

You must at all times comply with all laws and regulations concerning insider trading. In general, you are prohibited by applicable law from trading in the securities of any company while in possession of material, nonpublic information (also known as "inside information") regarding that company. This prohibition applies to the Company's securities as well as to the securities of other companies, including the Company's customers and suppliers, and to transactions for any account of the Company, client account or personal account. It is also illegal to "tip" or pass on inside information to any other person if you know or reasonably suspect that the person receiving such information from you will misuse such information by trading in securities or passing such information on further, even if you do not receive any monetary benefit.

## Investment Prudence

You must not use your position at the Company to obtain leverage with respect to any investment, including investments in publicly traded securities, and should not accept preferential treatment of any kind based on your position with the Company in connection with your investments.

## Cross - Selling Services/Tying Restrictions.

"Tying" arrangements, whereby customers are required to purchase or provide one product or service as a condition for another being made available, are unlawful in certain instances. You should consult the Company's outside legal counsel for advice on tying restrictions. The Company prohibits any such unlawful requirements.

## Anti - Competitive Practices.

The Company is subject to complex laws (known as "antitrust laws") designed to preserve competition among enterprises and to protect consumers from unfair business arrangements and practices. You should avoid discussion of competitively sensitive topics, such as prices, pricing policies, costs and marketing strategies (except as reasonably required by your job duties).

## Anti – Money Laundering Compliance.

Money laundering is the process of converting illegal proceeds so that funds are made to appear legitimate, and it is not limited to cash transactions. The Company is obligated by law to join with governments, international organizations and members of the financial services industry to help prevent money laundering. You must follow all of anti-money laundering policies and procedures.

GAMN-SIG-00054

**Nondiscrimination.**
The Company endeavors to make all decisions responsibly, constructively and equitably without bias as to race, color, creed, religion, national origin, sex, marital status, age, veteran's status or membership in any other protected class or receipt of public assistance. Failure to do so is against Company policy.

**Misleading Statements.**
You shall not make false or misleading remarks about suppliers, customers, or competitors, or their products and services.

**Corporate Gifts to Others.**
You must use care in connection with gifts to others. If a gift could be viewed as consideration for business, you should not make the gift.

**Entertainment.**
Legitimate entertainment of reasonable value is an accepted practice to the extent that it meets all standards of ethical business conduct and involves no element of concealment.

**Other Remuneration.**
In the conduct of the Company's business, no bribes, kickbacks or similar remuneration or consideration of any kind are to be given or offered to any individual or organization for any reason whatsoever.

**Equal Employment Opportunity.**
The Company is an equal opportunity employer and you are expected to comply with all laws concerning discriminatory employment practices. Advancement at the Company is based on talent and performance. In addition, retaliation against individuals for raising claims of discrimination is prohibited.

**Harassment and Intimidation.**
The Company prohibits sexual or any other kind of harassment or intimidation by any Employee, Officer, or Director of the Company. Harassment, whether based on a person's race, gender, religion, national origin, disability, sexual orientation, or socioeconomic status, is completely inconsistent with our tradition of providing a respectful, professional workplace. You must never use company systems to transmit or receive electronic images or text of a sexual nature or containing ethnic slurs, racial epithets or any other material of a harassing, offensive or lewd nature.

GAMN-SIG-00055

EXHIBIT 3

<div align="center">

**AMENDED AND RESTATED BYLAWS**
**OF**
**GREAT AMERICAN FOOD CHAIN, INC.**
a Nevada corporation

**ARTICLE 1.**
**DEFINITIONS**

</div>

1.1      <u>Definitions</u>. Unless the context clearly requires otherwise, in these Amended and Restated Bylaws:

    (a) "*Articles of Incorporation*" means the Articles of Incorporation of Great American Food Chain, Inc., as filed with the Secretary of State of the State of Nevada and includes all amendments thereto and restatements thereof subsequently filed.

    (b) "*Board*" means the board of directors of the Company and/or an authorized Committee of the Board.

    (c) "*Bylaws*" means these Amended and Restated Bylaws as adopted by the Board and includes amendments subsequently adopted by the Board or by the Stockholders.

    (d) "*Company*" means Great American Food Chain, Inc., a Nevada corporation.

    (e) "*Nevada Law*" means the Nevada Revised Statutes, as amended from time to time.

    (f) "*Section*" refers to sections of these Bylaws.

    (g) "*Stockholder*" means stockholders of record of the Company.

1.2      <u>Offices</u>. The title of an office refers to the person or persons who at any given time perform the duties of that particular office for the Company.

<div align="center">

**ARTICLE 2.**
**OFFICES**

</div>

2.1      <u>Principal Office</u>. The Company may locate its principal office within or without the state of incorporation as the Board may determine.

2.2      <u>Registered Office</u>. The registered office of the Company required by law to be maintained in the state of incorporation may be, but need not be, the same as the principal place of business of the Company. The Board may change the address of the registered office from time to time.

2.3      <u>Other Offices</u>. The Company may have offices at such other places, either within or without the state of incorporation, as the Board may designate or as the business of the Company may require from time to time.

<div align="center">

**ARTICLE 3.**
**MEETINGS OF STOCKHOLDERS**

</div>

3.1      <u>Annual Meetings</u>. The Stockholders of the Company shall hold their annual meetings for the purpose of electing directors and for the transaction of such other proper business as may come before such meetings at such time, date and place as the Board shall determine by resolution.

3.2      <u>Special Meetings</u>. The Board, the Chairman of the Board, the President or a committee of the Board duly designated and whose powers and authority include the power to call meetings may call special meetings of the Stockholders of the Company at any time for any purpose or purposes. Special meetings of the Stockholders of the Company may also be called by the holders of at least 30% of all shares entitled to vote at the proposed special meeting.

3.3      <u>Place of Meetings</u>. The Stockholders shall hold all meetings at such places, within or without the State of Nevada, as the Board or a committee of the Board shall specify in the notice or waiver of notice for such meetings.

3.4      <u>Notice of Meetings</u>. Except as otherwise required by law, the Board or a committee of the Board shall give notice of each meeting of Stockholders, whether annual or special, not less than 10 nor more than 60 days before the date of the meeting. The Board or a committee of the Board shall deliver a notice to each Stockholder entitled to vote at such meeting by delivering a typewritten or printed notice thereof to him personally, or by depositing such notice in the United States mail, in a postage prepaid envelope, directed to him at his address as it appears on the records of the Company, or by transmitting a notice thereof to him at such address by telegraph, telecopy, cable or wireless. If mailed, notice is given on the date deposited in the United States mail, postage prepaid, directed to the Stockholder at his address as it appears on the records of the Company. An affidavit of the Secretary or an Assistant Secretary or of the Transfer Agent of the Company that he has given notice shall constitute, in the absence of fraud, prima facie evidence of the facts stated therein.

Everynotice of a meeting of the Stockholders shall state the place, date and hour of the meeting and, in the case of a special meeting, also shall state the purpose or purposes of the meeting.  Furthermore, if the Company will maintain the list at a place other than where the meeting will take place, every notice of a meeting of the Stockholders shall specify where the Company will maintain the list of Stockholders entitled to vote at the meeting.

3.5     Stockholder Notice.  Subject to the Articles of Incorporation, the Stockholders who intend to nominate persons to the Board of Directors or propose any other action at an annual meeting of Stockholders must timely notify the Secretary of the Company of such intent.  To be timely, a Stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Company not earlier than the close of business on the day which falls 120 days prior to the one year anniversary of the Company's last annual meeting of Stockholders and not later than the close of business on the day which falls 90 days prior to the one year anniversary of the Company's last annual meeting of Stockholders, together with written notice of the shareholder's intention to present a proposal for action at the meeting, unless the Company's annual meeting date occurs more than 30 days before or 30 days after the one year anniversary of the Company's last annual meeting of Stockholders. In that case, the Company must receive proposals not earlier than the close of business on the 120th day prior to the date of the annual meeting and not later than the close of business on the later of the 90th day prior to the date of the annual meeting or, if the first public announcement of the date of the annual meeting is less than 100 days prior to the date of the meeting, the 10th day following the day on which the Company first makes a public announcement of the date of the annual meeting. Such notice must be in writing and must include a (i) a brief description of the business desired to the brought before the annual meeting and the reasons for conducting such business at the meeting; (ii) the name and record address of the Stockholder proposing such business; (iii) the class, series and number of shares of capital stock of the Company which are beneficially owned by the Stockholder; and (iv) any material interest of the Stockholder in such business.  The Board of Directors reserves the right to refuse to submit any such proposal to Stockholders at an annual meeting if, in its judgment, the information provided in the notice is inaccurate or incomplete.

3.6     Waiver of Notice.  Whenever these Bylaws require written notice, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall constitute the equivalent of notice.  Attendance of a person at any meeting shall constitute a waiver of notice of such meeting, except when the person attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.   No written waiver of notice need specify either the business to be transacted at, or the purpose or purposes of any regular or special meeting of the Stockholders, directors or members of a committee of the Board.

3.7     Adjournment of Meeting.  When the Stockholders adjourn a meeting to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Stockholders may transact any business which they may have transacted at the original meeting.  If the adjournment is for more than 30 days or, if after the adjournment, the Board or a committee of the Board fixes a new record date for the adjourned meeting, the Board or a committee of the Board shall give notice of the adjourned meeting to each Stockholder of record entitled to vote at the meeting.

3.8     Quorum.  Except as otherwise required by law, the holders of a majority of all of the shares of the stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for all purposes at any meeting of the Stockholders.  In the absence of a quorum at any meeting or any adjournment thereof, the holders of a majority of the shares of stock entitled to vote who are present, in person or by proxy, or, in the absence therefrom of all the Stockholders, any officer entitled to preside at, or to act as secretary of, such meeting may adjourn such meeting to another place, date or time.

If the chairman of the meeting gives notice of any adjourned special meeting of Stockholders to all Stockholders entitled to vote thereat, stating that the minimum percentage of Stockholders for a quorum as provided by Nevada Law shall constitute a quorum, then, except as otherwise required by law, that percentage at such adjourned meeting shall constitute a quorum and a majority of the votes cast at such meeting shall determine all matters.

Votes shall include votes cast against any proposal and shall exclude abstentions and broker non-votes, provided that votes cast against any proposal, abstentions and broker non-votes shall be counted in determining a quorum at any meeting.

3.9     Organization.  Such person as the Board may have designated or, in the absence of such a person, the highest ranking officer of the Company who is present shall call to order any meeting of the Stockholders, determine the presence of a quorum, and act as chairman of the meeting.  In the absence of the Secretary or an Assistant Secretary of the Company, the chairman shall appoint someone to act as the secretary of the meeting.

3.10    Conduct of Business.  The chairman of any meeting of Stockholders shall determine the order of business and the procedure at the meeting, including such regulations of the manner of voting and the conduct of discussion as he deems in order.

3.11    List of Stockholders.  At least 10 days before every meeting of Stockholders, the Secretary shall prepare a list of the Stockholders entitled to vote at the meeting or any adjournment thereof, arranged in alphabetical order, showing the address of each Stockholder and the number of shares registered in the name of each Stockholder.  The Company shall make the list available for examination by any Stockholder for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days prior to the meeting, either at a place within the city where the meeting will take place or at the place designated in the notice of the meeting.

Company by delivery to its registered office, its principal place of business, or an officer or agent of the Company having custody of the book in which proceedings of meetings of Stockholders are recorded.  Delivery made to the Company's registered office shall be by hand or by certified or registered mail, return receipt requested.

Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days (or such other period as provided by applicable law) of the earliest dated consent delivered in the manner required by this section to the Company, written consents signed by a sufficient number of holders to take action are delivered to the Company by delivery to its registered office, its principal place of business or an officer or agent of the Company having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Company's registered office shall be by hand or by certified or registered mail, return receipt requested.

Notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  In the event the Company is a reporting company which files periodic and current reports with the Securities and Exchange Commission (the "**Commission**"), the filing of a Report on Form 8-K with the Commission describing the items approved by the shareholders in the Consent to Action shall constitute "**notice**" to those shareholders who have not consented to such action in writing.

## ARTICLE 4.
### BOARD OF DIRECTORS

4.1    <u>General Powers</u>.  The Board shall manage the property, business and affairs of the Company.

4.2    <u>Number</u>.  The number of directors who shall constitute the Board shall equal not less than 1 nor more than 10, as the Board or majority stockholders may determine by resolution from time to time.

4.3    <u>Election of Directors and Term of Office</u>.  The Stockholders of the Company shall elect the directors at the annual or adjourned annual meeting (except as otherwise provided herein for the filling of vacancies).  Each director shall hold office until his death, resignation, retirement, removal, or disqualification, or until his successor shall have been elected and qualified.

4.4    <u>Resignations</u>.  Any director of the Company may resign at any time by giving written notice to the Board or to the Secretary of the Company.  Any resignation shall take effect upon receipt or at the time specified in the notice.  Unless the notice specifies otherwise, the effectiveness of the resignation shall not depend upon its acceptance.

4.5    <u>Removal</u>.  Stockholders holding 2/3 of the outstanding shares entitled to vote at an election of directors may remove any director or the entire Board of Directors at any time, with or without cause.

4.6    <u>Vacancies</u>.  Any vacancy on the Board, whether because of death, resignation, disqualification, an increase in the number of directors, or any other cause may be filled by a majority of the remaining directors, a sole remaining director, or the majority stockholders.  Any director elected to fill a vacancy shall hold office until his death, resignation, retirement, removal, or disqualification, or until his successor shall have been elected and qualified.

4.7    <u>Chairman of the Board</u>.  At the initial and annual meeting of the Board, the directors may elect from their number a Chairman of the Board of Directors.  The Chairman shall preside at all meetings of the Board and shall perform such other duties as the Board may direct.  The Board also may elect a Vice Chairman and other officers of the Board, with such powers and duties as the Board may designate from time to time.

4.8    <u>Compensation</u>.  The Board may compensate directors for their services and may provide for the payment of all expenses the directors incur by attending meetings of the Board or otherwise.

## ARTICLE 5.
### MEETINGS OF DIRECTORS

5.1    <u>Regular Meetings</u>.  The Board may hold regular meetings at such places, dates and times as the Board shall establish by resolution.  If any day fixed for a meeting falls on a legal holiday, the Board shall hold the meeting at the same place and time on the next succeeding business day.  The Board need not give notice of regular meetings.

5.2    <u>Place of Meetings</u>.  The Board may hold any of its meetings in or out of the State of Nevada, at such places as the Board may designate, at such places as the notice or waiver of notice of any such meeting may designate, or at such places as the persons calling the meeting may designate.

5.3    <u>Meetings by Telecommunications</u>.  The Board or any committee of the Board may hold meetings by means of conference telephone or similar telecommunications equipment that enable all persons participating in the meeting to hear each other.  Such participation shall constitute presence in person at

such meeting.

5.4    <u>Special Meetings</u>. The Chairman of the Board, the President, or one-half of the directors then in office may call a special meeting of the Board. The person or persons authorized to call special meetings of the Board may fix any place, either in or out of the State of Nevada as the place for the meeting.

5.5    <u>Notice of Special Meetings</u>. The person or persons calling a special meeting of the Board shall give written notice to each director of the time, place, date and purpose of the meeting of not less than three business days if by mail and not less than 24 hours if by facsimile (with confirmation of delivery), email or in person before the date of the meeting, or as otherwise provided by law. If mailed, notice is given on the date deposited in the United States mail, postage prepaid, to such director. A director may waive notice of any special meeting, and any meeting shall constitute a legal meeting without notice if all the directors are present or if those not present sign either before or after the meeting a written waiver of notice, a consent to such meeting, or an approval of the minutes of the meeting. A notice or waiver of notice need not specify the purposes of the meeting or the business which the Board will transact at the meeting.

5.6    <u>Waiver by Presence</u>. Except when expressly for the purpose of objecting to the legality of a meeting, a director's presence at a meeting shall constitute a waiver of notice of such meeting.

5.7    <u>Quorum</u>. A majority of the directors then in office shall constitute a quorum for all purposes at any meeting of the Board. In the absence of a quorum, a majority of directors present at any meeting may adjourn the meeting to another place, date or time without further notice. No proxies shall be given by directors to any person for purposes of voting or establishing a quorum at a directors' meetings.

5.8    <u>Conduct of Business</u>. The Board shall transact business in such order and manner as the Board may determine. Except as the law requires otherwise, the Board shall determine all matters by the vote of a majority of the directors present at a meeting at which a quorum is present. The directors shall act as a Board, and the individual directors shall have no power as such.

5.9    <u>Action by Consent</u>. The Board or a committee of the Board may take any required or permitted action without a meeting if all members of the Board or committee consent thereto in writing and file such consent with the minutes of the proceedings of the Board or committee.

<div align="center">

**ARTICLE 6.**
**COMMITTEES**

</div>

6.1    <u>Committees of the Board</u>. The Board may designate, by a vote of a majority of the directors then in office, committees of the Board. The committees shall serve at the pleasure of the Board and shall possess such lawfully delegable powers and duties as the Board may confer.

6.2    <u>Selection of Committee Members</u>. The Board shall elect by a vote of a majority of the directors then in office a director or directors to serve as the member or members of a committee. By the same vote, the Board may designate other directors as alternate members who may replace any absent or disqualified member at any meeting of a committee. In the absence or disqualification of any member of any committee and any alternate member in his place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or they constitute a quorum, may appoint by unanimous vote another member of the Board to act at the meeting in the place of the absent or disqualified member.

6.3    <u>Conduct of Business</u>. Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as the law or these Bylaws require otherwise. Each committee shall make adequate provision for notice of all meetings to members. A majority of the members of the committee shall constitute a quorum, unless the committee consists of one or two members. In that event, one member shall constitute a quorum. A majority vote of the members present shall determine all matters. A committee may take action without a meeting if all the members of the committee consent in writing and file the consent or consents with the minutes of the proceedings of the committee.

6.4    <u>Authority</u>. Any committee, to the extent the Board provides, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company, and may authorize the affixation of the Company's seal to all instruments which may require or permit it. However, no committee shall have any power or authority with regard to amending the Articles of Incorporation, adopting an agreement of merger or consolidation, recommending to the Stockholders the sale, lease or exchange of all or substantially all of the Company's property and assets, recommending to the Stockholders a dissolution of the Company or a revocation of a dissolution of the Company, or amending these Bylaws of the Company. Unless a resolution of the Board expressly provides, no committee shall have the power or authority to declare a dividend, to authorize the issuance of stock, or to adopt a certificate of ownership and merger.

6.5    <u>Minutes</u>. Each committee shall keep regular minutes of its proceedings and report the same to the Board when required.

6.6    <u>Committees</u>. All Committees and all powers provided to such Committees shall be consistent with Nevada Law, the Articles and the rules and regulations of the principal market or exchange on which the Company's capital stock then trades.

## ARTICLE 7.
## OFFICERS

7.1     Officers of the Company.  The officers of the Company shall consist of a President, a Secretary, a Treasurer and such Vice Presidents, Assistant Secretaries, Assistant Treasurers, and other officers as the Board may designate and elect from time to time.  The same person may hold at the same time any two or more offices.

7.2     Election and Term.  The Board shall elect the officers of the Company.  Each officer shall hold office until his death, resignation, retirement, removal or disqualification, or until his successor shall have been elected and qualified.

7.3     Compensation of Officers.  The Board shall fix the compensation of all officers of the Company.  No officer shall serve the Company in any other capacity and receive compensation, unless the Board authorizes the additional compensation.

7.4     Removal of Officers and Agents.  The Board may remove any officer or agent it has elected or appointed at any time, with or without cause.

7.5     Resignation of Officers and Agents.  Any officer or agent the Board has elected or appointed may resign at any time by giving written notice to the Board, the Chairman of the Board, the President, or the Secretary of the Company.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified.  Unless otherwise specified in the notice, the Board need not accept the resignation to make it effective.

7.6     Bond.  The Board may require by resolution any officer, agent, or employee of the Company to give bond to the Company, with sufficient sureties conditioned on the faithful performance of the duties of his respective office or agency.  The Board also may require by resolution any officer, agent or employee to comply with such other conditions as the Board may require from time to time.

7.7     President.  The President shall be the chief operating officer of the Company and, subject to the Board's control, shall supervise and direct all of the business and affairs of the Company.  When present, he shall sign (with or without the Secretary, an Assistant Secretary, or any other officer or agent of the Company which the Board has authorized) deeds, mortgages, bonds, contracts or other instruments which the Board has authorized an officer or agent of the Company to execute.  However, the President shall not sign any instrument which the law, these Bylaws, or the Board expressly require some other officer or agent of the Company to sign and execute.  In general, the President shall perform all duties incident to the office of President and such other duties as the Board may prescribe from time to time.

7.8     Vice Presidents.  In the absence of the President or in the event of his death, inability or refusal to act, the Vice Presidents in the order of their length of service as Vice Presidents, unless the Board determines otherwise, shall perform the duties of the President.  When acting as the President, a Vice President shall have all the powers and restrictions of the Presidency.  A Vice President shall perform such other duties as the President or the Board may assign to him from time to time.

7.9     Secretary.  The Secretary shall (a) keep the minutes of the meetings of the Stockholders and of the Board in one or more books for that purpose, (b) give all notices which these Bylaws or the law requires, (c) serve as custodian of the records and seal of the Company, (d) affix the seal of the corporation to all documents which the Board has authorized execution on behalf of the Company under seal, (e) maintain a register of the address of each Stockholder of the Company, (f) sign, with the President, a Vice President, or any other officer or agent of the Company which the Board has authorized, certificates for shares of the Company, (g) have charge of the stock transfer books of the Company, and (h) perform all duties which the President or the Board may assign to him from time to time.

7.10    Assistant Secretaries.  In the absence of the Secretary or in the event of his death, inability or refusal to act, the Assistant Secretaries in the order of their length of service as Assistant Secretary, unless the Board determines otherwise, shall perform the duties of the Secretary.  When acting as the Secretary, an Assistant Secretary shall have the powers and restrictions of the Secretary.  An Assistant Secretary shall perform such other duties as the President, Secretary or Board may assign from time to time.

7.11    Treasurer.  The Treasurer shall (a) have responsibility for all funds and securities of the Company, (b) receive and give receipts for moneys due and payable to the corporation from any source whatsoever, (c) deposit all moneys in the name of the Company in depositories which the Board selects, and (d) perform all of the duties which the President or the Board may assign to him from time to time.

7.12    Assistant Treasurers.  In the absence of the Treasurer or in the event of his death, inability or refusal to act, the Assistant Treasurers in the order of their length of service as Assistant Treasurer, unless the Board determines otherwise, shall perform the duties of the Treasurer.  When acting as the Treasurer, an Assistant Treasurer shall have the powers and restrictions of the Treasurer.  An Assistant Treasurer shall perform such other duties as the Treasurer, the President, or the Board may assign to him from time to time.

7.13    Delegation of Authority.  Notwithstanding any provision of these Bylaws to the contrary, the Board may delegate the powers or duties of any officer

to any other officer or agent.

7.14    Action with Respect to Securities of Other Corporations. Unless the Board directs otherwise, the President shall have the power to vote and otherwise act on behalf of the Company, in person or by proxy, at any meeting of stockholders of or with respect to any action of stockholders of any other corporation in which the Company holds securities. Furthermore, unless the Board directs otherwise, the President shall exercise any and all rights and powers which the Company possesses by reason of its ownership of securities in another corporation.

7.15    Vacancies. The Board may fill any vacancy in any office because of death, resignation, removal, disqualification or any other cause in the manner which these Bylaws prescribe for the regular appointment to such office.

<div align="center">

**ARTICLE 8.**
**CONTRACTS, LOANS, DRAFTS,**
**DEPOSITS AND ACCOUNTS**

</div>

8.1    Contracts. The Board may authorize any officer or officers, agent or agents, to enter into any contract or execute and deliver any instrument in the name and on behalf of the Company. The Board may make such authorization general or special.

8.2    Loans. Unless the Board has authorized such action, no officer or agent of the Company shall contract for a loan on behalf of the Company or issue any evidence of indebtedness in the Company's name.

8.3    Drafts. The President, any Vice President, the Treasurer, any Assistant Treasurer, and such other persons as the Board shall determine shall issue all checks, drafts and other orders for the payment of money, notes and other evidences of indebtedness issued in the name of or payable by the Company.

8.4    Deposits. The Treasurer shall deposit all funds of the Company not otherwise employed in such banks, trust companies, or other depositories as the Board may select or as any officer, assistant, agent or attorney of the Company to whom the Board has delegated such power may select. For the purpose of deposit and collection for the account of the Company, the President or the Treasurer (or any other officer, assistant, agent or attorney of the Company whom the Board has authorized) may endorse, assign and deliver checks, drafts and other orders for the payment of money payable to the order of the Company.

8.5    General and Special Bank Accounts. The Board may authorize the opening and keeping of general and special bank accounts with such banks, trust companies, or other depositories as the Board may select or as any officer, assistant, agent or attorney of the Company to whom the Board has delegated such power may select. The Board may make such special rules and regulations with respect to such bank accounts, not inconsistent with the provisions of these Bylaws, as it may deem expedient.

<div align="center">

**ARTICLE 9.**
**CERTIFICATES FOR SHARES AND THEIR TRANSFER**

</div>

9.1    Certificates for Shares. Shares of the capital stock of the Company may be certificated or uncertificated, as provided under Nevada Law. Each stockholder, upon written request to the transfer agent or registrar of the Company, shall be entitled to a certificate of the capital stock of the Company in such form as may from time to time be prescribed by the Board of Directors.  The Secretary, transfer agent, or registrar of the Company shall number the certificates representing shares of the stock of the Company in the order in which the Company issues them. The President or any Vice President and the Secretary or any Assistant Secretary shall sign the certificates in the name of the Company. Any or all certificates may contain facsimile signatures. In case any officer, transfer agent, or registrar who has signed a certificate, or whose facsimile signature appears on a certificate, ceases to serve as such officer, transfer agent, or registrar before the Company issues the certificate, the Company may issue the certificate with the same effect as though the person who signed such certificate, or whose facsimile signature appears on the certificate, was such officer, transfer agent, or registrar at the date of issue. The Secretary, transfer agent, or registrar of the Company shall keep a record in the stock transfer books of the Company of the names of the persons, firms or corporations owning the stock represented by the certificates, the number and class of shares represented by the certificates and the dates thereof and, in the case of cancellation, the dates of cancellation. The Secretary, transfer agent, or registrar of the Company shall cancel every certificate surrendered to the Company for exchange or transfer. Except in the case of a lost, destroyed, stolen or mutilated certificate, the Secretary, transfer agent, or registrar of the Company shall not issue a new certificate in exchange for an existing certificate until he has canceled the existing certificate.

9.2    Transfer of Shares. A holder of record of shares of the Company's stock, or his attorney-in-fact authorized by power of attorney duly executed and filed with the Secretary, transfer agent or registrar of the Company, may transfer his shares only on the stock transfer books of the Company. Such person shall furnish to the Secretary, transfer agent, or registrar of the Company proper evidence of his authority to make the transfer and shall properly endorse and surrender for cancellation his existing certificate or certificates for such shares. Whenever a holder of record of shares of the Company's stock makes a transfer of shares for collateral security, the Secretary, transfer agent, or registrar of the Company shall state such fact in the entry of transfer if the transferor and the transferee request.

9.3     Lost Certif..ates.  The Board may direct the Secretary, transfer agent, or registrar of the Company to issue a new certificate to any holder of record of shares of the Company's stock claiming that he has lost such certificate, or that someone has stolen, destroyed or mutilated such certificate, upon the receipt of an affidavit from such holder to such fact.  When authorizing the issue of a new certificate, the Board, in its discretion may require as a condition precedent to the issuance that the owner of such certificate give the Company a bond of indemnity in such form and amount as the Board may direct.

9.4     Regulations.  The Board may make such rules and regulations, not inconsistent with these Bylaws, as it deems expedient concerning the issue, transfer and registration of certificates for shares of the stock of the corporation.  The Board may appoint or authorize any officer or officers to appoint one or more transfer agents, or one or more registrars, and may require all certificates for stock to bear the signature or signatures of any of them.

9.5     Holder of Record.  The Company may treat as absolute owners of shares the person in whose name the shares stand of record as if that person had full competency, capacity and authority to exercise all rights of ownership, despite any knowledge or notice to the contrary or any description indicating a representative, pledge or other fiduciary relation, or any reference to any other instrument or to the rights of any other person appearing upon its record or upon the share certificate.  However, the Company may treat any person furnishing proof of his appointment as a fiduciary as if he were the holder of record of the shares.

9.6     Treasury Shares.  Treasury shares of the Company shall consist of shares which the Company has issued and thereafter acquired but not canceled.  Treasury shares shall not carry voting or dividend rights.

---

### ARTICLE 10.
### INDEMNIFICATION

10.1    Definitions.  In this Article:

    (a)     "*Indemnitee*" means (i) any present or former director, advisory director or officer of the Company, (ii) any person who while serving in any of the capacities referred to in clause (i) hereof served at the Company's request as a director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, and (iii) any person nominated or designated by (or pursuant to authority granted by) the Board of Directors or any committee thereof to serve in any of the capacities referred to in clauses (i) or (ii) hereof.

    (b)     "*Official Capacity*" means (i) when used with respect to a director, the office of director of the Company, and (ii) when used with respect to a person other than a director, the elective or appointive office of the Company held by such person or the employment or agency relationship undertaken by such person on behalf of the Company, but in each case does not include service for any other foreign or domestic corporation or any partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise.

    (c)     "*Proceeding*" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, any appeal in such an action, suit or proceeding, and any inquiry or investigation that could lead to such an action, suit or proceeding.

10.2    Indemnification.  The Company shall indemnify every Indemnitee against all judgments, penalties (including excise and similar taxes), fines, amounts paid in settlement and reasonable expenses actually incurred by the Indemnitee in connection with any Proceeding in which he was, is or is threatened to be named defendant or respondent, or in which he was or is a witness without being named a defendant or respondent, by reason, in whole or in part, of his serving or having served, or having been nominated or designated to serve, in any of the capacities referred to in Section 10.1, if it is determined in accordance with Section 10.4 that the Indemnitee (a) conducted himself in good faith, (b) reasonably believed, in the case of conduct in his Official Capacity, that his conduct was in the Company's best interests and, in all other cases, that his conduct was at least not opposed to the Company's best interests, and (c) in the case of any criminal proceeding, had no reasonable cause to believe that his conduct was unlawful; provided, however, that in the event that an Indemnitee is found liable to the Company or is found liable on the basis that personal benefit was improperly received by the Indemnitee the indemnification (i) is limited to reasonable expenses actually incurred by the Indemnitee in connection with the Proceeding and (ii) shall not be made in respect of any Proceeding in which the Indemnitee shall have been found liable for willful or intentional misconduct in the performance of his duty to the Company.  Except as provided in the immediately preceding proviso to the first sentence of this Section 10.2, no indemnification shall be made under this Section 10.2 in respect of any Proceeding in which such Indemnitee shall have been (a) found liable on the basis that personal benefit was improperly received by him, whether or not the benefit resulted from an action taken in the Indemnitee's Official Capacity, or (b) found liable to the Company.  The termination of any Proceeding by judgment, order, settlement or conviction, or on a plea of nolo contendere or its equivalent, is not of itself determinative that the Indemnitee did not meet the requirements set forth in clauses (a), (b) or (c) in the first sentence of this Section 10.2.  An Indemnitee shall be deemed to have been found liable in respect of any claim, issue or matter only after the Indemnitee shall have been so adjudged by a court of competent jurisdiction after exhaustion of all appeals therefrom.  Reasonable expenses shall, include, without limitation, all court costs and all fees and disbursements of attorneys for the Indemnitee.  The indemnification provided herein shall be applicable whether or not negligence or gross negligence of the Indemnitee is alleged or proven.

10.3   Successful Defense. Without limitation of Section 10.2 and in addition to the indemnification provided for in Section 10.2, the Company shall indemnify every Indemnitee against reasonable expenses incurred by such person in connection with any Proceeding in which he is a witness or a named defendant or respondent because he served in any of the capacities referred to in Section 10.1, if such person has been wholly successful, on the merits or otherwise, in defense of the Proceeding.

10.4   Determinations. Any indemnification under Section 10.2 (unless ordered by a court of competent jurisdiction) shall be made by the Company only upon a determination that indemnification of the Indemnitee is proper in the circumstances because he has met the applicable standard of conduct. Such determination shall be made (a) by the Board of Directors by a majority vote of a quorum consisting of directors who, at the time of such vote, are not named defendants or respondents in the Proceeding; (b) if such a quorum cannot be obtained, then by a majority vote of a committee of the Board of Directors, duly designated to act in the matter by a majority vote of all directors (in which designated directors who are named defendants or respondents in the Proceeding may participate), such committee to consist solely of two (2) or more directors who, at the time of the committee vote, are not named defendants or respondents in the Proceeding; (c) by special legal counsel selected by the Board of Directors or a committee thereof by vote as set forth in clauses (a) or (b) of this Section 10.4 or, if the requisite quorum of all of the directors cannot be obtained therefor and such committee cannot be established, by a majority vote of all of the directors (in which directors who are named defendants or respondents in the Proceeding may participate); or (d) by the shareholders in a vote that excludes the shares held by directors that are named defendants or respondents in the Proceeding. Determination as to reasonableness of expenses shall be made in the same manner as the determination that indemnification is permissible, except that if the determination that indemnification is permissible is made by special legal counsel, determination as to reasonableness of expenses must be made in the manner specified in clause (c) of the preceding sentence for the selection of special legal counsel. In the event a determination is made under this Section 10.4 that the Indemnitee has met the applicable standard of conduct as to some matters but not as to others, amounts to be indemnified may be reasonably prorated.

10.5   Advancement of Expenses. Reasonable expenses (including court costs and attorneys' fees) incurred by an Indemnitee who was or is a witness or was, is or is threatened to be made a named defendant or respondent in a Proceeding shall be paid by the Company at reasonable intervals in advance of the final disposition of such Proceeding, and without making any of the determinations specified in Section 10.4, after receipt by the Company of (a) a written affirmation by such Indemnitee of his good faith belief that he has met the standard of conduct necessary for indemnification by the Company under this Article and (b) a written undertaking by or on behalf of such Indemnitee to repay the amount paid or reimbursed by the Company if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized in this Article. Such written undertaking shall be an unlimited obligation of the Indemnitee but need not be secured and it may be accepted without reference to financial ability to make repayment. Notwithstanding any other provision of this Article, the Company may pay or reimburse expenses incurred by an Indemnitee in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not named a defendant or respondent in the Proceeding.

10.6   Employee Benefit Plans. For purposes of this Article, the Company shall be deemed to have requested an Indemnitee to serve an employee benefit plan whenever the performance by him of his duties to the Company also imposes duties on or otherwise involves services by him to the plan or participants or beneficiaries of the plan. Excise taxes assessed on an Indemnitee with respect to an employee benefit plan pursuant to applicable law shall be deemed fines. Action taken or omitted by an Indemnitee with respect to an employee benefit plan in the performance of his duties for a purpose reasonably believed by him to be in the interest of the participants and beneficiaries of the plan shall be deemed to be for a purpose which is not opposed to the best interests of the Company.

10.7   Other Indemnification and Insurance. The indemnification provided by this Article shall (a) not be deemed exclusive of, or to preclude, any other rights to which those seeking indemnification may at any time be entitled under the Company's Articles of Incorporation, any law, agreement or vote of shareholders or disinterested directors, or otherwise, or under any policy or policies of insurance purchased and maintained by the Company on behalf of any Indemnitee, both as to action in his Official Capacity and as to action in any other capacity, (b) continue as to a person who has ceased to be in the capacity by reason of which he was an Indemnitee with respect to matters arising during the period he was in such capacity, (c) inure to the benefit of the heirs, executors and administrators of such a person and (d) not be required if and to the extent that the person otherwise entitled to payment of such amounts hereunder has actually received payment therefor under any insurance policy, contract or otherwise.

10.8   Notice. Any indemnification of or advance of expenses to an Indemnitee in accordance with this Article shall be reported in writing to the shareholders of the Company with or before the notice or waiver of notice of the next shareholders' meeting or with or before the next submission to shareholders of a consent to action without a meeting and, in any case, within the 12-month period immediately following the date of the indemnification or advance.

10.9   Construction. The indemnification provided by this Article shall be subject to all valid and applicable laws, including, without limitation, the Nevada General Corporation Law, and, in the event this Article or any of the provisions hereof or the indemnification contemplated hereby are found to be inconsistent with or contrary to any such valid laws, the latter shall be deemed to control and this Article shall be regarded as modified accordingly, and, as so modified, to continue in full force and effect.

10.10   Continuing Offer, Reliance, etc. The provisions of this Article (a) are for the benefit of, and may be enforced by, each Indemnitee of the Company, the same as if set forth in their entirety in a written instrument duly executed and delivered by the Company and such Indemnitee and (b) constitute a continuing offer to all present and future Indemnitees. The Company, by its adoption of these Bylaws, (a) acknowledges and agrees that each Indemnitee of the Company has relied upon and will continue to rely upon the provisions of this Article in becoming, and serving in any of the capacities referred to in Section

10.1 of this Article, (b) waives reliance upon, and all notices of acceptance of, such provisions by such Indemnitees and (c) acknowledges and agrees that no present or future Indemnitee shall be prejudiced in his right to enforce the provisions of this Article in accordance with its terms by any act or failure to act on the part of the Company.

10.11     Effect of Amendment.  No amendment, modification or repeal of this Article or any provision hereof shall in any manner terminate, reduce or impair the right of any past, present or future Indemnitees to be indemnified by the Company, nor the obligation of the Company to indemnify any such Indemnitees, under and in accordance with the provisions of the Article as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims *may arise or be* asserted.

<div align="center">

**ARTICLE 11.**
**TAKEOVER OFFERS**

</div>

the event the Company receives a takeover offer, the Board of Directors shall consider all relevant factors in evaluating such offer, including, but not limited to, the terms of the offer, and the potential economic and social impact of such offer on the Company's stockholders, employees, customers, creditors and community in which it operates.

<div align="center">

**ARTICLE 12.**
**DIVIDENDS**

</div>

12.1     General.  The Board, subject to any restrictions contained in either (i) Nevada Law, or (ii) the Articles, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the Company's capital stock.

12.2     Dividend Reserve.  The Board may set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

<div align="center">

**ARTICLE 13.**
**NOTICES**

</div>

13.1     General.  Whenever these Bylaws require notice to any Stockholder, director, officer or agent, such notice does not mean personal notice.  A person may give effective notice under these Bylaws in every case by depositing a writing in a post office or letter box in a postpaid, sealed wrapper, or by dispatching a prepaid telegram addressed to such Stockholder, director, officer or agent at his address on the books of the Company.  Unless these Bylaws expressly provide to the contrary, the time when the person sends notice shall constitute the time of the giving of notice.

13.2     Waiver of Notice.  Whenever the law or these Bylaws require notice, the person entitled to said notice may waive such notice in writing, either before or after the time stated therein.

13.3     Electronic Notice.  Without limiting the manner by which notice otherwise may be given effectively to Stockholders pursuant to the Nevada Law, the Articles or these Bylaws, any notice to Stockholders given by the corporation under any provision of the Nevada Law, the Articles or these Bylaws shall be effective if given by a form of electronic transmission consented to by the Stockholder to whom the notice is given. Any such consent shall be revocable by the Stockholder by written notice to the corporation. Any such consent shall be deemed revoked if:

        (i) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent; and

        (ii) such inability becomes known to the Secretary or an Assistant Secretary of the corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

        (i)      if by facsimile telecommunication, when directed to a number at which the Stockholder has consented to receive notice;

        (ii)     if by electronic mail, when directed to an electronic mail address at which the Stockholder has consented to receive notice;

(iii)    if by a posting on an electronic network together with separate notice to the Stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iv)    if by any other form of electronic transmission, when directed to the Stockholder.

Affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

<div align="center">

**ARTICLE 14.**
**MISCELLANEOUS**

</div>

14.1    <u>Facsimile Signatures</u>. In addition to the use of facsimile signatures which these Bylaws specifically authorize, the Company may use such facsimile signatures of any officer or officers, agents or agent, of the Company as the Board or a committee of the Board may authorize.

14.2    <u>Corporate Seal</u>. The Board may provide for a suitable seal containing the name of the Company, of which the Secretary shall be in charge. The Treasurer, any Assistant Secretary, or any Assistant Treasurer may keep and use the seal or duplicates of the seal if and when the Board or a committee of the Board so directs.

14.3    <u>Fiscal Year</u>. The Board shall have the authority to fix and change the fiscal year of the Company.

14.4    <u>Invalid Provisions</u>. If any provision of these Bylaws is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of the Stockholders would not be materially and adversely affected thereby, such provision shall be fully separable, and these Bylaws shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, the remaining provisions of these Bylaws shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of these Bylaws, a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

---

<div align="center">

**ARTICLE 15.**
**AMENDMENTS**

</div>

15.1    Subject to the provisions of the Articles, the Stockholders or the Board may amend or repeal these Bylaws at any meeting.

The undersigned hereby certifies that the foregoing constitutes a true and correct copy of the Bylaws of the Company as adopted by the Board of Directors on the 18th day of January 2012.

Executed as of this 18th day of January 2012.

<div align="right" style="margin-right:25%">

/s/ Edward Sigmond
_____
Edward Sigmond
Chief Executive Officer

</div>

---

<div align="center">

**FIRST AMENDMENT TO AMENDED AND RESTATED BYLAWS**
**OF**
**GREAT AMERICAN FOOD CHAIN, INC.**

</div>

Section 4.7 of the Amended and Restated Bylaws of Great American Good Chain, Inc. (the "**Company**"), as adopted by the Board of Directors of the Company on January 18, 2012, shall hereby be amended and replaced with the following Section 4.7, effective as of January 25, 2012:

"4.7     <u>Chairman of the Board</u>.  The directors may elect from time to time from the directors, a Chairman of the Board of Directors.  The Chairman shall preside at all meetings of the Board and shall perform such other duties as the Board may direct.  The Board also may elect a Vice Chairman and other officers of the Board, with such powers and duties as the Board may designate from time to time.

Among such other powers and duties as the Board may designate to the Chairman from time to time, the Chairman shall have the right to decide any ties in the voting of the Board in the event the Board has an even number of directors.  For example only, if the Board has two directors (including the Chairman) and the Board shall become deadlocked with two directors voting for and two voting against the adoption of any corporate resolution, the vote of the Chairman shall be *counted for* all purposes as two votes and such deadlock shall be decided in favor of the vote of the Chairman."

EXHIBIT 4



Print Page  Close Window

**News Release**

## DineEquity, Inc. Announces the Sale of 33 Applebee's Company-Operated Restaurants in Missouri and Indiana to American Franchise Capital, LLC

GLENDALE, Calif.--(BUSINESS WIRE)--May. 29, 2012-- DineEquity, Inc. (NYSE:DIN), the parent company of Applebee's Neighborhood Grill & Bar and IHOP Restaurants, today announced that it has entered into an asset purchase agreement with American Franchise Capital, LLC for the sale of 33 Applebee's company-operated restaurants located primarily in Missouri and Indiana. The agreement does not contain financing contingencies, but closing is subject to regulatory processes related to liquor license transfers and other customary closing conditions.

The transaction is expected to result in net proceeds after taxes of approximately $26 million and reduce DineEquity's sale-leaseback related financing obligations by approximately $22 million. The Company expects to pay approximately $5 million related to the settlement of net working capital liabilities and deal costs. Additionally, the sale of these Applebee's company-operated restaurants will result in approximately $1.3 million in annualized general and administrative savings. The Company anticipates closing the transaction in the third quarter of 2012.

"We are pleased to announce the sale of 33 Applebee's company-operated restaurants, reflecting yet another significant step in our strategy to transition to a 99% franchised restaurant system," said Julia A. Stewart, Chairman and Chief Executive Officer of DineEquity, Inc. "American Franchise Capital is a great franchise partner with deep operating experience."

William J. Georgas, a Managing Partner with American Franchise Capital and a previous Applebee's franchisee with The Georgas Group, said, "We are excited about this iconic brand's future and look forward to participating in the revitalization of Applebee's in a meaningful way. This transaction represents the long-term continued confidence we have in the brand and the establishment of a solid partnership." Mr. Georgas was previously the co-managing owner of The Georgas Group, a restaurant franchise company which included 47 Applebee's restaurants.

To date, DineEquity has sold a total of 342 Applebee's company-operated restaurants since its acquisition of Applebee's International in November 2007. DineEquity currently has two transactions, which it anticipates will close in the third quarter of 2012. Upon consummation of the pending sales of 33 additional Applebee's company-operated restaurants, as detailed in this news release, and the 39 Applebee's company-operated restaurants in Virginia detailed in DineEquity's May 1st news release, 97% of DineEquity's restaurants will be franchised. The Company believes that its increasingly franchised business model is less capital intensive and experiences less volatility in cash flow performance compared to the operation of company-operated restaurants.

American Franchise Capital, LLC was formed by William Georgas and Trevor Ganshaw for the purpose of acquiring high-end restaurant franchises in the U.S. and Canada. Mr. Georgas is an industry veteran with over 20 years of operating experience in the restaurant franchise business. Mr. Ganshaw has over 20 years of experience in the banking and investment management industries. This is American Franchise Capital's first acquisition of Applebee's company-operated restaurants. American Franchise Capital's offices are located in Greenwich, Connecticut.

The Company will update its 2012 financial performance guidance upon closing of this transaction.

### About DineEquity, Inc.

Based in Glendale, California, DineEquity, Inc., through its subsidiaries, franchises and operates restaurants under the Applebee's Neighborhood Grill & Bar and IHOP brands. With more than 3,500 restaurants combined in 18 countries, over 400 franchisees and approximately 200,000 team members (including franchisee- and company-operated restaurant employees), we believe DineEquity is one of the largest full-service restaurant companies in the world. For more information on DineEquity, visit the Company's Web site located at www.dineequity.com.

## Forward-Looking Statements

Statements contained in this release may constitute forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by words such as "may," "will," "should," "expect," "anticipate," "believe," "estimate," "intend," "plan" and other similar expressions. These statements involve known and unknown risks, uncertainties and other factors, which may cause actual results to be materially different from those expressed or implied in such statements. These factors include, but are not limited to: the effect of general economic conditions; the Company's substantial indebtedness; risk of future impairment charges; the Company's results in any given period differing from guidance provided to the public; the highly competitive nature of the restaurant business; the Company's business strategy failing to achieve anticipated results; risks associated with the restaurant industry; shortages or interruptions in the supply or delivery of food; changing health or dietary preferences; our dependence upon our franchisees; our engagement in business in foreign markets; harm to our brands' reputation; litigation; environmental liability; liability relating to employees; failure to comply with applicable laws and regulations; failure to effectively implement restaurant development plans; concentration of Applebee's franchised restaurants in a limited number of franchisees; credit risk from IHOP franchisees operating under our previous business model; termination or non-renewal of franchise agreements; franchisees breaching their franchise agreements; insolvency proceedings involving franchisees; changes in the number and quality of franchisees; inability of franchisees to fund capital expenditures; third-party claims with respect to intellectual property assets; heavy dependence on information technology; failure to protect the integrity and security of individually identifiable information; failure to execute on a business continuity plan; inability to attract and retain talented employees; risks associated with retail brand initiatives; failure of our internal controls; and other factors discussed from time to time in the Company's Annual and Quarterly Reports on Forms 10-K and 10-Q and in the Company's other filings with the Securities and Exchange Commission. The forward-looking statements contained in this release are made as of the date hereof and the Company assumes no obligation to update or supplement any forward-looking statements.

Source: DineEquity, Inc.

**Investor Contact**
DineEquity, Inc.
Ken Diptee
Executive Director, Investor Relations
818-637-3632
or
**Media Contact**
Sard Verbinnen & Co.
Lucy Neugart
415-618-8750

EXHIBIT 5

Case 3:14-cv-01727-BK   Document 40-2   Filed 12/16/15   Page 46 of 64   PageID 1278

**From:** Rob Andreottola <rob.andreottola@applecentralllc.com>

**To:** esigmond <esigmond@aol.com>; mtorino <mtorino@amici-cafe.com>; ctorino <ctorino@amici-cafe.com>

**Subject:** Attachments

**Date:** Thu, Sep 19, 2013 2:58 pm

**Attachments:** Back_salary_Amici.xlsx (16K), Expense_report_January_1st_thru_15th_Amici.docx (14K),
Expense_report_Jan_15th_2012_thru_February_15th_2012_Amici.docx (14K),
Expense_report_March_1st_2012_thru_March_31st_2012_Amici.docx (14K),
Expense_report_April_1st_thru_April_30th_2012_Amici.docx (14K),
Expense_report_May_1st_2012_thru_May_31st_2012_Amici.docx (14K)

---

Mike you should have these

Rob

**GAMN-SIG-00085**

**INVOICE**

## Robert Andreottola

154 Long Leaf Lane
Eatonton Georgia 31024
Cell 706-318-4007

**DATE:** May 28 2012
**INVOICE #** Amici 101
**FOR:** *Back wages owed*

E-mail randreottola@bellsouth.net

**Bill To:**
Great American Food Chain
2808 Cole Avenue
Dallas, TX 75204

| DESCRIPTION | AMOUNT |
|---|---|
| | |
| Back salary March, April, May | |
| 1st pay period | Gross $2884.62 |
| 2nd pay period | Gross $2884.62 |
| 3rd pay period | Gross $2884.62 |
| Payroll check bounced incurred $280.00 in charges for bounced checks | $280.00 |
| | |
| **TOTAL** | $8,933.86 |

**THANK YOU FOR YOUR BUSINESS!**

GAMN-SIG-00086

Expense report January 1st thru 15th

Gas
1/03/12 - $73.33
1/05/12 - $57.89
1/09/12 - $44.71
1/13/12 - $37.63
Total gas - $ 213.56

Power bill December Jefferson Street $110.36
Cell phone allocation - $100.00
Food Amici - $33.00 Rob, Mike, Chris

Total $456.92

GAMN-SIG-00087

Expense report Jan 15th 2012 thru February 15th 2012

Cell phone $200.00 this bill was over $400.00
Gas
1/18/2012 - $65.70
2/02/12 - $56.47
2/07/12 - $77.46
2/14/12 - $52.10
Total gas $251.73

Food
Amici 1/17/12 $24.62
Amici 2/7/12 $22.02
Amici 2/15/12 $21.00
Total Food - $67.64

Power bill Jefferson Street
$262.28 included deposit

Total $781.65

Expense report March 1st 2012 thru March 31st 2012

Gas:
3/02/2012 - $40.04
3/05/2012 - $74.76
3/08/2012 - $53.80
3/12/2012 - $80.42
3/17/2012 - $79.24
3/22/2012 - $72.98
3/24/2012 - $58.25
3/27/2012 - $30.03
Total Gas - $489.52

Cell Phone $100.00

Food
3/06/2012 Amici $23.62

Power Bill Jefferson Street
$163.58

Total March $776.72

GAMN-SIG-00089

TAB B

## EMPLOYMENT AGREEMENT

This Agreement ("Agreement") is made and agreed to May __, 2012 by and between Apple Central, LLC, a Delaware limited liability company (the "Company") and Robert Andreottola (the "Employee").

In consideration of the mutual covenants herein set forth, Company hereby employs the Employee upon the following terms and conditions (this contract supersedes all other previously signed or oral agreements between Employee and Company):

1.      Compensation/Bonus/Benefits.

        a.      Base Salary.   Company will pay the Employee a base annual salary less all applicable withholdings and taxes ("Base Salary") based upon the number of restaurants owned by Company and its affiliates in the following amounts:

          0 to 50 restaurants      - $175,000.00 per annum
          51 to 99 restaurants     - $250,000.00 per annum
          100 to 150 restaurants - $300,000.00 per annum *

Base Salary is payable in semi-monthly installments during the period of actual employment and only during that period in which services are rendered.

        * The Base Salary increases referenced above are an indication of salary levels as the Company continues to grow in restaurant size. Final agreed upon base salary amount shall be determined at the time of any future expansion by the Company.

        b.      Signing Bonus.       Upon the consummation of the transactions contemplated under the APA (as defined below), Company will pay Employee a signing bonus of $15,000.00 for transaction coordination and completion, less all applicable withholdings and taxes.

        c.      Annual Bonus. At the end of each calendar year, Employee is eligible to earn an annual bonus equal to 1% of Company's budgeted EBITDA (the "Hurdle") less all applicable withholdings and taxes if the Company's actual EBIDTA at the end of the calendar year exceeds the Hurdle and provided Employee is still employed by Company at the end of such calendar year (the "Annual Bonus").

        d.      Secondary Bonus.     In addition, at the end of each calendar year Employee is eligible to earn an additional bonus equal to 10% of the amount of EBIDTA that exceeds the Hurdle less all applicable withholdings and taxes (the "Secondary Bonus" together with the

C:\Users\randreottola\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.IE5\AN0TT6DW\Employment Agreement v4 (clean).doc

Robert Andreottola
Employee Agreement
Page 2

Annual Bonus, collectively, the "Bonus"), provided that Employee is still employed by Company at the end of such calendar year. By way of example, if Budgeted EBITDA is $5,000,000 and actual EBITDA is $5,500,000.00, Employee, at the end of the calendar year would receive a Bonus of $100,000.00 ($50,000 for the Annual Bonus and $50,000 for the Secondary Bonus).

       e.     Payment of Bonus.    The Bonus shall be paid to Employee within 45 days after the expiration of each calendar year.

       f.     Benefits.    Employee shall be eligible to participate in the benefit plans, as may be adopted or amended by Company from time to time. Employee will be entitled to three (3) weeks of paid vacation each calendar year. Vacation time not utilized prior to the end of the calendar year in which it accrues shall not carry over into the following calendar year.

       g.     Business Expenses.    The Company shall pay or reimburse Employee for all reasonable and customary travel, entertainment and other business expenses incurred by Employee in the performance of his duties under this Agreement provided that the Employee complies with such budget policies and approval and reporting requirements with respect to expenses as the Company may establish from time to time.

       h.     Purchase of Equity in American Franchise Capital, LLC.    Employee shall be entitled to allocate up to fifty (50%) percent of his Secondary Bonus to purchase non-voting equity in American Franchise Capital, LLC ("AFC"). Any such purchase shall be subject to, among other things, Employee's compliance with the following conditions precedent:

          (i)     Delivery of written notice by Employee to AFC and the Company of Employee's desire to purchase non-voting equity in AFC (the "Non-Voting Membership Interests"). Such written notice shall be delivered to the Company and AFC no later than October 31st of each calendar year. The Employee shall not be entitled to purchase voting interests in AFC;

          (ii)     The purchase price for the Non-Voting Membership Interests shall be based upon the most recent appraised value of AFC;

          (iii)     Execution of all documentation required to join Employee as a non-voting member of American Franchise Capital, LLC;

          (iv)     Employee's and Company's receipt of all required consents to such purchase, if any;

          (v)     Employee remains employed by the Company on the purchase consummation date and Employee is in full compliance with the terms and conditions of this Agreement;

          (vi)     Employee agrees to sell all Non-Voting Membership Interests back to AFC in the event Employee is (i) terminated for cause or (ii) terminates this Agreement pursuant



05/25/2012  12:20     7063427264                    COPY CORNER                              PAGE   04

Robert Andreottola
Employee Agreement
Page 3

to Section 5(v) below, at a purchase price equal to the lesser of (a) fair market value or (b) the purchase price at which Employee acquired the Non-Voting Membership Interest; and

           (vii)   In the event Employee is terminated for any other reason other than for cause (either under Section 5 (i), (ii), or (iv) below), Employee shall have the option to "put" all Non-Voting Membership Interests back to AFC at a purchase price equal to fair market value.

2.      <u>Services/Title</u>.

      a.    <mark><u>Title</u>. Employee agrees to work for Company in the classification of Chief Operating Officer subject to the dictates of the management of the Company (the "Managers").</mark>

      b.    <u>Services</u>.    Commencing upon the full execution of that certain Asset Purchase Agreement between Applebee's Restaurants West LLC, a Delaware limited liability company and Applebee's Restaurants Kansas LLC, a Kansas limited liability company and Company (the "APA"), Employee agrees to render satisfactory services to Company within the customary meaning of the title set forth in Section 2(a) above, including, without limitation:

        (i)     assisting with the closing of the transactions contemplated under the APA, including, without limitation, travel as needed;

        (ii)    assist with due diligence review and coordination for all future acquisitions by the Company;

        (iii)   management of the 33 restaurants being acquired under the APA; and

        (iv)   those services as more particularly set forth in the attached <u>**Exhibit "A"**</u>.

Employee agrees to devote his full time to such employment. All full-time employees (defined as working at least 40 hours each week, year-round or receiving a minimum of 100% of a full-time equivalent salary as reflected in employee agreement) are considered "exempt" and "salaried" and, in this respect, means that Employee shall not be entitled to payment for overtime.

3.      <u>No Conflict</u>.   The Employee shall not undertake any work as consultant, agent or employee, directly or indirectly, for any other person, firm or corporation so long as he is in the employ of the Company, nor shall he maintain any office facilities other than those furnished to him by the Company.

4.      <u>Term/Employment At Will</u>.   The employment of Employee hereunder shall commence on the date of this Agreement and shall continue for one year from the date hereof (the "Initial Term") and that subject to any other rights contained herein to terminate this Agreement, the Company and Employee agree that after the expiration of the Initial Term, this Agreement shall automatically extend in one (1) year intervals, unless the Company gives notice to the Employee of its intent not to renew on or before October 31st of the then current year; provided, however, it is understood that the Employee is at all times employed on an at-will basis and Employee's employment is subject to



05/25/2012  12:20    7063427264              COPY CORNER                    PAGE  05

Robert Andreottola
Employee Agreement
Page 4

termination at any time for cause or without cause by Company.  Notwithstanding anything
contained herein to the contrary, Employee acknowledges and understands that in the event the
Company does not complete its acquisition of the Applebee's restaurants identified in the APA, the
Company may, upon two (2) weeks notice, terminate this Agreement and the employment of
Employee.

5.    Termination.

    a.    Basis for Termination.

        (i)    Employee's employment hereunder may be terminated at any time by
mutual agreement of the parties.

        (ii)    This Agreement shall automatically terminate on the last day of the month
in which Employee dies or becomes permanently incapacitated.  "Permanent incapacity" as used
herein shall mean mental or physical incapacity, or both, reasonably determined by the Managers
based upon a certification of such incapacity by, in the discretion of the Managers, either
Employee's regularly attending physician or a duly licensed physician selected by the Managers,
rendering Employee unable to perform substantially all of his duties hereunder and which
appears reasonably certain to continue for at least six (6) consecutive months without substantial
improvement.  Employee shall be deemed to have "become permanently incapacitated" on the
date the Managers determine that Employee is permanently incapacitated and so notifies
Employee.

        (iii)    Employee's employment may be terminated by the Company "for cause"
effective upon delivery of written notice to Employee given at any time (without any necessity
for prior notice) if any of the following shall occur: (i) any conviction of the Employee for a
felony or misdemeanor (other than for minor motor vehicle offenses or other minor offenses)
under the laws of the United States (or any state thereof); (ii) any material breach by the
Employee of this Agreement; (iii) the willful failure of the Employee to comply with any lawful
directive of the Managers; (iv) the failure of the Employee to comply with the provisions of the
Company's employee policies, guidelines and practices in effect from time to time; or (v)
dishonesty or gross negligence by the Employee in the performance of his duties hereunder.

        (iv)    Employee's employment may be terminated by the Company "without
cause" (for any reason or no reason at all) at any time by giving Employee sixty (60) days prior
written notice of termination, which termination shall be effective on the 60th day following such
notice.

        (v)    Employee may terminate his employment hereunder by giving the
Company sixty (60) days prior written notice, which termination shall be effective on the 60th day
following such notice.

    b.    Payment Upon Termination.  Upon termination under paragraphs 4, 5(a)(i), (ii),
(iii), (iv) or (v) the Company shall pay to Employee, within ten (10) days after termination, an

05/25/2012  12:20    7063427264                        COPY CORNER                            PAGE  06

Robert Andreottola
Employee Agreement
Page 5

amount equal to the sum of (i) Employee's Base Salary accrued to the date of termination and (ii) unreimbursed expenses accrued to the date of termination. After any such termination, the Company shall not be obligated to compensate Employee, his estate or representatives except for the foregoing compensation then due and owing, nor provide the benefits to Employee described in this Agreement (except as provided by law).

6.    Confidentiality Information. Non-solicitation.

    a.    The Employee agrees, during or after the term of his employment, not to reveal Confidential Information, including but not limited to client lists, or trade secrets to any person, firm, corporation, or entity and shall only use the Confidential Information in the performance of his duties and will not use any Confidential Information at any time for personal benefit, for the benefit of any other individual, firm, corporation or other entity or in any manner adverse to the interests of any of the Companies (defined below). Employee will not disclose any Confidential Information at any time except to authorized Company personnel, unless Company consents in advance in writing or unless the information becomes clearly of public knowledge or enters the public domain or is required to be disclosed by any court or governmental agency. Should Employee reveal or threaten to reveal any Confidential Information, the Company shall be entitled to an injunction restraining the Employee from disclosing same, or from rendering any services to any entity to whom said Confidential Information has been or is threatened to be disclosed. The right to secure an injunction is not exclusive, and the Company may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee. The obligations stated hereunder shall survive termination of this Agreement. Employee further agrees that for a period of two (2) years following the termination of this Agreement (the "Restricted Period"), Employee will not directly or indirectly solicit for employment or attempt to employ or solicit for employment, or assist any other person or entity in employing, soliciting for employment or attempting to employ or solicit for employment, whether on a full-time or part-time or consulting basis or otherwise, any employee, manager, consultant or executive who is at any time on or after the date of this Agreement through the Restricted Period employed or engaged with the Company.

    b.    Confidential Information means information disclosed or made available to or, acquired or discovered by Employee during the course of or as a result of Employee's employment, or as a result of acting in any capacity whatsoever for the Company, its respective successors and assigns, subsidiaries, parents and affiliates, whether now existing or organized at any time in the future (collectively, the "Companies"), that is not either (a) generally known in the industries in which the Companies conducts business, or (b) a matter of common knowledge or public record, including without limitation; (i) the contractual or financial arrangements between or amount any of the Companies and any of their respective employees, directors, officers, or members, or between the Companies and any individual, corporation or other entity with which one or more of the Companies does business; (ii) sensitive information about the

05/25/2012  12:20     7063427264              COPY CORNER                    PAGE   07

Robert Andreottola
Employee Agreement
Page 6

Companies' respective employees; (iii) the identities of any of the Companies' customers or clients and prospective customers or clients; (iv) the terms of any contractual arrangements between the Companies and their respective customers or clients; and (v) information and materials relating to the financial condition, operations, performance or marketing plans of any of the Companies.

7.   Miscellaneous.

a.   Attorneys' Fees.  Should either party hereto, or any heir, personal representative, successor or assign of either party hereto, resort to legal proceedings in connection with this Agreement or Employee's employment with the Company, the party or parties prevailing in such legal proceedings shall be entitled, in addition to such other relief as may be granted, to recover its or their reasonable attorneys' fees and costs in such legal proceedings from the non-prevailing party or parties.

b.   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to conflict of law principles and that jurisdiction and/or venue of any action involving the validity, interpretation or enforcement of this Agreement or any of its terms, provisions or obligations or claiming a breach thereof, shall exist exclusively in a court located within the State of Connecticut, County of Fairfield.

c.   Entire Agreement.  This Agreement, together with the attached exhibits, if any, contains the entire agreement and understanding between the parties hereto and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between them respecting the subject matter hereof.

d.   Amendment/Assignment.  This Agreement may be amended only by a writing signed by Employee and the Company.  Employee's right and obligations under this Agreement shall not be transferable by assignment or otherwise, and any purported assignment, transfer or delegation thereof shall be void.  This Agreement shall inure to the benefit of, and be binding upon and enforceable by, any purchaser or substantially all of Company's assets, any corporate successor to Company or any assignee thereof.

e.   Severability.  If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

05/25/2012  12:20    7063427264                COPY CORNER                              PAGE  08

Robert Andreottola
Employee Agreement
Page 7

    f.    <u>Construction</u>.  The headings and captions of this Agreement are provided for convenience only and are intended to have no effect in construing or interpreting this Agreement.  The language in all parts of this Agreement shall be in all cases construed according to its fair meaning and not strictly for or against the Company or Employee.

    g.    <u>Rights Cumulative</u>.  The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by either party hereto (or by its successor), whether pursuant to this Agreement, to any other agreement, or to law, shall not preclude or waive its right to exercise any or all other rights and remedies.

    h.    <u>Nonwaiver</u>.  No failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.  All waivers by either party hereto must be contained in a written instrument signed by the party to be charged and, in the case of the Company, by an officer of the Company (other than Employee) or other person duly authorized by the Company.

    i.    <u>Remedy for Breach</u>.  The parties hereto agree that, in the event of breach or threatened breach of any covenants of Employee, the damage or imminent damage to the value and the goodwill of the Company's business shall be inestimable, and that therefore any remedy at law or in damages shall be inadequate.  Accordingly, the parties hereto agree that the Company shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of any of such provisions by Employee, in addition to any other relief (including damages) available to the Company under this Agreement or under law.

    j.    <u>Notices</u>.  Any notice, request, consent or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if in writing, and if and when sent by certified or registered mail, with postage prepaid, to Employee's residence (as noted in the Company's records), or to the Company's principal office, as the case may be.

    k.    <u>Acknowledgement</u>.  The parties acknowledge: (a) that they have consulted with or have had the opportunity to consult with independent counsel of their own choice concerning this Agreement; (b) that they have read and understand the Agreement and are fully aware of its legal effect; and (c) have entered into it freely based on their own judgment and not on any representations or promises other than those contained in this Agreement.

    l.    <u>Arbitration of Disputes</u>.

        (i)    Any controversy, claim or dispute arising out of or in any way relating to this Agreement including, but not limited to, the performance or breach thereof, shall be determined exclusively by binding arbitration.  Both Employee and Company acknowledge that they are relinquishing their right to a jury trial in civil court.

05/25/2012   12:20   7063427264                 COPY CORNER                              PAGE   09

Robert Andreottola
Employee Agreement
Page 8

      (ii)    The arbitration shall be in accordance with the Employment Dispute Resolution Rules of the American Arbitration Association, except as provided otherwise in this Agreement. The arbitration shall be commenced and heard in the State of Connecticut, Town of Greenwich before a single arbitrator. The arbitrator shall apply the substantive law (and the law of remedies, if applicable) of Connecticut or federal law, or both, as applicable to the claim(s) asserted. In any arbitration, the burden of proof shall be allocated as provided by applicable law. The arbitrator shall have the authority to award any and all legal and equitable relief authorized by the law(s) applicable to the claim(s) being asserted in the arbitration, as if the claim(s) were brought in a court of law. Either party may bring an action in court to compel arbitration under this Agreement and to enforce an arbitration award. Discovery, such as depositions or document requests, shall be available to the Company and Employee as though the dispute were pending in Connecticut state court. The arbitrator shall have the ability to rule on pre-hearing motions, as though the matter were in a Connecticut state court, including the ability to rule on a motion for summary judgment.

      (iii)    The fees of the arbitrator and any other fees for the administration of the arbitration (*e.g.*, room rental fees, etc.) shall be paid in equal shares by the Company and Employee. The arbitrator must provide a written decision which is subject to limited judicial review consistent with applicable law. If any part of this arbitration provision is deemed to be unenforceable by an arbitrator or a court of law, that part may be severed or reformed so as to make the balance of this arbitration provision enforceable.

      (iv)    The parties acknowledge that this Agreement, including arbitration provision, was negotiated and executed outside of the context of any employment relationship between the Company and Employee.

      m.    **WAIVER OF JURY TRIAL.** THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO ANY POST JUDGMENT ACTIONS AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE COMPANY ENTERING INTO THIS AGREEMENT.

<center>[SIGNATURE PAGE TO FOLLOW]</center>



Robert Andreottola
Employee Agreement
Page 9


IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date set forth below.

Signed this_____ day of May, 2012.

**THE COMPANY:**

**APPLE CENTRAL, LLC**


By:_____
Name:
Title:

By:_____
Name:
Title:

**EMPLOYEE:**

_____
Robert Andreottola


**ACKNOWLEDGED WITH RESPECT TO SECTION 1(h) ONLY:**

**AMERICAN FRANCHISE CAPITAL, LLC**


By:_____
Name:
Title:


By:_____
Name:
Title:

TAB C

**From:** ROBERT ANDREOTTOLA <randreottola@bellsouth.net>

**To:** esigmond <esigmond@aol.com>

**Date:** Tue, Jul 24, 2012 8:28 am

Based on the direction and events that have transpired over the last two months, I just want to clarify that I have resigned form GAFC as an employee and as a board member.
Regards,
Rob

**GAMN-SIG-00084**

# TAB D

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE GREAT AMERICAN FOOD        )
CHAIN, INC., AND               )
EDWARD SIGMOND,                )
      Plaintiffs,            )
                     ) CIVIL ACTION NUMBER
VS.                            )   3:14-CV-01727-L
                     )
ROBERT ANDREOTTOLA,            )
      Defendant.             )

------------------------------------

ORAL DEPOSITION OF

EDWARD SIGMOND

JULY 29, 2015

------------------------------------

ORAL DEPOSITION OF EDWARD SIGMOND, produced as a

witness at the instance of the Defendant, and duly

sworn, was taken in the above-styled and numbered cause

on July 29, 2015, from 9:48 a.m. to 1:33 p.m., before

April C. Presley, CSR in and for the State of Texas,

reported by machine shorthand, at the law offices of

Uloth, P.C., 15455 Dallas Parkway, Suite 600, Addison,

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto:  that the deposition shall be read and signed

before any notary public.                ORIGINAL