1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:
         Ms. Tanja K. Martini
4        The Martini Law Firm
         2619 Hibernia
5        Dallas, Texas   75204
         214-753-4757 (o)
6        888-248-1734 (f)
         tanja@themartinilawfirm.com
7        and
         Ms. Nancy W. Wurzman
8        Law Office of Nancy Wurzman, P.C.
         2713 Pawnee Circle
9        P.O. Box 864003
         Plano, Texas   75086
10       972-964-0916 (o)
         972-419-8329 (f)
11       nwurzman@wurzlaw.com

12
    FOR THE DEFENDANT:
13       Mr. J. Douglas Uloth
         Uloth, P.C.
14       15455 Dallas Parkway, Suite 600
         Addison, Texas   75001
15       972-764-3125 (o)
         888-780-5946 (f)
16       douguloth@ulothlaw.com

17
    ALSO PRESENT:
18       Mr. Robert Andreottola

19

20

21

22

23

24

25

Page 3

1                              INDEX

2                                                      PAGE

3   Appearances.......................................   2

4   Stipulations..................................4/122

5   EDWARD SIGMOND

6       Examination by Mr. Uloth.....................   4

7   Signature and Changes............................  123

8   Reporter's Certificate...........................  125

9        .

10

11                   .

12

                             EXHIBITS
13

14   NO.   DESCRIPTION                               PAGE

15
    1   E-Mail with attachment to Edward Sigmond from
16      Robert Andreottola, 10-21-10.................   78

17   2   Great American Food Chain, company information   82

18   3   E-Mail with attachment to Edward Sigmond from
        Robert Andreottola, 2-14-11.................   83
19
    4   Engagement for legal services with the Mullin
20      Law Firm, 12-23-10..........................   87

21   5   Plaintiffs' First Amended Original Petition
        with Discovery..............................   91
22
    6   Plaintiffs' First Supplemental Response to
23      Robert Andreotolla's Request for Disclosure
        and Designation of Expert Witness............  108
24

25

1    number of Applebee restaurants.  They were a portfolio

2    restaurant holding company, having some, if I believe

3    I'm correct, of seven or eight different brands and took

4    it to the New York Stock Exchange.  That was exactly

5    what I was trying to do with Great American Food Chain.

6              Rob Andreottola agreed to come on to --

7    with Great American Food Chain as the president of the

8    company.  I had all the faith that he knew what to do,

9    how to do it.  And it was not the Amici Restaurants that

10   convinced me to do the deal.  It was having Rob

11   Andreottola on our team that convinced me to do that

12   deal.

13        Q.  When you resumed discussions with the Amici

14   entities, had you hired Mr. Andreottola at that point?

15        A.  We certainly -- no.  We certainly had an

16   agreement.  Rob was part of the package deal.  I would

17   have never done the acquisition without Rob being part

18   of the deal.

19        Q.  When you say Rob was part of the package deal

20   in the acquisition, what was it you were acquiring that

21   included Rob?

22        A.  Rob agreed to come on as president of Great

23   American Food Chain, would stay in the Atlanta area.

24   Although, he and I had discussions at some point in time

25   that he may move to Dallas when we acquired other

1    brands.  In fact, I remember even having a conversation
2    with him on his patio or outside of his home asking how
3    his wife would feel about moving from the beautiful home
4    on the golf course that they had in some suburb of the
5    Atlanta area to Dallas, Texas.  He assured me that that
6    would not be a problem at the right time if everything
7    was moving in the right direction.
8                    And so he and I had an agreement that he
9    would become the president of Great American Food Chain,
10   that he would stay there in Atlanta and that he would
11   oversee all the operations of the Amici Restaurants.
12                   We also had some discussions about the
13   growth of that brand.  We also had discussions that that
14   brand was probably not going to fit within our model and
15   portfolio in the future and that we might even -- that
16   we would probably spin it off or sell it and that even
17   possibly the Torino family would be a potential
18   repurchaser of the brand.
19       Q.   What was Mr. Andreottola's relationship to
20   Amici at the time you were having these discussions?
21       A.   To the best of my knowledge, he was a
22   consultant.
23       Q.   In conjunction with -- you were there -- was
24   there anyone else with Amici that you were going to be
25   bringing in as part of your deal with the Amici

1    but they were not coded properly.

2         Q.   Would -- what other -- what other information

3    or what other basis did you have to believe that these

4    errors existed?

5         A.   Again, it became apparent, once we were

6    involved with them on a day-to-day basis, that they did

7    not have adequate personnel to perform the accounting

8    function.

9         Q.   What effect would these discoveries about cash

10   flow have on the asset purchase price?

11        A.   I'm not really sure whether it had -- I'm not

12   sure it would have had any significant effect on that.

13        Q.   What is the source of concern about the errors?

14   Is it just going forward after the asset transaction, or

15   do you believe it would have affected your decision to

16   go forward with the asset purchase?

17        A.   No.   It -- it probably wouldn't have affected

18   us going forward with the asset purchase.   But,

19   certainly, our budgets were affected.   Going forward,

20   the operating budgets were definitely affected.

21        Q.   And I may have not asked correctly.   But would

22   you believe that this erroneous information would have

23   an effect on the purchase price?

24        A.   I'm not sure, but I would say, not

25   significantly.

1    Q.  Did you ever seek an adjustment of the purchase
2    price?
3    A.  Yes.  And I believe we got an adjustment of the
4    purchase price.
5    Q.  And is it my understanding that the Asset
6    Purchase Agreement has a provision there for allowing an
7    adjustment of the purchase price?
8    A.  Yes, it did.
9    Q.  And how did you go about seeking that
10   adjustment?  Let me try to --
11   A.  Sorry.
12   Q.  The -- when did this information first come to
13   your attention?
14   A.  Probably months after the acquisition.
15   Q.  And what steps did you take to raise this with
16   the Torinos after you discovered it?
17   A.  There was some correspondence and -- I'm sure
18   written correspondence to Mike Torino.
19   Q.  And do you remember what the time frame for
20   this was?
21   A.  My best guess would be 2000 -- spring of 2012.
22   Q.  And did your communication with the Torinos
23   lead y'all to have a discussion about adjustment of the
24   price?
25   A.  I certainly had a discussion with Mike Torino

1    about the price, yes.

2         Q.   And what was the nature of that discussion?

3         A.   I don't recall exactly.

4         Q.   But it was to raise this concern you had, was

5    it not?

6         A.   There was a provision in the Asset Purchase

7    Agreement for an adjustment of the number, should there

8    be an error.

9         Q.   And I assume -- do you recall whether

10   Mr. Torino asked for information to support your

11   recalculations?

12        A.   I believe that we were getting all the

13   accounting information from their office, so they had

14   it.  They were the ones providing it.

15        Q.   And did he agree with you that the numbers

16   needed to be recalculated?

17        A.   We certainly came to an agreement on it.

18        Q.   And what was the nature of that agreement?

19        A.   I do not recall.

20        Q.   Did you reach a written revision of the Asset

21   Purchase Agreement?

22        A.   I believe it was written, yes.  Excuse me.  A

23   total revision of the purchase agreement?  No, I don't

24   believe that there was an -- like, a formal, legal

25   document amendment to the original purchase agreement.

1      A.   I don't remember if he was or not.

2      Q.   And was Cheryl Mullin involved in reviewing

3   information?

4      A.   No, Cheryl Mullin never reviewed any financial

5   information.

6      Q.   And who is Kendall Laughlin?

7      A.   Kendall Laughlin is an attorney.  Primarily,

8   his specialty is leases, commercial leases.  And he

9   primarily does retail commercial leases, primarily those

10   being restaurants.

11      Q.   Was he involved in reviewing the information

12   received from the Torinos?

13      A.   No.  Possibly the lease or leases.

14      Q.   Who was responsible for making the decision to

15   go forward with the Asset Purchase Agreement?  Was it

16   you?

17      A.   Yes.

18      Q.   And was any -- was anyone else involved in that

19   decision?

20      A.   I believe, at the time, there was another --

21   there were two other board members, at the time, of

22   Great American Food Chain, a gentleman by the name of

23   Kevin Johnson (phonetic) and another, Jeff Brown

24   (phonetic).

25           And, with this acquisition, Mr. Andreottola

1   which we absolutely desperately needed someone with CFO

2   type of experience and capability.  And so that would

3   have been his role.

4        Q.  Do you recall Mr. Andreottola communicating to

5   you his belief that the deployment of Mr. Czufin or

6   Mr. Lazereth were essential to what he thought needed to

7   be done with Great American?

8        A.  No.  Although, I will say that we --

9   Mr. Andreottola and I both knew that we were in

10  desperate need of someone with the capabilities of Bruce

11  Lazereth as the CFO position.  But I don't -- you know,

12  so that was one person -- that was one person that could

13  assume that role.

14       Q.  Do you recall whether Mr. Andreottola expressed

15  to you any concern or thoughts that acquiring Canyon

16  Cafe was essential to the development of a plan that

17  involved Amici?

18       A.  No, I do not recall that.

19       Q.  Do you recall him expressing any concern that

20  not getting Canyon Cafe would present problems with the

21  growth plan for Amici?

22       A.  No, not at all.

23       Q.  Are you familiar with Lake Country Foods?

24       A.  Yes.

25       Q.  And how are you familiar with Lake Country

Page 58

1      Q.   Would it have been one or two or more than

2   that?

3      A.   Probably more than that.

4      Q.   As many as ten?

5      A.   No.

6      Q.   Do you recall what the occasions were that

7   brought you to Georgia after the Asset Purchase

8   Agreement?

9      A.   No.  Other than maybe just general business

10   matters.

11      Q.   Do you have any specific recollection of a

12   meeting with the Torinos or anyone after the Asset

13   Purchase Agreement?

14      A.   There were several meetings.  Some of them

15   occurred here in Dallas.

16      Q.   Do you recall what the subject matter of the

17   in-person meetings were?

18      A.   Primarily, accounting and audits.

19      Q.   Was this in conjunction with the operation of

20   the company, or were there registration -- or the S-1

21   registration process?

22      A.   Well, it was in conjunction with the audits for

23   the S-1 registration process.  But all of our operations

24   were Amici.  So they were -- they were one and the same.

25      Q.   Did you have any specific duties -- or what

Page 59

1    were your specific obligations or duties, in your mind,

2    with regard to great American at this time?

3        A.  My specific duties were to try to raise capital

4    and, primarily, oversee the registration process.

5        Q.  And what efforts did you undertake to raise

6    capital?

7        A.  I hit every single family and friend that I had

8    at the time.

9        Q.  And did you -- were you successful in raising

10   any additional capital?

11       A.  Yes, I was.

12       Q.  And from whom?

13       A.  I raised approximately $450,000 that came from

14   my family, my friends.  La Jolla Cove investors was one

15   hundred and -- well, there was two times we got money

16   from La Jolla Cove investors.  The first time was -- I

17   netted 118,000.  But the amount given to was -- and our

18   obligation to them was over that.  But there were

19   attorneys' fees and closing fees and stuff like that

20   that came out of there.  So it was 118,000 net that we

21   received from La Jolla Cove.  I think the whole thing

22   was about 125.  And then they gave us another $25,000

23   later on.

24               I had a friend that put in -- John Ardone

25   (phonetic), just a personal, schoolboy friend of mine

Page 60

1   that put a hundred thousand dollars in.  I had other

2   people in the $25,000 range.  I believe -- again, this

3   is off the top of my head; I might be incorrect -- that

4   I put about 80,000 more cash into the company at that

5   time.

6              So -- you know, there was another gentleman

7   that we raised 15,000 from, another friend, a woman

8   friend of mine, that I got 12,500 from.  In totality, it

9   was, I believe somewhere around the neighborhood of

10  $450,000.

11      Q.  Did you seek money from institutional investors

12  in any way?

13      A.  La Jolla Cove investors is an institutional

14  investor.

15      Q.  Has anyone else -- did you seek --

16      A.  No.

17      Q.  -- money from any other institutional

18  investors?

19      A.  Well, we were seeking money from it.  We didn't

20  receive any money from anyone else but La Jolla Cove

21  Investors.

22      Q.  What steps were you taking to seek funding from

23  institutional investors?

24      A.  I was personally contacting them.

25      Q.  Do you recall who you contacted?

1  with Canyon prior to the acquisition of Amici.  I could

2  be wrong.  I can't remember the timing of it.

3      Q.  But, other than Amici, there were no active

4  acquisition targets going on at the time that the Amici

5  transaction took place?

6      A.  No.

7      Q.  And would the primary reason for that be

8  funding?

9      A.  No.

10     Q.  What would have been the reason?

11     A.  We didn't find one.

12     Q.  But would funding have been a problem, if you

13  found it?

14     A.  I don't know.

15     Q.  You've discussed that you were actively looking

16  for other acquisition targets.  What would have been the

17  funding for those targets if you had reached an

18  agreement with any of them?

19     A.  Again, I explained to you that the Amici

20  acquisition was not a hundred percent owner-financing.

21  So once we got the target identified and the deal agreed

22  to, I went to friends, family, other business associates

23  and raised the money necessary to close the transaction.

24          I would have done exactly same thing with

25  another potential acquisition target.  Whether I could

1        A.   They were -- they were opened, then closed.

2   Yeah.

3        Q.   What time frame would that have been?

4        A.   2006-ish.  Around 2006, 2007.

5        Q.   So this is at some point in time after the

6   acquisition of the shell or --

7        A.   Yes, after the acquisition of the shell.

8        Q.   Open and closed several restaurants?

9        A.   Not several.  Two.

10       Q.   Two.  And, during the years prior to the Amici

11  acquisition, was -- other than the consulting contract.

12  you mentioned, was Great American doing anything?

13       A.   No.

14       Q.   Now, we discussed Mr. Andreottola's involvement

15  leading up to the Asset Purchase Agreement.  What did

16  you see his role as being when he came to work for Great

17  American?

18       A.   Well, again, the plan was that he would run the

19  Amici -- oversee and run the Amici acquisition.  And

20  then he would also be -- look for other acquisition

21  targets and help close other acquisition targets.

22       Q.   What would -- if I understood what you

23  previously testified, his role with respect to the Amici

24  transaction -- he was a consultant with Amici, and he

25  brought Amici to you?

Page 75

1       A.   Correct.

2           Q.   And then he facilitated your communications

3    with Mr. Torino in reaching an agreement about the

4    purchase of the Amici entities?   Is that correct?

5       A.   That's correct.

6       Q.   And what was his role other than that with

7    regard to the time period up to the APA, the Asset

8    Purchase Agreement?

9       A.   Well, I mean, he -- I think, again, we talked

10   about Tahoe Joe's, and we talked about Canyon Cafe.

11   Again, I can't recall exactly the timing.  But he was

12   certainly discussing other potential opportunities with

13   me.

14          Q.   And when did you discuss -- or when do you

15   first recall discussing him becoming a direct employee

16   of Great American?

17      A.   Prior to the acquisition of Amici's.

18      Q.   Do you recall when those discussions started?

19      A.   They -- they started -- they were the reason

20   for me changing my mind from not being interested in

21   Amici's to being interested in Amici's.  So whatever --

22   I don't recall the time frame.  But it had to be either,

23   you know, winter of 2010 or early 2011.  But it was

24   probably winter of 2010.

25      Q.   And what did you -- how would you -- what would

1   be the job description you would give him once he came

2   on board with Great American -- how would you describe

3   that?

4       A.   He came on board with Great American Food Chain

5   as the president of Great American Food Chain and a

6   member of the board of directors.  So he was a director

7   of Great American Food Chain and the president of Great

8   American Food Chain.

9            Because of where we were in the stage of

10  development of Great American Food Chain, he was pretty

11  much also the director of operations.  I mean, he was

12  over all of the operations of Great American Food Chain

13  at that time, which was Amici's Italian Cafe.

14      Q.   And what was his role with regard to the S-1?

15      A.   Rob had no -- Mr. Andreotolla had no major role

16  with the S-1 registration.

17      Q.   And, when you discussed hiring Mr. Andreottola,

18  do you recall what terms were being discussed?

19      A.   Generally, yes.

20      Q.   And what do you recall?

21      A.   Okay.  He was going to come on for a salary, I

22  believe, of $60,000 a year, beginning here.  After 90

23  days -- I don't remember if it was 60 days or 90 days.

24  But in a short period of time, which I believe to either

25  be 60 or 90 days, I believe his salary was bumped to

Page 77

1    $75,000 a year.

2                There were terms and conditions in his

3    agreement with me that -- with Great American Food

4    Chain, sorry, that he would get a salary increase with

5    any -- with an acquisition of some percentage and not to

6    exceed some percentage.

7                He certainly had, in our agreement, you

8    know, where expenses would be covered.  And I don't

9    remember the other terms and conditions exactly.  But

10   that's primarily --

11      Q.  Were these terms that he proposed to you and

12   you accepted?  Did you go back and forth?  Or do you

13   recall how they were developed?

14      A.  He made the first proposal to me in writing in

15   an e-mail.  I think we went back and forth once or twice

16   with it but not -- not very -- not very much.  I think I

17   pretty much accepted his terms and conditions, other

18   than maybe some minor adjustments.

19      Q.  Do you recall whether that acceptance was prior

20   to or after the Asset Purchase Agreement?  I mean, did

21   you have everything locked down --

22      A.  It was prior -- prior to.  I would have never

23   acquired Amici's Italian Cafe without Rob Andreottola

24   being involved.

25                MR. ULOTH:  Off the record.

1      A.   Mr. Laughlin is how I find found her.  I had a

2  relationship with Mr. Laughlin prior to Cheryl Mullins

3  (sic).

4      Q.   So Mr. Laughlin, essentially referred you to

5  Ms. Mullins?

6      A.   Mullins, that's correct.

7      Q.   And did you sign a document like this?  This

8  one doesn't have your signature.

9      A.   I -- I believe I signed an engagement letter

10  with her.  I can't -- I don't know if it was this one or

11  a modified one.

12      Q.   You testified that you began discussing

13  Mr. Andreottola's role with Great American at some point

14  in time during the process prior to the Amici

15  transaction.  Is that correct?

16      A.   Correct.

17      Q.   And would you agree that, from these documents,

18  it appears that, even as late as February 14th, two

19  weeks before the document, you were still discussing

20  what that relationship might involve?

21      A.   Yes.

22      Q.   And, in fact, when Ms. Mullin was looking at

23  the transaction in December, there was no reference to

24  preparing an employment agreement for Mr. Andreottola,

25  is there?

1      A.   No.

2                (Exhibit 5 marked.)

3      Q.   I'd like to show you Exhibit 5, which is the

4  Plaintiffs' First Amended Original Petition with

5  Discovery which was filed in your lawsuit.  Have you

6  seen this document before?

7      A.   Yes, I have.

8      Q.   And your understanding is that this document

9  states the things that you're seeking in this lawsuit?

10  That's your --

11      A.   Yes.

12      Q.   -- operative pleading?

13                Now, I'd like you to look at Paragraph 11

14  of this document and read along with me.  It basically

15  says in the second sentence that, "Due to the logistics

16  involved, plaintiffs initially declined to pursue the

17  acquisition."  And --

18      A.   I'm sorry.  I'm not finding where --

19      Q.   Paragraph 11 --

20      A.   Yes.

21      Q.   -- the second sentence.

22      A.   Yes.

23      Q.   And would you -- you described a scenario where

24  Mr. -- where you were approached regarding Great

25  American, and then you initially decided not -- that you

1    was not accurate.

2         Q.   And is that a factor in your adjustment of the

3    purchase price that was reached with the Torinos?

4         A.   No.

5         Q.   And how did that affect the purchase price?

6         A.   I don't think that affected the purchase price,

7    as I have testified earlier.

8         Q.   If you look at Page 7, Paragraph 29, you state

9    that "Mr. Andreottola committed fraud by way of

10   misrepresentations made to plaintiff, on an ongoing

11   basis, made material false representations to plaintiff

12   regarding the status of Amici Restaurants" (sic).

13               What misrepresentations did he make

14   regarding the status of Amici Restaurants?

15        A.   Mr. Andreottola presented me with a -- with the

16   EBITDA numbers the business was producing and a pro

17   forma of what this company would look like going forward

18   after the acquisition with our cost-based structure of

19   the new company.   That didn't materialize to be

20   accurate.

21        Q.   And how did this affect the purchase price?

22        A.   It did not affect the purchase price.

23        Q.   And how did this affect operations after the

24   company was acquired?

25        A.   We couldn't meet our financial obligations with

1   all the G&A overhead that we -- that we had involved

2   with the company.

3       Q.  Did you receive information from the Torinos on

4   this subject as well?

5       A.  No.  I received financial information from the

6   Torinos.  But the pro forma, what this would look like

7   after the acquisition, was solely provided by Rob

8   Andreottola.

9       Q.  You state that he committed fraud by way of

10  misrepresenting his commitment to grow the business.  In

11  what way did he misrepresent his commitment to grow the

12  business?

13      A.  I'm not sure this is referring -- hold on.  Let

14  me read this again.  I just want to make sure that I'm

15  understanding the question properly.

16              (Pause in proceedings.)

17      A.  Okay.  His commitment to grow the business with

18  plaintiffs in here does not only refer -- or

19  specifically refer to the Amici Restaurants.  Okay?  The

20  commitment to grow the business was involving other

21  acquisitions and other means of exercise -- or of

22  implementing our business-plan model.

23      Q.  In what way did he misrepresent that intent?

24      A.  Well, for example, we did another acquisition

25  of Yummy To Go.  Rob's role in that was to provide a lot

1    of support to that company that was based here in

2    Dallas, Texas.  All right?  He was supposed to be over

3    here on a regular basis, when we acquired that company,

4    to help that company get on track.

5              He made very few trips over here.  I could

6    probably count them on less than -- maybe two or three

7    trips over here and did not provide the support and --

8    and -- and things that we needed with that acquisition.

9    And it became a disaster very quickly.

10        Q.   How is that a misrepresentation of his

11   commitment to --

12        A.   Well --

13        Q.   -- great American?

14        A.   We -- because we needed his restaurant

15   expertise in these acquisitions to make sure that they

16   were -- they were going to perform in a way that was

17   going to contribute to the growth of Great American Food

18   Chain.  He didn't do it.  He said he would do it.  He

19   made representations that he would do it.  But, when it

20   came down to it, he didn't do it.

21        Q.   Do what?

22        A.   Manage and contribute his expertise in the

23   operations of the -- of the business.

24        Q.   Of Great American?

25        A.   Well, in Great American's sub -- subsidiaries,

1    which is Great American.  We're a holding company.  So

2    any subsidiary we have in here is part of Great

3    American.

4        Q.  So your -- the factual basis for your assertion

5    that he misrepresented his commitment to grow the

6    business with plaintiffs is the fact that he did not

7    regularly oversee the operation of Yummy To Go?

8        A.  That was part of it, yes.

9        Q.  What are the other parts?

10       A.  I'm drawing a blank right now.

11       Q.  So you have no recollection of any other basis

12   for that assertion in your lawsuit, other than the Yummy

13   To Go operation?

14       A.  No.  Part -- okay.  Another part of this is

15   that, you know, we were -- we were bleeding money

16   because of our G&A overhead.  All right?  Rob could have

17   -- and I expected him to -- assume the role of what

18   Chris Torino and Mike -- and partly what Mike Torino was

19   doing, that we could have cut our overhead expense and

20   met our financial obligations.

21                He made representation to me, when we had a

22   phone call or meeting, that -- when we knew that we were

23   having trouble meeting our financial obligations, that

24   he would cut this down to the bare bones and operate all

25   this himself over there so we can meet our financial

Page 102

1   obligations.  And I took that that he would do that.
2       Q.  When did that conversation occur?
3       A.  Probably sometime in 2012.
4       Q.  That conversation was after the Asset Purchase
5   Agreement was signed?
6       A.  Yes.
7       Q.  What other failures of commitment do you refer
8   to in that allegation?
9       A.  I think I've stated what I -- what I meant --
10  what's meant by that.
11      Q.  Nothing else that you can recall?
12      A.  No.
13      Q.  And then you assert that he misrepresented his
14  promise to act in plaintiffs' best interests.  In what
15  way did he misrepresent his promise to act in
16  plaintiffs' best interests?
17      A.  Again, the primary thing on that was that he
18  knew -- he and I had several conversations, that I was
19  not comfortable with the current management or -- of
20  Amici's, the family members, that the only reason I was
21  agreeing to do this acquisition was because he was
22  coming on board.  And I was really investing in
23  Mr. Andreottola as much -- or Great American Food Chain
24  was investing in Andreottola.  And the people I raised
25  money from, the commitments I made for loans were

1    investing in Andreottola and not necessarily in the
2    brand.
3                I felt that the brand had the potential he
4    represented.  But we certainly weren't going to invest
5    in the people, the original people, the Torinos, not
6    that they're bad people.  But they did not have the
7    experience or the abilities that we would have ever put
8    our dollars behind.  We put our dollars behind Rob
9    Andreottola.
10               He made representations to me that he would
11   be there to operate this restaurant.  He made
12   representations to me that, if we could not meet our
13   financial obligations, that he would trim all of the
14   costs primarily associated with human resources -- and,
15   again, Mike Torino and Chris Torino being on the top of
16   that list -- and run this company so that we can meet
17   our financial obligations.  He didn't do that.
18        Q.   Were these made to you prior to the Asset
19   Purchase Agreement or after?
20        A.   I would have never acquired -- or approved the
21   acquisition of this company without the assurance or the
22   belief that he had -- he was committing to do the things
23   that he said he would do with us.
24        Q.   Did you give him an employment agreement that
25   would tie him up for a period of years?

1      A.   No.

2      Q.   So how long would he have had to stay with the

3   company before you felt like this commitment was

4   confirmed?

5      A.   Well, certainly -- look, I would have been -- I

6   would have been comfortable with him leaving us at any

7   time in which we were in a position to manage the

8   acquisition or -- or be able to fulfill our obligations.

9   He left us high and dry.

10      Q.   However, there is no set term or time which you

11   believe he had to stay to maintain his obligations, as

12   you see them?

13      A.   There wasn't a specific, set time.  But he

14   didn't fulfill those obligations.

15      Q.   Did you make all of the payments that were due

16   to Mr. Andreottola?

17            MS. MARTINI:  Objection, form.

18      Q.   When I say "you," Great American.

19      A.   No.

20      Q.   What was that, 5?

21      A.   That was 5.

22            (Pause in proceedings.)

23      Q.   Can you tell me what actions you took to verify

24   the accuracy of the EBITDA information that was provided

25   to you by Mr. Andreottola?

Edward Sigmond * July 29, 2015

Page 108

1    accurate.

2        Q.   You've testified -- or I stated --

3             MR. ULOTH:   Strike that.

4        Q.   Do you believe that Mr. Andreotolla made any

5    misrepresentation to you regarding his experience in the

6    restaurant business?

7        A.   No.

8        Q.   And is any of the information that you received

9    from him by way of a resume` or otherwise incorrect?

10       A.   To the best of my knowledge, it's correct.

11       Q.   And was -- so do you believe that

12   Mr. Andreottola made any misrepresentations to you about

13   his prior experience in any way?

14       A.   Not to my knowledge.

15       Q.   What was the basis for your decision to hire

16   Mr. Andreottola?

17       A.   I -- as I testified earlier, his experience,

18   restaurant experience; but, primarily, it was because he

19   did exactly with Abado Brands that I was trying to

20   accomplish with Great American Food Chain.

21             (Pause in proceedings.)

22       A.   This was 5 here.

23             (Exhibit 6 marked.)

24       Q.   Yeah.   I'll show you what I've marked Exhibit

25   6.   And, if you would turn to Page 5 and look at the

Edward Sigmond * July 29, 2015

1    section toward the bottom called -- "plaintiffs

2    calculate their damages as follows."  And it begins

3    GAMN/Amici Enterprises.  Are the closing costs you're

4    identifying there the costs enclosed in the APA,

5    Asset --

6         A.  Yes.

7         Q.  I'm sorry.  The Asset Purchase Agreement?

8         A.  Yeah.  I've got you.  Yes.

9         Q.  And that's actual costs that you've paid and

10   incurred?

11        A.  Yes.

12        Q.  Does that include the attorney's fees to

13   Ms. Mullin?

14        A.  I believe it has -- it does.

15        Q.  And then you're alleging your damages are

16   operating losses of Amici of $810,000.  What is that

17   based on and over what time period?

18        A.  That would be from inception to probably the

19   end of 2014.

20        Q.  And do those operating losses include the

21   payment of salaries?  Is that a factor in calculating --

22        A.  Yes.  I'm sorry.

23        Q.  And were salaries being paid to the Torinos?

24        A.  Yes.

25        Q.  Did you receive any salary?

1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
2                          DALLAS DIVISION

3    THE GREAT AMERICAN FOOD          )
     CHAIN, INC., AND                 )
4    EDWARD SIGMOND,                  )
              Plaintiffs,             )  CIVIL ACTION NUMBER
5                                     )  3:14-CV-01727-L
     VS.                              )
6                                     )
     ROBERT ANDREOTTOLA,              )
7              Defendant.             )

8

9    STATE OF TEXAS      *

10   COUNTY OF COLLIN    *

11       I, April C. Presley, Certified Shorthand Reporter,

12   in and for the State of Texas, hereby certify to the

13   following:

14       That the witness, EDWARD SIGMOND, was duly sworn by

15   the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by

17   the witness;

18       That the original deposition transcript was

19   delivered to Ms. Tanja Martini, attorney for the

20   Plaintiffs;

21       That a copy of this certificate was served on all

22   parties and/or the witness shown herein on

23   _____8/17/15_____;

24       That the amount of time used by each party at the

25   deposition is as follows:

Page 126

1        Ms. Tanja K. Martini - 0 hours, 0 minutes

2        Mr. J. Douglas Uloth - 2 hours, 57 minutes

3        That, pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the following includes counsel for all parties of

6    record:

7

     FOR THE PLAINTIFFS:
8        Ms. Tanja K. Martini
         The Martini Law Firm
9        2619 Hibernia
         Dallas, Texas  75204
10       214-753-4757 (o)
         888-248-1734 (f)
11       tanja@themartinilawfirm.com
         and
12       Ms. Nancy W. Wurzman
         Law Office of Nancy Wurzman, P.C.
13       2713 Pawnee Circle
         P.O. Box 864003
14       Plano, Texas  75086
         972-964-0916 (o)
15       972-419-8329 (f)
         nwurzman@wurzlaw.com
16

17   FOR THE DEFENDANT:
         Mr. J. Douglas Uloth
18       Uloth, P.C.
         15455 Dallas Parkway, Suite 600
19       Addison, Texas  75001
         972-764-3125 (o)
20       888-780-5946 (f)
         douguloth@ulothlaw.com
21

22       I further certify that, pursuant to FRCP Rule

23   30(f)(1), the signature of the deponent:

24           __X__ was requested by the deponent or a party

25   before the completion of the deposition and that the

Edward Sigmond * July 29, 2015

Page 127

1    signature is to be before any notary public and returned

2    within 30 days from date of receipt of the transcript.

3    If returned, the attached Changes and Signature Page

4    contains any changes and the reasons therefore;

5           _____ was not requested by the deponent or a

6    party before the completion of the deposition.

7

8         I further certify that I am neither counsel for,

9    related to, nor employed by any of the parties or

10   attorneys in the action in which this proceeding was

11   taken and, further, that I am not financially or

12   otherwise interested in the outcome of the action.

13        Certified to by me this 14th day of August 2015.

14

15        _____

          April C. Presley, Texas CSR

16        Expiration Date:  12/31/15

          Usher Reporting Services

17        Firm Identification No. 588

          1326 Lochness Drive

18        Allen, Texas  75013

          214-755-1612 (o)

19        214-547-0822 (f)

          karen@usherreporting.com

20

21

22

23

24

25

TAB E

ROBERT ANDREOTTOLA   7/30/15

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   THE GREAT AMERICAN            )
     FOOD CHAIN, INC.              )
 4   AND EDWARD SIGMOND            )    CIVIL ACTION
                                   )
 5   VS.                           )    NO.: 3:14-cv-1727-L
                                   )
 6   ROBERT ANDREOTTOLA            )

 7

 8

 9

10        -------------------------------------

11                  ORAL DEPOSITION OF

12                  ROBERT ANDREOTTOLA

13                    JULY 30, 2015

14        -------------------------------------

15

16        ORAL DEPOSITION OF ROBERT ANDREOTTOLA, produced as

17   a witness at the instance of the Plaintiff, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on the 30th day of July, 2015, from 10:43 a.m. to

20   12:18 p.m., before Kimberly R. Spurger, CSR in and for

21   the State of Texas, reported by machine shorthand, at

22   the law offices of Uloth, P.C., 15455 Dallas Parkway,

23   Suite 600, Addison, Texas, pursuant to the Federal Rules

24   of Civil Procedure and the provisions stated on the

25   record or attached hereto.
```

ORIGINAL

```
 1                    A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF:

 4      MS. TANJA K. MARTINI
        The Martini Law Firm, P.C.
 5      2619 Hibernia
        Dallas, Texas 75204
 6      (214) 753-4757
        (888) 248-1734 Fax
 7
    - AND -
 8
        MS. NANCY W. WURZMAN
 9      Law Office of Nancy Wurzman, P.C.
        2713 Pawnee Circle
10      P.O. Box 864003
        Plano, Texas 75086-4003
11      (972) 964-0916
        (972) 419-8329 Fax
12

13  FOR THE DEFENDANT:

14      MR. J. DOUGLAS ULOTH
        Uloth, P.C.
15      15455 Dallas Parkway
        Suite 600
16      Addison, Texas 75001-6760
        (972) 764-3125
17      (888) 780-5946 Fax

18

19  ALSO PRESENT:  Mr. Edward Sigmond

20

21

22

23

24

25
```

```
 1                          INDEX
 2
                                                   PAGE
 3
    Appearances....................................  2
 4
    ROBERT ANDREOTTOLA
 5     Examination by Ms. Martini...................  4
       Examination by Mr. Uloth..................... 70
 6     Further Examination by Ms. Martini........... 71
 7  Reporter's Certificate.......................... 72
 8
                       E X H I B I T S
 9  NUMBER  DESCRIPTION                            PAGE
10    7     E-mail from Mr. Andreottola dated 10/21/10
             Subject:  Rob's roles and compensation   30
11
      8     Employment Agreement                     42
12
      9     News Release from DineEquity announcing
13           the sale of 33 Applebee's to AFC         46
14   10     Resignation e-mail from Mr. Andreottola
             dated 7/24/12 to Mr. Sigmond             49
15
16
17
18
19
20
21
22
23
24
25
```

1    contract with Amici ended in -- I'm sorry -- in

2    February of 2011?

3         A.    Didn't have a contract with them.

4         Q.    Okay.  Then your consulting --

5         A.    Yes.

6         Q.    -- with them stopped in February 2011?

7         A.    Say that again.

8         Q.    Sorry.  That was a bad question.

9         A.    Yeah.  I'm a little confused with what you're

10   saying.

11        Q.    So your consulting with Amici ended in

12   February of 2011; is that correct?

13        A.    Yes.  Well, there's two pieces to this.

14        Q.    Okay.

15        A.    The first June and July ended.  And then in

16   October, Mike Torino and Chris Torino asked me to help

17   them with their menu.  So I started doing menu work for

18   them and that's -- was finished probably in early

19   February.

20        Q.    Okay.  And that's in 2011?

21        A.    Yes.

22        Q.    Okay.  Now, with the consulting work that you

23   had with them, was that a -- you were working as an

24   independent contractor?

25        A.    Uh-huh.

```
 1        Q.    Okay.

 2        A.    Yes.  Sorry.

 3        Q.    And then how is it that you became involved

 4   with the Amici acquisition by GAMN?

 5        A.    I introduced Keith to -- to the Torinos and

 6   Keith introduced Ed to the Torinos and that's how it got

 7   started.  They -- they agreed that they thought it would

 8   be a good time for them to sell their company.

 9        Q.    Okay.  And when did that introduction occur?

10        A.    June of 2010.

11        Q.    And during that entire acquisition process,

12   what exactly was your role?

13        A.    I didn't have a role in the acquisition at

14   all.  I was focusing on the menu.  And every now and

15   then, I'd have a call with the Torinos or with Ed, but

16   predominantly, that was -- I was not an employee of GAMN

17   nor of the Torinos.

18        Q.    Okay.  So you didn't make any representations

19   about wanting to run the restaurant for GAMN?

20        A.    No.  When Ed said if he was to buy this thing

21   would it be my interest and I said it'd be interesting

22   to run this company for him --

23        Q.    Okay.  And --

24        A.    -- the Amici's.

25        Q.    And when you say run it, what exactly did you
```

1    mean by that?

2         A.    Develop it, develop the menu, grow it, its

3    consumer metrics, its financial metrics, that kind of

4    stuff.

5         Q.    And did you end up doing that?

6         A.    Yes.

7         Q.    When did you begin doing that?

8         A.    End of February whenever they signed the APA

9    and officially took the company over.

10        Q.    Now, during the -- prior to the APA being

11   executed -- and by that, you know we're talking about

12   the asset purchase agreement, correct?

13        A.    Correct.

14        Q.    -- did you make any representations to GAMN

15   or Ed about what role or the specific duties that you

16   wanted to have as the president or what goals you would

17   achieve for GAMN?

18        A.    No.

19        Q.    Okay.  Did you ever talk to Ed about the

20   ABITA [phonetic] of Amici and how you could --

21        A.    What's ABITA?

22        Q.    EBITDA.  I'm sorry.

23        A.    EBITDA.

24        Q.    EBITDA, yes.

25        A.    Cash flow.

1      Q.    How you can improve the cash flow for Amici?

2      A.    Probably in conversation.  We had

3  conversations about their current cash flow from what

4  they were presenting to us and what the opportunities

5  were.  But in terms of hard specific numbers, no.

6      Q.    Did you tell Ed that the EBITDA wasn't

7  sufficient to cover cash flow or overhead and that you

8  would be able to fix that and correct that problem?

9      A.    No.  Amici's cash flow -- if you added up the

10  company restaurants and you added up the franchise

11  revenue, it was roughly about $380,000, I think.  If you

12  look at the Amici's G&A -- dedicated G&A and then a new

13  debt service, that would cover that.

14            On the other hand, you had GAMN G&A; my

15  salary, Ed's assistant, Ed's other person he hired in

16  Dallas, his accountant.  And then you had the fees for

17  the S-1 registration, you had legal fees, you had CapEx.

18  You add all that up, we were about $300,000 short.  So

19  the bottom line was we needed funding for the first day.

20  And that was explained to everybody and Ed actually

21  agreed with that.

22      Q.    Okay.  And whose job was it to get the funding

23  that was necessary?

24      A.    Ed Sigmond's.

25      Q.    And does the president of a corporation have

1  any role in obtaining funding?

2      A.    That wasn't my role.   At that particular time,

3  I was really running the restaurant operations.

4      Q.    Okay.

5      A.    I was focused on the transition of that.

6      Q.    And later on during your tenure as president

7  of GAMN, did your role change so that you would have

8  to go out --

9      A.    No.  I was more --

10      Q.    -- and obtain funding?

11      A.    -- interested in bringing other M&A to the

12  company.

13              MR. ULOTH:  You need to, like, let her

14  finish her question --

15      A.    Oh, I'm sorry.

16              MR. ULOTH:  -- before you start answering.

17      A.    What was your question again?

18              MS. MARTINI:  Would you read it back,

19  please?

20              THE REPORTER:  Yes.

21              (The record was read back as requested.)

22      Q.    (By Ms. Martini)  Work on develop -- or

23  obtaining funding?

24      A.    That wasn't my primary role.  I did assist Ed

25  and met with a guy named Robert Hersch, but that was

ROBERT ANDREOTTOLA      7/30/15

1  all around?

2      A.    No.   Keith told me that Ed was not interested.

3  That's all I know.

4      Q.    Okay.

5      A.    And to pass it on to the Torinos and that's

6  what I did.

7      Q.    Now, you would have gotten the $50,000 finder

8  fee with the Amici acquisition, correct?

9      A.    Supposedly.

10      Q.    Okay.   But under the terms of the agreement

11  between GAMN and ARC, you should have?

12      A.    Correct.

13      Q.    And so you had some kind of a financial

14  interest in GAMN acquiring Amici.   Is that fair to say?

15      A.    Yes.

16      Q.    And with that, there was a great incentive for

17  you to close the deal at all costs?

18      A.    And Ed was aware of that from day one.

19      Q.    Did you ever advise Ed that this might not be

20  the best opportunity for GAMN?

21      A.    No.   I advised Ed -- we were working on other

22  deals at the time.   There were other good things out

23  there like Canyon Cafe and things, but we had a plethora

24  of opportunities and Ed was in charge of GAMN and he was

25  making those decisions.

1      Q.    So you weren't in Cheryl Mullin's office for

2  any time to --

3      A.    That was post.  And at that time in Cheryl

4  Mullin's office, we were reviewing the Lake Oconee

5  contract.

6      Q.    And what was that?

7      A.    Ed was interested in buying the Lake Oconee

8  franchisee.  And the franchisee developed the APA and

9  we were viewing it at her office with Mike Torino and

10 Ed Sigmond.

11     Q.    Okay.  Now, did Cheryl Mullin play a role

12 in the acquisition of the Amici restaurants to your

13 knowledge?

14     A.    The only knowledge I had was she assisted in

15 developing the APA and some of the due diligence that

16 you guys discussed yesterday.

17     Q.    Okay.

18     A.    That was the first time I even met Cheryl

19 Mullins was at that meeting, at the Lake Oconee APA.

20     Q.    And did you participate in any of the due

21 diligence of the Amici acquisition?

22     A.    No.  Well, define due diligence for me.

23     Q.    Well, did you investigate the financials of

24 Amici to see whether it was worth pursuing for GAMN?

25     A.    No.  The finances were provided by Mike Torino

1  and they were forwarded to Ed.  We discussed them.  But

2  as far as going back and looking at the tax records and

3  conforming sales and revenue, that was not my position.

4  I was not an employee for either company.

5     Q.   Okay.  I notice in your interrogatory answers

6  that you said that they were -- and use the term that

7  you used -- unaudited -- I think it was unaudited

8  financials.

9     A.   We knew from the get-go -- Mike Torino

10 probably in the first meeting said, Our financials are

11 not audited.

12    Q.   And what does that mean when you're looking at

13 financials --

14    A.   That somebody --

15    Q.   -- of a company?

16    A.   -- has not audited the finances.  And so the

17 only thing they really can go off is the tax records.

18    Q.   Okay.  And is that what you-all used for the

19 tax records?

20    A.   I don't know.  I did not develop the APA for

21 Amici's.  I was not involved in that process.

22    Q.   And you didn't provide any financial

23 information to Ed or GAMN?

24    A.   If I did, it was through Torinos as the

25 conduit to send to Ed.

1      Q.    Okay.  So in your role as the agent through
2  ARC to put Ed or GAMN and the Amici restaurants
3  together, there was nothing that you did to facilitate
4  the acquisition.  You weren't providing information to
5  either side.  You were just a conduit?
6      A.    And doing menu analysis and developing menus
7  for them.
8      Q.    Right.
9      A.    That was my role.  I couldn't tell either
10 of them what to do.  No.  They were the ones having the
11 conversations.
12     Q.    Now, when Ed walked away from the Amici deal
13 initially, did he give you a reason why he wasn't
14 interested?
15     A.    Back then, I probably couldn't remember.  Once
16 again, Keith was the one that said Ed wasn't interested.
17 And then he said, Do you have anything else?  At that
18 particular time, I said no.
19     Q.    Okay.  There wasn't anything about the
20 distance between the two -- between Dallas and Atlanta?
21     A.    Well, my assumption is that Ed's business
22 was in Dallas and, you know, Amici's is in Atlanta.
23 I assumed that would be a situation.
24     Q.    And then later on when you offered to run
25 Amici restaurants for him, you were already living in

ROBERT ANDREOTTOLA    7/30/15

1    Atlanta at the time, right?

2        A.    Yes.   Not Atlanta, outside of Atlanta.

3        Q.    But in the greater Atlanta area?

4        A.    Yeah, where the restaurants were.

5        Q.    Okay.   Makes sense.   So when you offered to

6    run the restaurants for him, there was -- it was very

7    advantageous to GAMN to have you there in Atlanta or the

8    Atlanta area to run those restaurants, right?

9        A.    It was a convenience, yes.

10       Q.    It was more than a convenience.   I mean, it

11   was a necessity.   Isn't that fair to say?

12                MR. ULOTH:   Objection, leading.

13       Q.    (By Ms. Martini)   You can answer.

14       A.    It wasn't a necessity.   I open restaurants all

15   over the country and not live there.

16       Q.    But this was a little different because you

17   were kind of starting it over in a way.

18       A.    No.   It wasn't a start-up.   It wasn't --

19       Q.    I'm not saying it was --

20       A.    -- a start-up company.

21       Q.    But it was a start-up.   You were redoing

22   the menus.   You were kind of doing a major shift in

23   management.

24       A.    No, I wasn't doing a major shift in

25   management.   Management was still employed and still

 1   there.

 2       Q.    But you were kind of running the show at this

 3   point rather than the Torinos?

 4       A.    Yes.

 5       Q.    And you were changing the menu?

 6       A.    The menu was changed prior.  We were finished

 7   with that process in November.

 8       Q.    Okay.  And the Torinos weren't really in

 9   control of their own restaurant anymore since GAMN was

10   now owning and operating it?

11       A.    No.

12              MR. ULOTH:  Objection, leading.

13       A.    Chris was very involved in the company,

14   founded the company, knew the managers very well, was

15   still making decisions.  Mike was looking for real

16   estate, still managing the financials of the company.

17   They were very involved in the company.

18       Q.    (By Ms. Martini)  What benefit do you think

19   you added to GAMN by acting as president of the company?

20       A.    Of GAMN or Amici's?

21       Q.    GAMN.

22       A.    Bring in opportunities from an M&A

23   perspective, giving them the opportunities to develop an

24   infrastructure to grow the organization as we brought on

25   more brands and have an ability to bring people in that

1  I knew in the industry that were very talented.

2     Q.   And who did you bring in from the industry?

3     A.   Nobody because we didn't buy anything but

4  Amici's.

5     Q.   Well, you bought Yumi-to-Go, didn't you?

6     A.   I'm sorry?

7     Q.   Yumi-to-Go, wasn't that another purchase?

8     A.   We didn't buy Yumi-to-Go.  We bought a

9  licensing to open some Yumi-to-Goes.

10     Q.   Okay.  And your tenure as president was for

11  how long?  A little bit over a year?

12     A.   Sixteen months, I think.

13     Q.   What did you accomplish in that 16 month

14  period?

15     A.   Restaffing the restaurants, we improved sales,

16  food cost went down, beer and liquor cost went down, we

17  had more stable management in the Amici's brand.  Tony

18  opened a Yumi-to-Go.  It wasn't very profitable in terms

19  of its sales.  Other than that, bringing some M&A to the

20  company.  And just working on a day-to-day basis, what

21  you do from an operational perspective; making sure you

22  perform from a consumer metric perspective.

23     Q.   So when you said you -- GAMN only purchased

24  licensing for Yumi-to-Go?

25     A.   From what I understand, we had the right to

1  Amici's.  I think they did an audit in 2009 that didn't

2  count.  We had to go back and do 2010.  Things just kept

3  happening with this audit.  We changed accounting firms.

4  We changed the legal firm.  Ed, for some reason, changed

5  the firms.  He didn't think they were getting the

6  results that we needed.

7      Q.   Uh-huh.

8      A.   And so this thing kept going on and on and on

9  indefinitely.

10      Q.   Now, prior to the asset purchase agreement

11  being executed, did you have any conversations with Ed

12  about the pro forma of the Amici restaurants?

13      A.   No.  Once again, the pro forma we're talking

14  about is we understood Amici's cash flow.  We also

15  understood bringing on additional G&A from a GAMN

16  perspective.  We wanted to see the difference in that.

17  Could Amici's fund their own debt service and the

18  dedicated G&A and what was leftover to settle GAMN --

19  to accommodate GAMN's G&A.  Well, there was a two to

20  $300,000 difference from day one.  We all knew we had

21  to have an influx of capital -- about $300,000 -- to

22  maintain our operational, you know, smoothness.  Not

23  extending AP to 60 days, so forth and so on.

24      Q.   And did you and Ed ever have conversations

25  about firing Mike or Chris Torino from the company?

1    A.    I think that happened in March or April of
2  2012 when -- Mike actually sent Ed some e-mails about
3  the fact we need to start an austerity program 'cause we
4  can't go on.  We need to get rid of Rob and some other
5  people.
6    Q.    Are you aware that Mike ever took any money
7  from the company?
8    A.    No.  If you mean, like, took a salary.
9    Q.    Well, no.  Are you aware that he ever took,
10 like, 40 or $60,000 from the corporate funds?
11   A.    No.
12   Q.    When you were negotiating your role as
13 president for GAMN, do you recall the -- those
14 negotiations you had with Ed?
15   A.    I wouldn't call them negotiations.  I would
16 call them that we agreed I was gonna work for GAMN and
17 the only negotiations we had was in terms of financial.
18   Q.    Okay.
19   A.    He -- I wanted a certain financial situation,
20 which you guys are aware of.  I sent that information
21 over and Ed said that he couldn't afford it.  And just
22 for the Amici's, he thought this was more appropriate
23 and I agreed.  However, once again, Canyon was already
24 teed up and we assumed Canyon would come on right after
25 the Amici's acquisition based on the S-1 and we were

1  gonna negotiate our salaries at that time.

2          And Ed also informed us that during the

3  S-1 process, that there should be no employment

4  agreements because it would slow the process down and

5  convolute it.  And the Torinos were the ones that really

6  wanted employment agreements.

7      Q.    Did you ever tell Ed that your focus would

8  be -- that you had a commitment to the company to make

9  it grow?

10     A.    Yeah.  I was there to help him grow the

11 company.  Whether it's their acquisition or it's the

12 acquisition of the Amici franchisees or open new

13 restaurants.  That was the full intention of this.

14     Q.    Okay.  I'm gonna hand you what I'm gonna mark

15 as exhibit -- mark as Exhibit 1.

16          MR. ULOTH:  I guess I'm wondering, do we

17 want to, like, do consecutive or sequential exhibit

18 markings?

19          MS. MARTINI:  You know, we can do that.

20          MR. ULOTH:  It might make more sense in

21 terms of --

22          MS. MARTINI:  We started -- what was it?

23 It was 6 yesterday.

24          MR. ULOTH:  I think it was 6 yesterday,

25 so we can start this one at 7.  You don't have to.  I'm

```
 1  page that's marked Defendant -- or DEF 00014.
 2      A.    Gotcha.
 3      Q.    So in this e-mail that's dated October 21st,
 4  2010, here you're offering to run Great American Food
 5  Chain, correct?
 6      A.    Uh-huh.
 7      Q.    And you want to assume the role of leading
 8  Amici's to the next level of profitability and
 9  conservative growth.  What does that mean?
10      A.    Conservative growth means grow within your
11  means through your cash flow.  And taking it to the next
12  level is restructuring the company in terms of its
13  operational performance.
14      Q.    And did you do that?
15      A.    Uh-huh.  Sales were up.
16            MR. ULOTH:  Answer yes or no as opposed
17  to --
18            THE WITNESS:  Uh-huh?
19            MR. ULOTH:  -- nodding or uh-huh.
20      A.    Yes.
21      Q.    (By Ms. Martini)  How did you do that?
22      A.    Put a new menu in place which reduced food
23  cost.  The new menu increased lunch sales.  They were in
24  a positive same store sales.  And we reduced beer and
25  liquor costs.  Those were the first things I attacked.
```

ROBERT ANDREOTTOLA   7/30/15

1  risk free without knowing what GAMN's --

2      A.   Because we already got the primary numbers

3  from -- from Amici.

4      Q.   Now, did you initially approach Ed about

5  wanting to be the president of GAMN or did he approach

6  you about that?

7      A.   He approached me about being the president of

8  GAMN at the particular time I was talking -- initially,

9  when I talked with Ed was about Amici's.  And then later

10 on, it evolved from the president of GAMN after Canyon

11 Cafe got involved, other things got involved.

12     Q.   And that's when -- then you sent this

13 e-mail --

14     A.   Uh-huh.

15     Q.   -- after the initial discussions because --

16     A.   Right.

17     Q.   -- if I'm gonna do this, this is what I want?

18     A.   Right.

19     Q.   Gotcha.  And then at some point, GAMN did hire

20 you.  And I want to say that's in February of 2011?

21     A.   Say that again.

22     Q.   GAMN hired you in February of 2011?

23     A.   After the date of the close.

24     Q.   And there was an employment agreement that was

25 generated by GAMN for you.  Have you seen that?

```
 1      A.    You know, I recollect seeing it.
 2      Q.    Well, I'm curious if -- 'cause your signature
 3 is not on it, so I was curious why you never signed it.
 4      A.    Because the employment agreement -- the
 5 financial arrangement that Ed and I talked about was --
 6 I think it was in late February -- was right now, it's
 7 just Amici's.  It was -- my role was only gonna be at
 8 this limited scope.  It was only with so much money I
 9 agreed to that.  But with Canyon Cafe already teed up,
10 my assumption was we would renegotiate going forward.
11      Q.    Okay.  And after 16 months, was there ever a
12 renegotiation of your --
13      A.    I'm sorry?
14      Q.    During your 16 month tenure with GAMN, was
15 there ever a time that y'all renegotiated your terms?
16      A.    We never bought anything else.  My role was
17 still just the Amici's.
18      Q.    Okay.  But there was a point where your salary
19 increased.
20      A.    Right.  When I talked to Ed on the phone was
21 that we'd increase my salary from 60,000 to $72,000
22 after three months.
23      Q.    And I think that was also a term in the
24 employment agreement.  Do you recall that?
25      A.    If you say so, yes.
```

1      Q.    Now, with the employment agreement, there was

2   a code of ethics attached to it.  Even though you didn't

3   sign the employment agreement, would you -- were you --

4   did you have to abide by the code of ethics of the

5   company?

6      A.    I wouldn't know because I didn't read the

7   employment agreement.  I don't -- I don't think I did.

8      Q.    Okay.

9      A.    I wouldn't have seen the code of ethics.

10   I didn't -- my whole thing was about a financial

11   arrangement, not an employment agreement.

12      Q.    Okay.  Do you know whether other employees had

13   to abide by the code of ethics that was set out by GAMN?

14      A.    I'm not quite sure what code of ethics was set

15   out by GAMN.  I mean --

16      Q.    Well, have you -- and you were also a director

17   of GAMN -- you were on the board of directors?

18      A.    Yes.

19      Q.    Now, did you ever read the bylaws for GAMN

20   when you were either the president --

21      A.    Probably.

22      Q.    -- or on the board?

23      A.    Probably.

24      Q.    I'm going to hand you what I'm going to mark

25   as Exhibit 8 -- now, as a director of GAMN, what are

1  your responsibilities?

2      A.    We would have periodic board meetings and talk

3  about the financial condition of the company.  We'd also

4  talk about future M&A.  That's about the scope of what

5  we did.  The meetings -- we only had probably two that I

6  can remember.

7      Q.    And were the meetings in person or were they

8  on the telephone?

9      A.    The first -- I think one of them was on the

10  telephone.  I think we might have had one or two in

11  person --

12      Q.    And --

13      A.    -- in Dallas here.

14      Q.    Okay.  And when you're a director or on the

15  board of a company, do you believe that you owe any

16  duties to the company?

17              MR. ULOTH:  Objection --

18      A.    Explain to me what you're trying to say.

19              MR. ULOTH:  -- form.

20      Q.    (By Ms. Martini)  Well, what -- when -- as a

21  director of the company, it's your job to make sure that

22  everything is happening in the best interest of the

23  company.  Is that fair to say?

24              MR. ULOTH:  Objection, leading --

25      A.    That's fair to say.

ROBERT ANDREOTTOLA 7/30/15

```
 1              MR. ULOTH:  -- legal conclusion.
 2      Q.    (By Ms. Martini)  Well, do you believe that as
 3   a director of a company, that you have a duty of loyalty
 4   to the company?
 5      A.    I have a duty to perform my job for a company.
 6      Q.    Do you have a duty of candor?
 7              MR. ULOTH:  Objection, legal conclusion.
 8      A.    I -- no.  Yes, I guess.
 9      Q.    (By Ms. Martini)  And with that candor, do you
10   believe that that includes a duty to fully disclose
11   anything that you're doing?
12              MR. ULOTH:  Objection, legal conclusion.
13      A.    I'm pretty transparent.
14              MR. ULOTH:  Objection, leading.
15      A.    I disclosed everything in the company.
16      Q.    (By Ms. Martini)  Okay.  But at some point
17   during your tenure with GAMN, you began looking for a
18   new job opportunity?
19      A.    Post GAMN.
20      Q.    Well, when did you first -- 'cause you took a
21   job with AFC, American Franchise.
22      A.    Correct, in August of 2013 -- '12, I mean.
23      Q.    Okay.  When did you -- when were you first
24   contacted by them?
25      A.    April.
```

1    Q.    April of what year?

2    A.    2012.

3    Q.    Who contacted whom?

4    A.    They contacted me.

5    Q.    How did that come about?

6    A.    Picked up the phone and called me.

7    Q.    Did you have a prior relationship with them?

8    A.    Yes, I did.

9    Q.    Well, I mean, they could have used a

10   headhunter.  I --

11   A.    No.

12   Q.    So they telephoned you?

13   A.    Called my cell phone.

14   Q.    Okay.  And what prior relationship did you

15   have with them?

16   A.    I only knew one of the gentlemen, Bill

17   Georgas.  I sold him 44 Applebee restaurants back in

18   2000 and -- I mean, 1998.

19   Q.    And when he contacted -- when he telephoned

20   you in April of 2012, did he say, We're looking for

21   someone, are you interested, or how did that

22   conversation go?

23   A.    He said they were looking to start a company

24   again and get into the tier one restaurant business and

25   would you be interested in probably doing something with

1  us if this comes to fruition.

2      Q.    And what was your response?

3      A.    Keep me in mind.  It wasn't a deal.  There was

4  nothing.  It was just -- he was -- he was fishing.

5      Q.    Okay.  But didn't they close the deal in May

6  of 2012?

7      A.    No.

8      Q.    They didn't acquire 33 Applebee restaurants?

9      A.    No.  They acquired 17 Applebee's restaurants

10  August 12th of 2012 and they acquired 16 on September

11  12th of 2012.

12      Q.    But didn't they fax to you an employment

13  agreement in May of 2012?

14      A.    That was a financial arrangement.  That if I

15  did come to work for them, this is what I was desiring.

16      Q.    And in that agreement, didn't it say that they

17  would -- once they acquired these companies, that you

18  would then come on as a COO?

19      A.    Yes.

20      Q.    So in May of 2012, you were already

21  negotiating a job salary.

22      A.    This is the financial package I'd like if they

23  got a deal done.  They were looking at multiple things

24  and some of the things didn't come to fruition and some

25  things did.

1    Q.   Did you tell anybody at GAMN that you were

2 looking for a job with someone else?

3    A.   I wasn't looking for a job with someone else.

4 They contacted me.  I was still focused on GAMN.

5    Q.   Well, you signed the employment agreement.

6    A.   It was a financial arrangement.  It wasn't an

7 employment agreement.

8    Q.   I'm pretty sure it says across the top

9 employment agreement and not financial arrangement.

10   A.   If you also read into it, it says, This is not

11 an employment agreement in the detail.

12   Q.   Let's take a look.

13   A.   Please do.

14   Q.   Well, let me hand you what I'm gonna mark

15 as Exhibits --

16            THE REPORTER:  You said you were going to

17 mark something as Exhibit 8 last time.

18            MS. MARTINI:  Yeah, we're gonna skip that

19 one for now and make this one 8.

20            THE REPORTER:  Okay.

21            (Deposition Exhibit 8 was marked.)

22   Q.   (By Ms. Martini)  Let me hand you what I've

23 marked as Exhibit 8.  And across the top of that

24 document, what does it say?

25   A.   It says, Employment Agreement.

1    Q.    Okay.   And it's dated what?

2    A.    I'm sorry?

3    Q.    It's dated when?   May of 2012.

4    A.    On the 25th.

5    Q.    Okay.   And is this -- is this your fax number,

6  the 706?

7    A.    Yes, my house fax number.   342-7264.

8    Q.    And it says -- if you turn to Page 4 --

9  it's Defense -- DEF 00048.   And if you look under

10 Services/Title, it says you will be the chief operating

11 officer.   And the services will be -- once the Asset

12 Purchase Agreement is completed.   Then further down, it

13 says for the 33 restaurants being acquired under the

14 APA.

15   A.    Correct.

16   Q.    Did I read that correctly?

17   A.    Uh-huh.   There was no APA.

18   Q.    And then on the very last page, Page 9, is

19 that your signature?

20   A.    Uh-huh.

21   Q.    Okay.   That's your signature on the employment

22 agreement?   Just to be clear.

23   A.    Yes.   And it has not been dated.

24   Q.    Why would you sign an employment agreement

25 with them but not with GAMN?

1        A.    This -- once again, this is a financial
2    arrangement, in my mind.  And as far as GAMN was
3    concerned, Ed, once again, told us there were no
4    employment agreements based on the S-1 registration,
5    number one.  Number two, the fact that we were teeing up
6    other companies like Canyon Cafe to buy.  My term at
7    Amici's was for a specific amount of money.  And as
8    things grew, I'd make different kind of monies.  We'd
9    have to renegotiate again going forward and that's what
10   we agreed upon.

11       Q.    Now, in April of 2012, Ed was trying to obtain
12   financing for GAMN.  Do you recall that?

13       A.    Uh-huh.

14       Q.    And he tried to secure a loan through
15   La Jolla Cove.

16       A.    Uh-huh.

17       Q.    Do you remember that?

18             And he used personal property to secure
19   that loan.

20       A.    That's what he said, yes.

21       Q.    When -- were you aware of that in April?

22       A.    Uh-huh.

23       Q.    Did you tell him then that you had gotten a
24   call from someone and that you were --

25       A.    No, because it was just a call.  There wasn't

1  went to a couple meetings, like, with Robert Hersch and

2  all, but that's not my capacity.  I've never done that.

3      Q.   Do you think that Ed did enough to raise funds

4  for GAMN?

5      A.   Ed tried as best as he could to raise funds

6  for GAMN, but we could not finance this company

7  traditionally.  That means using -- you're leveraging

8  your current cash flow.  That wasn't there, especially

9  with the S-1 filing and all.  And he tried everything he

10  could, but our backs were kind of against the wall.

11      Q.   Now, your role as president, what exactly were

12  your duties?

13      A.   Initially, it was to run the operations and to

14  bring M&A to the organization because I knew the people

15  that we were trying to affiliate ourselves with.  That

16  was the scope of my responsibilities.

17      Q.   Were you also responsible for performing due

18  diligence on any new concepts for acquisition?

19      A.   No.

20      Q.   Were you responsible for creating budgets?

21      A.   For the Amici's, yes.

22      Q.   Were you the acting COO of the company?

23      A.   I wouldn't call it that, no.

24      Q.   What would you call it?

25      A.   Director of operations.  There wasn't scope

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3  THE GREAT AMERICAN        )
    FOOD CHAIN, INC.          )
 4  AND EDWARD SIGMOND        )     CIVIL ACTION
                              )
 5  VS.                       )     NO.: 3:14-cv-1727-L
                              )
 6  ROBERT ANDREOTTOLA        )

 7                      REPORTER'S CERTIFICATION
                 DEPOSITION OF ROBERT ANDREOTTOLA
 8                         JULY 30, 2015

 9           I, Kimberly R. Spurger, a Certified Shorthand

10  Reporter in and for the State of Texas, hereby certify

11  to the following:

12           That the witness, ROBERT ANDREOTTOLA, was duly

13  sworn by the officer and that the transcript of the oral

14  deposition is a true record of the testimony given by

15  the witness;

16           That the original deposition was delivered to

17  Ms. Tanja K. Martini.

18           That a copy of this certificate was served

19  on all parties and/or the witness shown herein on

20  AUGUST 14TH         ;

21           That the amount of time used by each party at the

22  deposition is as follows:

23     MS. TANJA K. MARTINI - 1 HOUR:14 MINUTES
       MR. J. DOUGLAS ULOTH - 2 MINUTES
24     MS. NANCY WURZMAN - 00 HOURS:00 MINUTES

25           I further certify that pursuant to FRCP Rule 30
```

1  (f)(1) that the signature of the deponent:

2  ____ was requested by the deponent or a party

3  before the completion of the deposition and that

4  signature is to be before any notary public and returned

5  within 30 days from date of receipt of the transcript.

6  If returned, the attached Changes and Signature

7  Page contains any changes and the reasons therefore:

8  _X_ was not requested by the deponent or a party

9  before the completion of the deposition.

10  I certify that I am neither counsel for, related

11  to, nor employed by any of the parties or attorneys in

12  the action in which this proceeding was taken, and

13  further that I am not financially or otherwise

14  interested in the outcome of the action.

15  Certified to by me this, the 14th day of August,

16  2015.

17

18  _____

19  Kimberly R. Spurgen, Texas CSR 7709
    Expiration Date:  12.31.16

20  K.R.S. Court Reporting
    4220 Forbes Drive

21  Plano, Texas 75093
    214.232.7422 Telephone

22

23

24

25

```
 1  COUNTY OF DALLAS )
    STATE OF TEXAS  )
 2

 3          I hereby certify that the witness was notified on

 4  _____, 2015, that the witness has 30 days or

 5  (___ days per agreement of counsel) after being notified

 6  by the officer that the transcript is available for

 7  review by the witness and if there are changes in the

 8  form or substance to be made, then the witness shall

 9  sign a statement reciting such changes and the reasons

10  given by the witness for making them:

11          That the witness' signature was/was not returned

12  as of _____.

13          Subscribed and sworn to on this, the ___ day of

14  _____, 2015.

15

16

17

18          _____
            Kimberly R. Spurger, Texas CSR 7709
19          Expiration Date:  12.31.16
            K.R.S. Court Reporting
20          4220 Forbes Drive
            Plano, Texas 75093
21          214.232.7422 Telephone

22

23

24

25
```